**UNITED STATES of America, Plaintiff,**

**Quinault Tribe of Indians on its own behalf and on behalf of the Queets Band of Indians, et al., Intervenor-Plaintiffs,**

v.

**STATE OF WASHINGTON, Defendant,**

**Thor C. Tollefson, Director, Washington State Department of Fisheries, et al., Intervenor-Defendants.**

**Civ. No. 9213.**

United States District Court,
W. D. Washington at Tacoma.

Feb. 12, 1974.

On Question Per Reconsideration Motion
March 22, 1974.

Injunction March 22, 1974.

Stan Pitkin, U. S. Atty., Stuart F. Pierson, Sp. Asst. U. S. Atty., Seattle, Wash., for the U. S.; George D. Dysart, Asst. Regional Sol., U. S. Dept. of the Interior, Portland, Or., of counsel.

David H. Getches, Native American Rights Fund, Boulder, Colo., and John H. Sennhauser, Legal Services Center, Seattle, Wash., for Muckleshoot Indian Tribe, Squaxin Island Tribe of Indians, Sauk-Suiattle Indian Tribe, Skokomish Indian Tribe, Stillaguamish Indian Tribe.

Alvin J. Ziontz, Ziontz, Pirtle, Morisset & Ernstoff, Seattle, Wash., for Makah Indian Tribe, Lummi Indian Tribe, Quileute Indian Tribe.

Michael Taylor, Taholah, Wash., for Quinault Tribe of Indians.

James B. Hovis, Hovis, Cockrill & Roy, Yakima, Wash., for Yakima Indian Tribe.

Lester Stritmatter, Stritmatter & Stritmatter, Hoquiam, Wash., for Hoh Tribe of Indians.

William A. Stiles, Jr., Sedro-Woolley, Wash., for Upper Skagit River Tribe.

Slade Gorton, Atty. Gen., Edward B. Mackie, Deputy Atty. Gen., Olympia, Wash., for State of Wash.

Joseph Larry Coniff, Jr., Asst. Atty. Gen., Dept. of Game, Olympia, Wash., for Game Defendants & Carl Crouse.

Earl R. McGimpsey, Asst. Atty. Gen., Dept. of Fisheries, Olympia, Wash., for Thor Tollefson.

David E. Rhea, Amundson, Rhea & Atwood, Bellingham, Wash., for Wash. Reef Net Owners Ass'n.

Lawrence C. Smith, Smith, Smith & Smith, Spokane, Wash., for amicus curiae The Ass'n of Northwest Steelheaders, Inc.

William N. Moloney, Davis, Wright, Todd, Riese & Jones, Seattle, Wash., for amicus curiae Wash. State Sportsmen's Council, Inc.

T. J. Jones, III, Sp. Counsel, Jones & Jones, Boise, Idaho, for amicus curiae Idaho Fish and Game Dept.

## STATEMENT OF THE CASE

BOLDT, Senior District Judge.

In September, 1970 the United States, on its own behalf and as trustee for several Western Washington Indian Tribes,[1] later joined as intervenor plaintiffs by additional tribes,[2] filed the complaint initiating this action against the State of Washington. Shortly later the State Department of Fisheries (Fisheries) and the State Game Commission (Game), their respective directors, and the Washington Reef Net Owners Association (Reef Net Owners) were included as defendants. By state statute Fisheries is charged with exercising regulatory authority over fishing for all anadromous food fish. Regulation of anadromous steelhead trout is vested in Game. Plaintiffs seek a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 concerning off reservation treaty right fishing within the case area by plaintiff tribes, which long has been and now is in controversy; and for in-

---

1. Hoh Tribe; Makah Tribe, Muckleshoot Tribe; Nisqually Tribe; Puyallup Tribe; Quileute Tribe; Skokomish Tribe.

2. Lummi Tribe; Quinault Tribe; Sauk-Suiattle Tribe; Squaxin Island Tribe; Stillaguamish Tribe; Upper Skagit River Tribe; Yakima Nation.

junctive relief to provide enforcement of those fishing rights as they previously have been or herein may be judicially determined. The case area is that portion of the State of Washington west of the Cascade Mountains and north of the Columbia River drainage area, and includes the American portion of the Puget Sound watershed, the watersheds of the Olympic Peninsula north of the Grays Harbor watershed, and the offshore waters adjacent to those areas.

Plaintiffs also assert claims for relief concerning alleged destruction or impairment of treaty right fishing due to state authorization of, or failure to prevent, logging and other industrial pollution and obstruction of treaty right fishing streams. Separation of those claims for pretrial and trial after trial of the issues determined in this decision was stipulated and approved by the court.

Venue is properly laid in this court under 28 U.S.C. § 1391(b). Jurisdiction is alleged as to all tribes under one or more of the following provisions: 28 U.S.C. §§ 1345, 1331, 1343(3) and (4) and 1362.[3] All of these allegations were conceded by all defendants, subject to their contention that exclusive jurisdiction to hear and determine the issues in this case is in the Indian Claims Commission under 25 U.S.C. §§ 70–70v and Game's denial of jurisdiction as to the Puyallup Tribe. This court has previously held and hereby affirms that both of these contentions are without merit and denied. It is hereby found and held that jurisdiction and venue have been established in all particulars as detailed in Part One of the Final Pretrial Order.

Fisheries contends the Muckleshoot, Stillaguamish and Upper Skagit tribes do not hold a special treaty status to harvest anadromous fish. Game joins in this contention and makes the same contention regarding the Sauk-Suiattle

Tribe. These contentions are considered and denied in the written Findings of Fact and Conclusions of Law.

Shortly after appearance in the action by all defendants the first of a considerable number of pretrial conferences was held. Among many preliminary matters considered at that time were the court's suggestions that so far as possible all tribes, agencies or organizations having or claiming direct or indirect justiciable interest in treaty fishing rights in this judicial district be brought into the case either as parties or as amicus curiae; and that every issue of substantial direct or indirect significance to the contentions of any party be raised and adjudicated in this case. Both suggestions were acceptable to all parties and to a great extent they have been put into effect. Thus every interested agency and organization not joined as a party has had an opportunity to present its views on any of the issues in the case.[4]

For more than three years, at the expenditure by many people of great time, effort and expense, plaintiffs and defendants have conducted exhaustive research in anthropology, biology, fishery management and other fields of expertise, and also have made extreme efforts to find and present by witnesses and exhibits as much information as possible that pertains directly or indirectly to each issue in the case. As a consequence of this extensive pretrial preparation, all parties joined in stipulating to a great many agreed facts which are stated in exhibits or included in the Final Pretrial Order. The Joint Biological Statement, Exhibit JX–2a, jointly proposed and admitted in evidence as agreed facts applicable as indicated therein, was prepared by and agreed to by highly qualified experts employed by and representing both plaintiffs and defendants and is of exceptional impor-

---

3. See Final Pretrial Order paragraph 1.

4. The following agencies or organizations have submitted, or concurred in, written briefs: Idaho Fish & Game Department; Port of Seattle; Washington State Sports-men's Council, Inc.; Northwest Steelheaders, Inc.; Committee to Save Our Fish; Tacoma Sportsmen's Club, Inc.; Tacoma Poggie Club, Inc.; Purse Seine Vessel Owners Association.

tance and practical value. It is believed considerable historic and scientific information never before presented in a case involving treaty rights is now recorded and may prove of value in later proceedings in this case and possibly in others.

To great advantage, all procedures recommended in the Manual for Complex Litigation have been followed by counsel in the particulars and to the extent found applicable and practicable by the court. With approval of court and counsel upon its entry the Final Pretrial Order became the final statement of all issues to be heard and determined in this decision, and pleadings pertaining to those issues passed out of the case, subject only to amendment by the court to prevent manifest injustice. Such amendments have been included in the text of the Final Pretrial Order.

Every attorney in the case has vigorously and effectively presented the particular interests and contentions of each client he represents to the maximum extent professional duty requires. On the other hand there has been a remarkable degree of highly responsible and most commendable cooperation on the part of all counsel throughout trial preparation and trial which has greatly expedited discovery and full presentation of the issues and evidence in the case. All of the legal issues have been researched in depth and effectively presented and argued in the pretrial briefs, and in the final briefs submitted after the presentation of evidence was concluded and before final argument, which also was exceptional in professional quality. By direction of the court all parties either individually or jointly, as they chose, prepared and submitted proposed findings of fact and conclusions of law referenced to the record and also drafts of a proposed decree. Each proposed finding, conclusion and decree has been closely examined and considered by review of the evidence and the portions of the briefs pertaining to each item. All fact findings and legal rulings stated herein and the detailed Findings of

Fact, Conclusions of Law and Decree signed and entered by the court are hereby made a part of this decision.

On January 11, 1974, when Game filed the final version of its proposed findings, conclusions and decree the issues tried were finally submitted for decision.

This court is confident the vast majority of the residents of this state, whether of Indian heritage or otherwise, and regardless of personal interest in fishing, are fair, reasonable and law abiding people. They expect that kind of solution to all adjudicated controversies, including those pertaining to treaty right fishing, and they will accept and abide by those decisions even if adverse to interests of their occupation or recreational activities.

More than a century of frequent and often violent controversy between Indians and non-Indians over treaty right fishing has resulted in deep distrust and animosity on both sides. This has been inflamed by provocative, sometimes illegal, conduct of extremists on both sides and by irresponsible demonstrations instigated by non-resident opportunists.

To this court the evidence clearly shows that, in the past, root causes of treaty right dissension have been an almost total lack of meaningful communication on problems of treaty right fishing between state, commercial and sport fishing officials and non-Indian fishermen on one side and tribal representatives and members on the other side, and the failure of many of them to speak to each other and act as fellow citizens of equal standing as far as treaty right fishing is concerned. Some commendable improvement in both respects has developed in recent years but this court believes high priority should be given to further improvement in communication and in the attitude of every Indian and non-Indian who as a fisherman or in any capacity has responsibility for treaty right fishing practices or regulation. Hopefully that will be expedited

by some of the measures required by this decision.

The ultimate objective of this decision is to determine every issue of fact and law presented and, at long last, thereby finally settle, either in this decision or on appeal thereof, as many as possible of the divisive problems of treaty right fishing which for so long have plagued all of the citizens of this area, and still do.

## I. ESTABLISHED BASIC FACTS AND LAW

(Hereinafter italicize emphasis added unless otherwise indicated)

The first decision of the United States Supreme Court on Indian treaty rights, Cherokee Nation v. Georgia, 5 Pet. 1, 30 U.S. 1, 8 L.Ed. 25, was written by Chief Justice Marshall in 1831. Since then decisions on the same subject matter have been rendered in that court, other federal courts and state courts in a considerable number to the present time.[5] All of the decisions that appear to have direct or indirect application to the present case have been closely reviewed and analyzed, individually and in relation to each other. Based thereon this court finds and holds that the following statements are now well established in fact and law.

1. Art. VI, cl. 2 of the United States Constitution provides:

The "Constitution . . . of the United States . . . and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

2. To the great advantage of the people of the United States, not only in property but also in saving lives of citizens, and to expedite providing for what at the time were immediate and imperative national needs, Congress chose treaties rather than conquest as the means to acquire vast Indian lands. It ordered that treaty negotiations with the plaintiff tribes and others in the Northwest be conducted as quickly as possible. Isaac I. Stevens, Governor of Washington Territory, proved to be ideally suited to that purpose for in less than one year during 1854–1855 he negotiated eleven different treaties, each with several different tribes, at various places distant from each other in this rugged and then primitive area. The treaties were written in English, a language unknown to most of the tribal representatives, and translated for the Indians by an interpreter in the service of the United States using Chinook Jargon, which was also unknown to some tribal representatives. Having only about three hundred words in its vocabulary, the Jargon was capable of conveying only rudimentary concepts, but not the sophisticated or implied meaning of treaty provisions about which highly learned jurists and scholars differ.[6]

In 1899 the United States Supreme Court in considering a similar situation said:

"In construing any treaty between the United States and an Indian tribe, it must always (as was pointed out by the counsel for the appellees) be borne in mind that the negotiations for the treaty are conducted, on the part of the United States, an enlightened and powerful nation, by representatives skilled in diplomacy, masters of a written language, understanding the modes and forms of creating the various technical estates known to their law, and assisted by an interpreter employed by themselves; that the

---

5. The Table of Cases appended hereto includes only all cases which have been cited by any party as authority pertaining to any issue in this case and other cases considered by the court. In the table, the abbreviated title of each case referred to in the decision is italicized.

6. Exhibit (Ex) USA–20, pp 24–29; Finding of Fact (FF) #2.

treaty is drawn up by them and in their own language; that the Indians, on the other hand, are a weak and dependent people, who have no written language and are wholly unfamiliar with all the forms of legal expression, and whose only knowledge of the terms in which the treaty is framed is that imparted to them by the interpreter employed by the United States; and that the treaty must therefore be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians. Worcester v. Georgia, 6 Pet. 515 [8 L.Ed. 483]; The Kansas Indians, 5 Wall. 737, 760 [18 L.Ed. 667]; Choctaw Nation v. United States, 119 U.S. 1, 27, 28 [7 S.Ct. 75, 30 L.Ed. 306, 314, 315] . . . . 'The language used in treaties with the Indians should never be construed to their prejudice.' . . . 'How the words of the treaty were understood by this unlettered people, rather than their critical meaning, should form the rule of construction.' " [7]

In 1905 the above principles were reiterated in *Winans* (198 U.S. p. 380, 25 S.Ct. p. 664):

"And we have said we will construe a treaty with the Indians as 'that unlettered people' understood it, and 'as justice and reason demand, in all cases where power is exerted by the strong over those to whom they owe care and protection,' and counterpoise the inequality 'by the superior justice which looks only to the substance of the right, without regard to technical rules.' [citing *Choctaw* and *Jones*]"

3. The United States Supreme Court in *Missouri* (252 U.S. p. 434, 40 S.Ct. p. 384) stated:

"Valid treaties of course 'are as binding within the territorial limits of the States as they are elsewhere throughout the dominion of the United States.' Baldwin v. Franks, 120 U.S. 678, 683, 7 S.Ct. 656, 32 L.Ed. 766."

■ 4. Each of the basic fact and law issues in this case must be considered and decided in accordance with the treaty language reserving fishing rights to the plaintiff tribes, interpreted in the spirit and manner directed in the above quoted language of the United States Supreme Court. Each treaty in this case contains a provision substantially identical to that in the Medicine Creek treaty: "The right of taking fish, at all usual and accustomed grounds and stations, is further secured to said Indians, in common with all citizens of the territory, and of erecting temporary houses for the purpose of curing, . . ." [8]

5. "The right to resort to the [usual and accustomed] fishing places in controversy was a part of larger rights possessed by the Indians, upon the exercise of which there was not a shadow of impediment, and which were not much less necessary to the existence of the Indians than the atmosphere they breathed. . . . [T]he treaty was not a grant of rights to the Indians but a grant of right from them —a reservation of those not granted." [9]

"And surely it was within the competency of the Nation to secure to the Indians such a remnant of the great rights they possessed as 'taking fish at all usual and accustomed places.' " [10]

■ 6. " . . . [T]he [treaty] negotiations were with the tribe. They reserved rights, however, to every individual Indian, as though named therein. . . . And the right was intended to be continuing against the United States and its grantees as well as against the State and its grantees." [11] That those rights are also reserved to the descend-

---

7. *Jones*, 175 U.S. at 10, 11, 12, 20 S.Ct. at 5; other decisions by the same court containing the same or similar language: *Cherokee, Worcester, Kansas Indians, Winans, Kennedy, Seufert, Tulee*.

8. Text of all treaties FF #1.

9. U.S.Sup.Ct. in *Winans*, 198 U.S. at 381, 25 S.Ct. at 664.

10. Id. at 384, 25 S.Ct. at 665.

11. Id. at 381–382, 25 S.Ct. at 664.

ants of treaty Indians, without limitation in time, excepting as Congress may determine, has been recognized and applied by the United States Supreme Court from the first to the latest decision of that court involving Indian treaty fishing rights.

■■ 7. An *exclusive* right of fishing was reserved by the tribes within the area and boundary waters of their reservations,[12] wherein tribal members might make their homes if they chose to do so. The tribes also reserved the *right* to off reservation fishing "at all usual and accustomed grounds and stations" and agreed that "all citizens of the territory" might fish at the same places "in common with" tribal members. The tribes and their members cannot rescind that agreement or limit non-Indian fishing pursuant to the agreement. However, off reservation fishing by other citizens and residents of the state is not a *right* but merely a *privilege* which may be granted, limited or withdrawn by the state as the interests of the state or the exercise of treaty fishing rights may require.

■ 8. The tribes reserved the right to fish at "*all* usual and accustomed grounds and stations." The words "grounds" and "stations" have substantially different meanings by dictionary definition and as deliberately intended by the authors of the treaty. "Stations" indicates fixed locations such as the site of a fish wier or a fishing platform or some other narrowly limited area; "grounds" indicates larger areas which may contain numerous stations and other unspecified locations which in

the urgency of treaty negotiations could not then have been determined with specific precision and cannot now be so determined. "Usual and accustomed," being closely synonymous words, indicate the exclusion of unfamiliar locations and those used infrequently or at long intervals and extraordinary occasions. Therefore, the court finds and holds that every fishing location where members of a tribe customarily fished from time to time at and before treaty times, however distant from the then usual habitat of the tribe, and whether or not other tribes then also fished in the same waters, is a usual and accustomed ground or station at which the treaty tribe reserved, and its members presently have, the right to take fish.[13]

## II. SUMMARY OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

This summary of the 253 separate detailed Findings of Fact and 48 Conclusions of Law filed herewith is intended as a recital of only the principal categories thereof, several of which are discussed elsewhere in this opinion.

The Findings of Fact set forth the treaties under which each tribe, or its predecessors, negotiated with the United States, and in which the Indians expressly reserved the right to fish at off reservation usual and accustomed fishing places. The pretreaty role of fishing among Northwest Indians is outlined, emphasizing the universal importance of the fishery resource, particularly salmon and steelhead, to Indians in the case area as an element of diet and in

12. This proposition is not denied or challenged by any party in this case. As previously stated in paragraph 4 of the text, the fishing clauses are substantially identical in the treaties of all plaintiff tribes. The fishing clause in the Yakima treaty applies the word "exclusive" to on reservation fishing. Although the word is used in the same context in several other treaties not involved in this case it does not appear in the treaty of any other plaintiff tribe. However, in every case involving a fishing clause substan-

tially similar to that quoted in the text of this decision in which "exclusive" is not present, without exception the United States Supreme Court has assumed that on reservation fishing *is* exclusive and has interpreted and applied similar fishing clauses as though the word "exclusive" was expressly stated therein as in the Yakima treaty. Research has not disclosed any reported decision to the contrary.

13. *Seufert* and see F.F. 10 and 13.

religious practices and trade. The Northwest Indians developed a wide variety of fishing methods which they utilized to catch many varieties of fish at innumerable locations throughout the areas where they lived and traveled.

In the mid-1850's the United States treated with the unlettered Northwest Tribes to acquire great expanses of land. Reluctant to be confined to small reservation bases, the Indian negotiators insisted that their people continue to fish as they had beyond the reservation boundaries. There is no indication that the Indians intended or understood the language "in common with all citizens of the Territory" to limit their right to fish in any way. For many years following the treaties the Indians continued to fish in their customary manner and places, and although non-Indians also fished, there was no need for any restrictions on fishing.

For each of the plaintiff tribes, the findings set forth information regarding the organization and membership of the tribe, and some, but by no means all, of their principal usual and accustomed fishing places. Anthropological data are also presented for several tribes, as well as information concerning present Indian culture and economy. Several tribes are currently involved in fish propagation programs which benefit the tribes and the state.

Fact findings are also presented regarding reef net fishing which show that current non-Indian reef net operations take place at or near the same locations occupied historically by Lummi Indian fishermen.

General fisheries conservation and management data are presented, incorporating the Joint Biological Statement which sets forth many significant facts concerning anadromous fish. Procedures and objectives are outlined for managing salmon and steelhead for commercial, sport and Indian user groups including regulatory schemes promulgated by state authorities and by Indian

tribes. The means and locations used to harvest the resource and the quantity of the harvest are also presented.

The policies and practices of both Fisheries and Game are also presented. Due in part to the nature of the species of fish regulated, Fisheries evidences better success in managing the salmon than does Game with regard to steelhead. Fisheries has also evidenced an attitude of cooperation with the plaintiff tribes that has been lacking from Game, at least prior to *Puyallup-II*.

 The Conclusions of Law, after stating the basis of jurisdiction and venue, establish the treaty status of each of the plaintiff tribes, and therefore, the right of their members to fish off reservation in common with the citizens of the state. The fishing right was reserved by the Indians and cannot be qualified by the state. The state has police power to regulate off reservation fishing only to the extent reasonable and necessary for conservation of the resource. For this purpose, conservation is defined to mean perpetuation of the fisheries species. Additionally, state regulation must not discriminate against the Indians, and must meet appropriate due process standards.

 The Yakima Nation and the Quinault Tribe are presently qualified to self-regulate the off reservation fishing of their tribal members. Other tribes may similarly self-regulate member fishing if and when they meet the qualifications and conditions set forth in the decision.

 Several current state laws and regulations which restrict the time, place, manner and volume of off reservation fishing by treaty tribes, and reserve game fish for sport interests, have not been established as reasonable and necessary for conservation and the application thereof to plaintiff tribes is unlawful. The court will retain continuing jurisdiction of this case to grant such further relief as the court may find appropriate.

## III. STATE REGULATION OF OFF RESERVATION TREATY RIGHT FISHING

There is neither mention nor slightest intimation in the treaties themselves, in any of the treaty negotiation records or in any other credible evidence, that the Indians who represented the tribes in the making of the treaties, at that time or any time afterward, understood or intended that the fishing rights reserved by the tribes as recorded in the above quoted language would, or ever could, authorize the "citizens of the territory" or their successors, either individually or through their territorial or state government, to qualify, restrict or in any way interfere with the full *exercise* of those rights. All of the evidence is overwhelmingly to the contrary, particularly in the vivid showing in the record that the treaty Indians pleaded for and insisted upon retaining the *exercise* of those rights as essential to their survival. They were given unqualified assurance of that by Governor Stevens himself without any suggestion that the Indians' *exercise* of those rights might some day, without authorization of Congress, be subjected to regulation by non-Indian citizens through their territorial or state government.[14]

For several decades following negotiation and ratification of the treaties all of the tribes extensively exercised their treaty rights by fishing as freely in time, place and manner as they had at treaty time, totally without regulation or any restraint whatever, excepting only by the tribes themselves in strictly enforcing tribal customs and practices which, during that period and for innumerable prior generations, had so successfully assured perpetuation of all fish species in copious volume. The first

other than naturally caused threat to volume or species came from non-Indian population growth and non-Indian industrial development in the rapid westward advance of civilization.[15]

In the final pretrial order in this case issues were raised therein by the contentions of several tribes later joined by the remaining plaintiff tribes that: (a) the state police power dicta followed by the United States Supreme Court are not sound in legal logic or principle, and (b) even if so, state regulation of the exercise of Indian off reservation treaty fishing rights must be denied in "justice and reason, looking to the substance of the rights reserved as understood by the Indians who negotiated the treaties, without regard to technical rules," as all American courts for a century or more have been repeatedly admonished by the United States Supreme Court in the same or similar language.[16]

In addition to raising the above stated issues in the final pretrial order, the tribes have submitted well researched briefs and vigorous oral argument in support thereof. That the contentions are not without at least color of merit in judicial and scholarly support is shown by a decision of the Supreme Court of Idaho,[17] the judicial views of at least one highly respected Washington State Supreme Court Judge[18] and a scholarly article in The University of Washington Law Review written by a Law Professor of that University and other similar articles.[19]

No federal decision or state decision cited to this court has directly and specifically interpreted the clause "in common with all citizens of the Territory" as, in itself, directly or impliedly justifying state police power regulation of off reservation treaty right fishing, or

14. Ex. USA–20 pp 24–29, 42–43; FF #2.

15. Ex. USA–20, pp 39–42; FF #2.

16. See footnote 7.

17. *Arthur.*

18. Donworth dissenting in *McCoy* (p. 439, 378 P.2d 942) and *Game-I* (70 Wash.2d p.

263, 422 P.2d 754); and in *Satiacum* (50 Wash.2d p. 529, 314 P.2d 400) a 4–4 decision.

19. R. Johnson, 47 U.Wash.L.Rev. 207 (1972); C. Hobbs, 37 Geo.Wash.L.Rev. 1251 (1969); Comment, 59 U.Calif.L.Rev. 485 (1971).

has specifically stated or even indicated any federal source of or basis for such state power.

Under these circumstances and the facts hereinabove recited, judicial integrity requires that this court must give the tribes' above stated contentions serious consideration and specific determination.

The first decision of the United States Supreme Court, later cited by the same court as authority for state regulation of treaty right fishing, is *Ward*. On that subject unquestionably the decision was obiter dictum because: (a) the Indian hunting rights reserved in the treaty in question were limited to specifically designated areas outside of which Race Horse hunted, for which he was imprisoned and from which he sought enlargement by habeas corpus; and (b) because later in the opinion it was held the treaty hunting rights in question had been finally terminated by Congress prior to the allegedly criminal hunting by Race Horse.

The only statement in *Ward* in either the majority or minority opinions that could possibly justify later citation of the decision as applicable to treaty right fishing was the single sentence 163 U.S. on page 507, 16 S.Ct. on page 1076:

"The power of a state to control and regulate the taking of game cannot be questioned. Geer v. Connecticut, 161 U.S. 519, [16 S.Ct. 600, 40 L.Ed. 793."

However, in the next preceding paragraph of the majority opinion in *Ward* two sentences before the sentence just quoted, the majority opinion stated:

" . . . the sole question which the case presents is whether the treaty made by the United States with the Bannock Indians gave them the right to exercise the hunting privilege, therein (the treaty) referred to within the limits of the state of Wyoming in violation of its laws. If it [the treaty] gave such right, the mere fact that the state had created school districts or election districts, and had

provided for pasturage on the lands, could no more efficaciously operate to destroy the right of the Indian to hunt on the lands *than could passage of the [state] game law."*

This statement, even if it too be a dictum, is far more sound in treaty law applicable to fish and game regulation than the first statement quoted above.

Thus the second statement in *Ward*, quoted in the paragraph above to the effect that exercise of treaty right hunting cannot be controlled by state regulatory laws would appear to be compelling, or at least equal, authority for denying state regulation, not authorized by Congress, of Indian fishing off reservation as specified in existing treaties which expressly record and recognize reservation of that right by the Indian tribes.

In *Geer*, Mr. Justice White, speaking for a 5–2 majority traced in detail principles pertaining to the taking of *ferae naturae* down through the ages from Solon of ancient Athens to 1895, but treaty rights were not involved in that case or even mentioned in any way whatever in the exhaustive opinion. The only issue decided in *Geer* was the holding that it was not unconstitutional for Connecticut to allow, by regulation, killing of birds within the state during a designated open season, and to permit such birds, when so killed, to be used, sold and bought for use within the state, but forbid their transportation beyond the state. Hence the statement in *Geer* as well as that in *Ward*, on the subject of off reservation treaty right fishing, were both purest dicta.

*Ward* was not cited in *Winans*, wherein state power to regulate off reservation treaty fishing was assumed without any explanation or citation of authority. That subject was mentioned only in the concluding clause of a sentence (198 U. S. p. 384, 25 S.Ct. p. 665):

" . . . nor does it [the right to take fish] restrain the state unreasonably, if at all, in the regulation of the right."

*Geer, Ward, Patsone* and *Lacoste* are cited in footnote #2 of *Tulee* (315 U.S. p. 683, 62 S.Ct. 864) as supporting the only statement in that opinion referring to the state power to regulate off reservation fishing:

"Relying upon its broad powers to conserve game and fish within its borders, (2) however, the state asserts that its right to regulate fishing may be exercised at places like the scene of the alleged offense, which, although within the territory originally ceded by the Yakimas, is outside of their reservation."

In *Patsone* the United States Supreme Court reviewed the conviction of an alien for possession of a shotgun in violation of a state criminal statute. One of the two defenses presented and determined in the decision was based on provisions of a United States treaty with Italy. The treaty provisions and facts in *Patsone* are totally dissimilar to those in the present case and nothing in the holdings or language in the opinion directly or by implication would legally authorize state regulation of a federally guaranteed civil right which is expressly stated in a treaty and the exercise of which right could not possibly endanger the personal safety of any resident of the State.

Treaty rights were in no way involved in *Lacoste*. The only statment in that decision (263 U.S. p. 549, 44 S.Ct. 186) concerning state police power to regulate the taking of wild animals is supported by citation of *Geer, Ward, Kennedy* and other decisions having only remote applicability in either fact or law to the present case.

The remaining treaty right fishing decisions of the United States Supreme Court are *Puyallup-I* and *Puyallup-II*. Thus until *Puyallup-I* was decided in 1968 there was neither judicial analysis nor citation of a non-dictum decision supporting police power state regulation of the exercise of Indian off reservation treaty right fishing in any Supreme Court decision because all previous Supreme Court references to that subject were either based solely on the reiterated dicta discussed above or assumed such authority without discussion of its basis or indication of its source.

In support of a statement in *Puyallup-I* (391 U.S. p. 399, 88 S.Ct. 1725) concerning state regulation of treaty fishing outside of reservations the United States Supreme Court cited *Winans* and *Kennedy* as forerunners of *Tulee* and quoted portions of all three. As indicated above herein, the *Tulee* and *Winans* quotations were dicta.

In *Kennedy*, a habeas corpus proceeding, Indian lands were transferred by the Seneca Tribe to private ownership in a 1797 treaty containing a provision which permitted the Seneca Indians to fish in waters on the lands conveyed "at will, and at all seasons of the year, regardless of the provisions of the game laws of the State of New York." Shortly after that conveyance the lands were resold and continued in private ownership to the time of *Kennedy*, decided in 1915. That decision cites *Geer* and *Ward* as the sole basis for its statement (241 U.S. p. 562, 36 S.Ct. p. 707) that "it is not to be doubted that the power to preserve fish and game within its borders is inherent in the sovereignty of the state . . ." *Kennedy* paraphrases *Winans* for more than *Winans* held and quotes the same passing reference to regulation in *Winans* previously quoted above.[20] Most significant of all, it is stated in the very *Kennedy* language quoted in *Puyallup-I* (391 U.S. pp. 399–400, 88 S.Ct. p. 1729) that the fishing clause in the treaty conveyance "is fully satisfied by considering it a reservation of a *privilege* of fishing . . ." subject to state regulation. If at this time anything concerning treaty fishing rights should be beyond doubt or question it is the basic principle that the treaty fishing of plaintiff

---

**20.** " . . . nor does it restrain the state unreasonably, if at all, in the regulation of the right." (198 U.S. p. 384, 25 S.Ct. p. 665)

tribes in this case is a reserved *right* and not a *mere privilege*. The treaty fishing in *Kennedy* was held to be only a *privilege* under the peculiar facts of that case. Nothing faintly comparable to those facts can be found in either *Puyallup-I* or the present case.

Another statement in *Puyallup-I* (391 U.S. p. 398, 88 S.Ct. p. 1728) concerning police power regulation, without analysis other than as stated therein, or citation of a non-dictum authority, is:

> "Moreover, the right to fish at those respective [usual and accustomed] places is not an exclusive one. Rather it is one 'in common with all citizens of the territory.' Certainly the right of the latter may be regulated. And we see no reason why the right of the Indians may not also be regulated by an appropriate exercise of the police power of the State."

This statement seems to say that because a state has police power to regulate fishing *privileges* which the state has granted and may limit or entirely withdraw, that is somehow a legal reason for state regulation of federal fishing *rights* which are expressly reserved in a treaty which only Congress has authority to limit or modify. If that seeming non sequitur be the law it certainly is deserving of more specific legal analysis and justification than it has ever had in any United States Supreme Court decision.

In *Puyallup-I* it is also stated (391 U. S. p. 398, 88 S.Ct. p. 1728):

> "The *right* to fish 'at all usual and accustomed' places *may, of course, not be qualified by the State*, even though all Indians born in the United States are now citizens of the United States. [citations] But the manner of fishing, the size of the take, the restriction of commercial fishing, and the like may be regulated by the State in the interest of conservation, provided the regulation meets appropriate standards

and does not discriminate against the Indians."

That a treaty *right*, guaranteed as the supreme law of the land by the Federal Constitution, can not be "qualified" (i.e. "in some way limited or modified") [21] by a state but the *exercise* of the right may be limited or modified by state regulation, especially when these seemingly conflicting propositions are stated in consecutive sentences, is very difficult to comprehend. The practical effect of a difference between *having* a constitutional right but only a limited right to *exercise* it certainly could not have been understood and accepted by the "unlettered" Indians who negotiated the treaties and it must be little less impossible for their somewhat more sophisticated present-day descendants to comprehend and accept.

Mindful that treaty fishing is a right, not a mere privilege, the following sentence from *Murdock*, quoted in a footnote (p. 402, 88 S.Ct. p. 1730) of Puyallup-I, seems pertinent :

> "The power to tax the exercise of a privilege is the power to control or suppress its enjoyment."

As stated by the United States Supreme Court in *Winans* (198 U.S. pp. 381–382, 25 S.Ct. 662), treaty fishing rights are personal rights held and exercised by individual tribe members. Although the exercise of that particular civil treaty right may be limited or modified in any particular or to any extent by or with authority of Congress,[22] that the exercise of such a right may be limited in any way by the police power of a state, without having previously received authority to do so from Congress, seems to be diametrically opposed to relevant treaty law and personal civil rights decisions, particularly those of recent years.

In the *Puyallup-II* decision, decided less than three months ago, it was stated (414 U.S. p. 2, 94 S.Ct. p. 332):

> "The sole question tendered in the present cases concerns the regulations

---

21. Webster's Third New International Dictionary of the English Language, 1961 Ed. (p 1858)

22. *Lone Wolf* citing other Supreme Court decisions to the same effect.

of the Department of Game concerning steel head trout."

Other than by recital or quotations from *Puyallup-I* and State Supreme Court decisions, in *Puyallup-II* there was no discussion of or ruling upon the basis of state police power to regulate off reservation treaty right fishing unless it be derived from the next to the last paragraph in the opinion of Justice Douglas (pp. 5–6, 94 S.Ct. p. 333):

"We do not imply that these fishing rights persist down to the very last steel head in the river. Rights can be controlled by the need to conserve a species; and the time may come when the life of a steel head is so precarious in a particular stream that all fishing should be banned until the species regains assurance of survival. The police power of the State is adequate to prevent the steel head from following the fate of the passenger pigeon; and the Treaty does not give the Indians a federal right to pursue the last living steel head until it enters their nets."

Whatever the above quoted statement may have added to or taken from the right to exercise the off reservation treaty fishing rights of the plaintiff tribes, to the present time there never has been either legal analysis or citation of a non-dictum authority in any decision of the Supreme Court of the Land in support of its decisions holding that *state* police power may be employed to limit or modify the exercise of rights guaranteed by national treaties which the federal Constitution mandates must be considered and applied as "the supreme Law of the Land."

From the above summary of the United States Supreme Court decisions it is clear the following 1971 comment by the Washington State Supreme Court[23] is not overstated:

"Surprisingly little judicial attention, we note, has been given to this rather standard treaty language [in the fishing rights clause of Indian treaties]."

It also appears that the United States Supreme Court has exercised a prerogative specifically reserved by and to Congress in the treaties. Congress has never exercised its prerogative to either limit or abolish Indian treaty right fishing. In recent years it declined to do the latter by three times failing to enact proposed legislation for the termination of Indian treaty fishing rights.[24] It may be that the refusal or failure of Congress to exercise a specific prerogative, by enactment of legislation, would legally justify judicial exercise of that particular prerogative. If so, it has never been stated or indicated in any United States Supreme Court decision as the basis or source of authority for the federal judicial decisions authorizing state regulation of off reservation treaty fishing rights.

■■■ Since Congress has the power to qualify or revoke any treaty or any provision thereof,[25] unquestionable federal authority is available to provide federal regulation, or to authorize state regulation, for the protection of fishery resources against any threatened or actual harm that might arise from off reservation treaty right fishing by tribal members limited *only* by tribal regulation.[26] In these circumstances it is unfortunate, to say the least, that

23. *Moses–II*, 79 Wash.2d at p. 108, 483 P.2d p. 834.

24. H.R.J. Res. 698, 87th Cong., 2d Sess. (1962); H.R.J.Res. 48, 88th Cong., 1st Sess. (1963); S.J.Res. 170 & 171, 88th Cong., 2d Sess. (1964) All have died in committee.

25. See footnote 22.

26. With a single possible exception testified to by a highly interested witness (FF #102) and not otherwise substantiated, notwithstanding three years of exhaustive trial preparation, neither Game nor Fisheries has discovered and produced any credible evidence showing any instance, remote or recent, when a definitely identified member of any plaintiff tribe exercised his off reservation treaty rights by any conduct or means detrimental to the perpetuation of any species of anadromous fish.

state police power regulation of off reservation fishing should be authorized or invoked on a legal basis never specifically stated or explained. This is particularly true because state regulation of off reservation treaty right fishing is highly obnoxious to the Indians and in practical application adds greatly to already complicated and difficult problems and may stimulate continuing controversy and litigation long into the future.

Having the judicial duty to independently research, consider and fairly appraise the tribes' contentions concerning state regulation of off reservation treaty right fishing, this court has intended and attempted to do that as conscientiously and thoroughly as possible within the personal capabilities of the author of this decision. The results of that effort are above stated as directly and briefly as the subject matter appeared to permit.

■ In the opinion of this court, judicial integrity also requires this court to hold that the tribes' contention that the state does not have legal authority to regulate the exercise of their off reservation treaty right fishing must be and hereby is denied by this court. The basis of this ruling is the indisputable and unqualified duty of every federal circuit or trial judge, despite academic or personal misgivings, to enforce and apply every principle of law as it is directly stated in a decision of the United States Supreme Court. Recently the United States Supreme Court in *Puyallup-I* and *Puyallup-II* directly and specifically held that Washington has the power to regulate off reservation treaty right fishing in the particulars and to the extent indicated in those decisions, which holding continues in effect unless and until overruled or modified by that court or by Congress. Accordingly, each of the rulings on specific issues in this case stated in Section IV of this decision

has been considered and determined on that basis.

## IV. RULINGS ON MAJOR ISSUES IN THIS CASE

■ 1. In the detailed Findings of Fact and Conclusions of Law on file herein this court has found and held and hereby reaffirms that each of plaintiff tribes in this case, including each of the tribes whose status as such was challenged by some or all defendants, has established its status as an Indian tribe recognized as such by the federal government and therefore is entitled to maintain this action for relief based on a treaty of the United States negotiated by and for the tribe, its members at that time and their descendants.

■ An appeal from a district court decision holding that the Puyallup reservation no longer exists has not yet been determined. However, in *Menominee* (1968) the United States Supreme Court held that termination of a tribal reservation established pursuant to a treaty did not extinguish hunting and fishing rights, reserved in the treaty by implication, or impair the exercise of such rights within the area of the terminated reservation. In the opinion of this court, treaty right fishing within the area of a former Indian reservation cannot be *exclusive* when that reservation no longer exists, but such fishing must be "in common with" non-treaty right fishermen. It is so found and held and hereby shall be applicable to any plaintiff tribe, the reservation of which has been or hereafter may be terminated.

■ 2. Ever since the first Indian treaties were confirmed by the Senate, Congress has recognized that those treaties established self-government by treaty tribes, excepting only as limited in the treaties, judicial interpretation thereof or by Congress. This basic principle was confirmed in the first

---

Unfortunately, insinuations, hearsay and rumors to the contrary, usually but not always instigated anonymously, have been and still are rampant in Western Washington.

Indeed, the near total absence of substantial evidence to support these apparent falsehoods was a considerable surprise to this court.

United States Supreme Court decision dealing with such a treaty[27] and has always been expressly or impliedly reaffirmed when applicable in every succeeding decision of that court. There was a period during which Congress enacted legislation limiting the exercise of tribal autonomy in various particulars. However, in the last decade Congressional legislation has definitely been in the contrary direction, notably in the so-called "Indian Civil Rights Act."[28] Among other measures in that Act encouraging the exercise of tribal autonomy are those providing for enlarged jurisdiction of tribal courts, pursuant to which special training of tribal judges and other court personnel has been in progress for some time and still continues.

■ These measures and others make plain the intent and philosophy of Congress to increase rather than diminish or limit the exercise of tribal self-government.

The right to fish for all species available in the waters from which, for so many ages, their ancestors derived most of their subsistence is the single most highly cherished interest and concern of the present members of plaintiff tribes, with rare exceptions even among tribal members who personally do not fish or derive therefrom any substantial amount of their subsistence. The right to fish, as reserved in the treaties of plaintiff tribes, certainly is the treaty provision most frequently in controversy and litigation involving all of the tribes and numerous of their individual members for many years past.

The philosophy of Congress referred to above and the evidence in this case as a whole clearly indicate to this court that the time has now arrived, and this case presents an appropriate opportunity, to take a step toward applying congressional philosophy to Indian treaty right fishing in a way that will not be inconsistent with *Puyallup-I* and *Puyallup-II* and also will provide ample security for the interest and purposes of conservation.

■ In all the circumstances shown by the evidence, including those briefly sketched above, this court hereby finds and holds that any one of plaintiff tribes is entitled to exercise its governmental powers by regulating the treaty right fishing of its members without any state regulation thereof; PROVIDED, however, the tribe has and maintains the qualifications and accepts and abides by the conditions stated below. If, as to any plaintiff tribe, any one of such qualifications and conditions is not determined by the court in this decision on the evidence in this case, establishment of the qualifications and conditions of each other plaintiff tribe shall be determined either to the satisfaction of both Fisheries and Game, or upon hearing by or under direction of the court. When the qualifications and conditions of a tribe have been fully established in the manner indicated, that tribe shall be relieved of state regulation except to the extent specified in the below stated conditions. Failure of a tribe either to maintain its required qualifications or to abide by and adhere to prescribed conditions, when established and not promptly corrected, shall suspend self-regulation by such tribe until such time as all required qualifications and conditions are fully established.

To qualify for self-regulation of off reservation treaty right fishing as above provided, a tribe must establish to the satisfaction of either Fisheries and Game or the court, that the tribe has each of the following qualifications and that the tribe will accept and abide by each of the following conditions.

## QUALIFICATIONS

The tribe shall have:

(a) Competent and responsible leadership.

---

27. *Cherokee*, 30 U.S. p. 15 et seq. (1831)

28. Pub.L. #90–284 Title II–VII; 82 Stat. pp. 77–81 (1968)

(b) Well organized tribal government reasonably competent to promulgate and apply tribal off reservation fishing regulations that, if strictly enforced, will not adversely affect conservation.

(c) Indian personnel trained for and competent to provide effective enforcement of all tribal fishing regulations.

(d) Well qualified experts in fishery science and management who are either on the tribal staff or whose services are arranged for and readily available to the tribe.

(e) An officially approved tribal membership roll.

(f) Provision for tribal membership certification, with individual identification by photograph, in a suitable form that shall be carried on the person of each tribal member when approaching, fishing in or leaving either on or off reservation waters.

## CONDITIONS

The tribe shall:

(a) Provide for full and complete tribal fishing regulations which, before adoption, have been discussed in their proposed final form with Fisheries and Game, and include therein any state regulation which has been established to the satisfaction of the tribe, or upon hearing by or under direction of this court, to be reasonable and necessary for conservation.

(b) Permit monitoring of off reservation Indian fishing by Fisheries and Game to the extent reasonable and necessary for conservation.

(c) Provide fish catch reports, as to both on and off reservation treaty right fishing, when requested by Fisheries or Game for the purpose of establishing escapement goals and other reasonable and necessary conservation purposes.

All parties in this case agree that on reservation fishing is not subject to state regulation and no issue to the contrary is presented in this case. Indeed, any contention to the contrary would be diametrically opposed to the Indian self-government intent and philosophy of Congress. However, state regulation of off reservation fishing to the extent reasonable and necessary for conservation requires that Fisheries and Game must have all information essential to such limited regulation. From the evidence in this case, the court hereby finds and holds that recording the number of fish taken in treaty right fishing, both on and off reservation, is essential to reliable estimates of future run sizes which are necessary for reasonably accurate calculation of spawning escapement requirements and for the allocation of harvestable fish as provided in this decision.

The lack of adequate, or any, approved identification of treaty right fishermen long has and now does seriously interfere with their fishing and hampers enforcement of both tribal and state regulations reasonable and necessary for conservation. Therefore, each of plaintiff tribes, self-regulated or not, is hereby directed to provide as promptly as practicable both (a) certification and identification of its tribal fishermen as specified in ¶ (f) of the above stated Qualifications; and also (b) fish catch returns as specified in ¶ (c) of the above stated conditions.

The uncontradicted evidence shows that for a considerable time the Quinault and Yakima tribes have adopted and effectively enforced tribal fishing regulations which in some material respects are more restrictive than the regulations of Fisheries and Game. To a considerable extent those tribes have consulted and cooperated with Fisheries and Game in matters pertaining to responsible regulation of Indian fishing. In the Findings of Fact and Conclusions of Law on file herein the court has found, held and hereby confirms that the evidence in this case clearly estab-

lishes that both the Quinault and Yakima Tribes for a considerable time have had, and now have, each of the above stated ·Qualifications, other than (f), and have provided or permitted each of the above stated Conditions, other than (c). The items excepted can and the court believes will be promptly supplied by both tribes; and when accomplished, the Quinault and Yakima Tribes shall be entitled to exercise their treaty fishing rights without any state regulation thereof, except as hereinabove provided.

The evidence indicates several other plaintiff tribes have capacity for, and are not far from, achievement of the same status, which potentially is within the capability of every plaintiff tribe.

 3. Although state police power permits state regulation of the exercise of off reservation treaty fishing rights, under all of the United States Supreme Court decisions cited or quoted hereinabove there can be no doubt that it is *not* within the province of state police power, however liberally defined, to deny or "qualify" rights which are made the supreme law of the land by the federal constitution. Therefore, in each specific particular in which the state undertakes to regulate the exercise of treaty right fishing, all state officers responsible therefor must understand that the power to do so must be interpreted narrowly and sparingly applied, with constant recognition that *any* regulation will restrict the exercise of a right guaranteed by the United States Constitution. Every regulation of treaty right fishing must be strictly limited to specific measures which before becoming effective have been established by the state, either to the satisfaction of all affected tribes or upon hearing by or under direction of this court, to be reasonable and necessary to prevent demonstrable harm to the actual conservation of fish.

 To clearly identify state treaty right fishing regulations and to make them more readily understood and usable by plaintiff tribes and others inter-ested therein such regulations shall be published either separate and apart from other state fishing regulations or as a separate and plainly labeled part thereof readily distinguishable from other fishing regulations.

4. However broadly the word may be used and applied in the theory and practice of fisheries science and management, "conservation" as used in Supreme Court decisions and herein is limited to those measures which are reasonable and necessary to the perpetuation of a particular run or species of fish. In this context, as well as by dictionary definition, "reasonable" means that a specifically identified conservation measure is appropriate to its purpose; and "necessary" means that such purpose in addition to being reasonable must be essential to conservation.

 5. The state having the burden of proof aș above indicated, no regulation applied to off reservation treaty fishing can be valid or enforceable unless and until it has been shown ·reasonable and necessary to conservation as above defined. The arrest of, or seizure of property owned or in permitted custody of, a treaty right fisherman under a regulation not previously established to be reasonable and necessary for conservation, is unlawful and may be actionable as to any official or private person authorizing or committing such unlawful arrest or seizure.

 6. If alternative means and methods of reasonable and necessary conservation regulation are available, the state cannot lawfully restrict the exercise of off reservation treaty right fishing, even if the only alternatives are restriction of fishing by non-treaty fishermen, either commercially or otherwise, to the full extent necessary for conservation of fish.

 7. In *Arizona* the United States Supreme Court held that irrigation water rights reserved by implication in an Indian treaty could only be limited in amount to the total reasonably required by the needs of the treaty tribe

as determined from time to time indefinitely in the future. That holding cannot be distinguished in principle or application from the fishing rights specifically reserved by the plaintiff tribes and recognized by the United States in the treaties. Since tribal on reservation treaty right fishing is exclusive, fish taken on reservation shall not be included in any allocation of fish between treaty and non-treaty fishermen. Therefore, the *amount* or *quantity* of any species of fish that may be taken off reservation by treaty right fishing during a particular fishing period can only be limited by either:

(a) The number of fish required for spawning escapement and any other requirements established to be reasonable and necessary for conservation, and

(b) The number of harvestable fish non-treaty fishermen may take at the tribes' "usual and accustomed grounds and stations" while fishing "in common with" treaty right fishermen.

As used above, "harvestable" means the number of fish remaining to be taken by any and all fishermen, at usual and accustomed grounds and stations, after deducting the number of fish required for spawning escapement and tribal needs.

■ *Arizona* was concerned with the amount of water impliedly reserved for the use of the treaty tribe and it was held they were entitled to the full amount required to serve their needs. In the present case a basic question is the amount of fish the plaintiff tribes may take in off reservation fishing under the express reservation of fishing rights recorded in their treaties. The evidence shows beyond doubt that at treaty time the opportunity to take fish for personal subsistence and religious ceremonies (FF ## 3, 6) was the single matter of utmost concern to all treaty tribes and their members. The extent of taking fish by tribal members for these purposes is now less than in former times but for a substantial number of tribal members at or near poverty level their need in these particulars is little, if any, less than it was for their ancestors. For these reasons the court finds that the taking of fish for ceremonial and subsistence purposes has a special treaty significance distinct from and superior to the taking of fish for commercial purposes and therefore fish taken to serve ceremonial and subsistence needs shall not be counted in the share of fish that treaty right fishermen have the opportunity to take. Such needs shall be limited to the number of fish actually used for: (a) Traditional tribal ceremonies; and (b) Personal subsistence consumption by tribal members and their immediate families.

■ By dictionary definition and as intended and used in the Indian treaties and in this decision "in common with" means *sharing equally* the opportunity to take fish[29] at "usual and accustomed grounds and stations"; therefore, non-treaty fishermen shall have the opportunity to take up to 50% of the harvestable number of fish that may be taken by all fishermen at usual and accustomed grounds and stations and treaty right fishermen shall have the opportunity to take up to the same percentage of harvestable fish, as stated above.

While emphasizing the basic principle of *sharing equally in the opportunity to take fish* at usual and accustomed grounds and stations, the court recognizes that innumerable difficulties will arise in the application of this principle to the fisheries resource. For the present time, at least, precise mathematical equality must give way to more practical means of determining and allocating the harvestable resource, with the methodology of allocation to be developed and modified in light of current data and future experience. However, it is

---

29. The court has found and hereby affirms that Indians fished for commercial purposes at and prior to treaty times and have the right to do so now and in the future. If and when any question is raised by any party pertaining to commercial fishing by Indians, it will be heard and determined by the court. (FF #7).

necessary at the outset to establish the scope of the anadromous fish resource which is subject to being "shared equally." The amount of fish of a particular species, from which the harvestable portions allocable to treaty right fishermen and non-treaty right fishermen are to be determined, is not merely the number of harvestable fish of that species which pass through the usual and accustomed fishing places of the various treaty tribes.

It is uncontroverted in the evidence that substantial numbers of fish, many of which might otherwise reach the usual and accustomed fishing places of the treaty tribes, are caught in marine areas closely adjacent to and within the state of Washington, primarily by non-treaty right fishermen. [Ex. F–6, 7; PL–67(b)–(c); JX–2(a), pp. 125–135; Figs. 49–54, Tables 34–60]. These catches reduce to a significant but not specifically determinable extent the number of fish available for harvest by treaty right fishermen. A considerable amount of this harvest is beyond any jurisdiction or control of the State. Some of this harvest is subject to limited state control because the landings are made in areas of state jurisdiction. A considerable number of fish taken within the territorial waters of Washington are under the regulatory authority of the International Pacific Salmon Fisheries Commission, an international body established by treaty between the United States and Canada. While the defendants cannot determine or control the activities of that Commission, the Washington Department of Fisheries does have some input into development of the harvest program which is prescribed or permitted by that Commission, particularly as it pertains to harvest within Washington waters. The Commission is essentially concerned with assuring adequate spawning escapement from runs subject to its jurisdiction and equal division of the harvestable portion between the two countries. Its control over times, places and manner of harvest is designed to accomplish those results. [Ex. JX–2a, § 2.-14, pp. 103–104; and the Commission's annual report for 1971]. Consequently, while it must be recognized that these large harvests by non-treaty fishermen cannot be regulated with any certainty or precision by the state defendants, it is incumbent upon such defendants to take all appropriate steps within their actual abilities to assure as nearly as possible an equal sharing of the opportunity for treaty and non-treaty fishermen to harvest every species of fish to which the treaty tribes had access at their usual and accustomed fishing places at treaty times. Some additional adjustments in the harvesting scheme under state jurisdiction may be necessary to approach more nearly an equal allocation of the opportunity to harvest fish at usual and accustomed grounds and stations.

Therefore, this court finds and holds that the amount of fish of each species from which the harvestable portions shall be determined for the purposes of allocation consistent with this opinion shall be:

1. The total number of fish within the regulatory jurisdiction of the State of Washington which, absent harvest en route, would be available for harvest at the treaty tribes' usual and accustomed fishing places; plus

2. An additional equitable adjustment, determined from time to time as circumstances may require, to compensate treaty tribes for the substantially disproportionate numbers of fish, many of which might otherwise be available to treaty right fishermen for harvest, caught by non-treaty fishermen in marine areas closely adjacent to but beyond the territorial waters of the State, or outside the jurisdiction of the State, although within Washington waters.

It is suggsted in *Puyallup-II* that a distinction between native and propagated steelhead should be made in computing the allocation of fish to off reservation treaty right and to non-treaty right fishing. This appears to present many difficulties and problems which must be considered and determined with all deliberate speed, by

agreement or by judicial decision. Discharge of that responsibility appears to be within the jurisdiction of this court by issues all parties have submitted to this court in the Final Pretrial Order in this case. However, under the *Puyallup-II* mandate to the State Supreme Court it appears appropriate to this court that the state courts hear and determine the matter referred to, at least in the first instance.

8. Certain issues in this case are specified in the Final Pretrial Order which involve reef net fisheries. The only parties in this case directly concerned with these issues are the defendant Reef Net Owners and the plaintiff Lummi Tribe, although it may be other parties and non-parties have the same or similar interests. In the Findings of Fact and Conclusions of Law filed herein, the court has found and held: (a) that there is evidence which the court finds reasonable, credible and sufficient to establish that plaintiff Lummi Tribe has treaty fishing rights in the reef net fishing areas involved; (b) that members of the Lummi Tribe are entitled to and shall have, as a matter of *right*, the opportunity to fish with reef nets in such areas; (c) that while non-treaty fishermen when licensed by the State to fish in reef net areas have the *privilege* of fishing in those areas "in common with" Lummi Tribal members, they do not have the *right* to do so.

The specific number and location of stations in the reef net areas at which Lummi Tribal members shall have the right and opportunity to fish and what, if any, conditions shall be applicable thereto, will be determined by or under direction of this court upon hearing of those matters at the earliest date reasonably convenient to counsel and the court.

9. *Sohappy* is a 1969 decision by Judge Robert Belloni of the Oregon United States District Court on Indian treaty fishing rights involving a number of law and fact issues identical or closely similar to those presented in this case. Much of what was found and held

in that thoroughly researched, well reasoned and highly practicable decision is directly applicable to issues to be determined in the present case. The *Sohappy* decision was not appealed and therefore it is controlling as to all parties to that case which include the United States and the Yakima Tribe. The following quotations from that decision, changed by this court only as bracketed, are hereby adopted and held by this court to be applicable to the issues in the present case.

302 F.Supp. at page 907:

" . . . [B]efore [Washington] may regulate the taking and disposition of fish by treaty Indians at their usual and accustomed fishing places:

'(a) It must establish preliminary to regulation that the specific proposed regulation is both reasonable and necessary for the conservation of the fish resource. In order to be necessary, such regulations must be the least restrictive which can be imposed consistent with assuring the necessary escapement of fish for conservation purposes; the burden of establishing such facts is on the state.

'(b) Its regulatory agencies must deal with the matter of the Indians' treaty fishing as a subject separate and distinct from that of fishing by others. As one method of accomplishing conservation objectives it may lawfully restrict or prohibit non-Indians fishing at the Indians' usual and accustomed fishing places without imposing similar restrictions on treaty Indians.

'(c) It must so regulate the taking of fish that the treaty tribes and their members will be accorded an opportunity to take, at their usual and accustomed fishing places, by reasonable means feasible to them, . . . fish [to the extent hereinabove specified.]

\* \* \* \* \* \*

At pages 908–909:

" . . . state restriction on treaty referenced fishing must be 'necessary for the conservation of the fish.'

. . . It [the Supreme Court] was not endorsing any particular state management program which is based not only upon that factor but also upon allocation of fish among particular user groups or harvest areas, or classification of fish to particular uses or modes of taking.

The state may regulate fishing by non-Indians to achieve a wide variety of management or 'conservation' objectives. Its selection of regulations to achieve these objectives is limited only by its own organic law and the standards of reasonableness required by the Fourteenth Amendment. But when it is regulating the federal right of Indians to take fish at their usual and accustomed places it does not have the same latitude in prescribing the management objectives and the regulatory means of achieving them. The state may not qualify the federal right by subordinating it to some other state objective or policy. It may use its police power only to the extent necessary to prevent the exercise of that right in a manner that will imperil the continued existence of the fish resource. The measure of the legal propriety of a regulation concerning the time and manner of exercising this 'federal right' is, therefore, 'distinct from the federal constitutional standard concerning the scope of the police power of the State.' [citations] To prove necessity, the state must show there is a need to limit the taking of fish and that the particular regulation sought to be imposed upon the exercise of the treaty right is necessary to the accomplishment of the needed limitation. This applies to regulations restricting the type of gear which Indians may use as much as it does to restrictions on the time at which Indians may fish."

\* \* \* \* \* \*

At page 911:

"The Supreme Court has said that the right to fish at all usual and accustomed places may not be qualified by the state. Puyallup Tribe et al. v. Department of Game, et al., supra. [citations] I interpret this to mean that the state cannot so manage the fishery that little or no harvestable portion of the run remains to reach the upper portions of the stream where the historic Indian places are mostly located."

At page 911:

"There is no reason to believe that a ruling which grants the Indians their full treaty rights will affect the necessary escapement of fish in the least. The only effect will be that some of the fish now taken by sportsmen and commercial fishermen must be shared with the treaty Indians, as our forefathers promised over a hundred years ago."

\* \* \* \* \* \*

At pages 911–912:

"In the case of regulations affecting Indian treaty fishing rights the protection of the treaty right to take fish at the Indians' usual and accustomed places must be an objective of the state's regulatory policy [at least] coequal with the conservation of fish runs for other users. The restrictions on the exercise of the treaty right must be expressed with such particularity that the Indian can know in advance of his actions precisely the extent of the restriction which the state has [shown] to be necessary for conservation. [citations]

This court cannot prescribe in advance all of the details of appropriate and permissible regulation of the Indian fishery, nor do the plaintiffs ask it to. As the Government itself acknowledges, 'proper anadromous fishery management in a changing environment is not susceptible of rigid predetermination. \* \* \* the variables that must be weighed in each given instance make judicial review of state action, through retention of continuing jurisdiction, more appropriate than overly-detailed judicial predetermination.' The requirements of fishery regulation are such that many of the specific restrictions, particularly

as to timing and length of seasons, cannot be made until the fish are actually passing through the fishing areas or shortly before such time. Continuing the jurisdiction of this court in the present cases may, as a practical matter, be the only way of assuring the parties an opportunity for timely and effective judicial review of such restrictions should such review become necessary.

I also do not believe that this court should at this time and on this record attempt to prescribe the specific procedures which the state must follow in adopting regulations applicable to the Indian fishery. The state must recognize that the federal right which the Indians have is distinct from the fishing rights of others over which the state has a broader latitude of regulatory control and that the tribal entities are interested parties to any regulation affecting the treaty fishing right. They, as well as their members to whom the regulations will be directly applicable, are entitled to be heard on the subject and, consistent with the need for dealing with emergency or changing situations on short notice, to be given appropriate notice and opportunity to participate meaningfully in the rule-making process. [and to seek prompt judicial review of regulations assertedly invalid.]

This does not mean that tribal consent is required for restrictions on the exercise of the treaty rights."

\* \* \* \* \* \*

At page 912:

" . . . the state's authority to prescribe restrictions within the limitations imposed by the treaties and directly binding upon the Indians is not dependent upon assent of the tribes or of the Secretary of the Interior. But certainly agreements with the tribes or deference to tribal preference or regulation on specific aspects pertaining to the exercise of treaty fishing rights are means which the state [should] adopt in the exercise of its jurisdiction over such fishing rights.

Both the state and the tribes should be encouraged [and directed] to pursue such a cooperative approach . . . ."

Thus far, this decision has been confined to discussion and ruling upon major issues, mostly because of the great number of secondary, or comparatively less important, issues of fact and law presented in this case. However, fact findings and legal conclusions, with comment thereon in most instances, on all of the secondary findings are included in the Findings of Fact and Conclusions of Law filed herein. For the most part the secondary findings and conclusions provide amplifying and implementing details for both major and secondary rulings of the court. Every issue, proposed finding of fact and conclusion of law, of whatever importance, has been individually considered and determined in the Findings of Fact and Conclusions of Law on file in this case, excepting only with a few reservations that are stated and explained in each instance.

Subject to suggested limitations by some of the parties, all parties have urged that the court reserve continuing jurisdiction of this case and have suggested various ways in which such jurisdiction might be exercised. Quotations from *Sohappy*, above quoted and adopted by this court, indicate some of the purposes for, and practical importance of, continuing jurisdiction in this type of case. From the beginning most, if not all, counsel in this case and the court have anticipated that continuing jurisdiction would be of great value to all parties in promptly putting the court's rulings into effect and in providing readily available early hearing and determination of factual and legal questions that may arise in interpreting and applying such rulings. Accordingly, the court does hereby reserve continuing jurisdiction of this case without limitation at this time.

Most if not all parties have also suggested that the court should appoint a master with technical fisheries expertise to assist the court in helping the parties to reach agreed solutions of problems

and questions when agreement thereon cannot be reached. Questions regarding whether or not a master should be appointed, the suggested and perhaps other purposes for appointment of a master, with or without technical fisheries expertise; and, if appointed what the master's duties should be and the manner of his selection, will be considered and determined at a hearing on the earliest date after the entry of the judgment and decree reasonably convenient to all counsel. At that hearing counsel are requested to present their views as to whether or not the court should appoint an Advisory Committee on Treaty Right Fishing. The members of such a committee should be knowledgeable and responsible citizens inclined to and capable of objectively considering, determining and reporting to the court the viewpoint of the interested public concerning Indian fishing as to: satisfactory solution of problems; means of expediting better communication between Indian and non-Indian officials and fishermen and keeping interested citizens in this area more accurately informed on matters pertaining to Indian fishing. Other topics to be considered at the conference may be suggested by counsel.

The remaining issues in this case reserved for separate pretrial and trial in the future, however such issues may be determined, do not have direct or indirect bearing upon any issue submitted and heretofore tried by this court. Accordingly, this decision and the Declaratory Judgment and Decree based thereon, upon entry in this case, shall become unreservedly final and reviewable as provided by 28 U.S.C.A. 2201; subject only to determination of any motions that may be appropriately and timely served and filed following entry of the Final Judgment and Decree. Each such motion, if any, that may be filed shall be supported [30] by a memorandum of authorities to which counsel for adverse parties shall timely serve and file a re-sponsive memorandum of authorities, following which such motions, if any, shall be promptly heard and determined by the court on the earliest date reasonably convenient to counsel and the court.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case came on regularly for trial on August 27, 1973, upon the basis of a final pretrial order entered August 24, 1973, and the presentation of evidence concluded September 18, 1973. Counsel for all parties appeared and presented nearly 50 witnesses, whose testimony was reported in 4,600 pages of trial transcript, more than 350 exhibits, pretrial briefs, final oral argument 12/9–10/73 and post trial briefs. In addition to consideration of the above evidence and material by the court, more than 500 proposed findings of fact and conclusions of law, submitted by counsel and annotated to the record, have been checked to determine the accuracy of every citation made by any counsel alleged to support a proposed finding or conclusion. Many of the proposed findings and conclusions were modified and many of the supporting citations were corrected, and additional findings and conclusions not proposed by any party were developed. The court has also read and examined, individually and in relation to one another, every case cited by any party as possible authority concerning any issue in this case, as well as other cases not cited by the parties.

Based upon this exhaustive examination of the controlling law, the briefs and oral argument of counsel and upon a preponderance of the evidence found credible and inferences reasonably drawn therefrom, the court now makes the following Findings of Fact and Conclusions of Law:

### TREATY STATUS

1. The United States has entered into treaties with each of the following Indian tribes or bands (herein collective-

---

**30.** Local Rules WD Wash.Civil Rule 7.

ly referred to as "Plaintiff tribes" and individually by the shorter name set out after each such tribe), or with their predecessors in interest:

Hoh Indian Tribe ("Hoh Tribe")

Treaty with the Quinaeilt, et al. (Treaty of Olympia), July 1, 1855, and January 25, 1856, ratified March 8, 1859, and proclaimed April 11, 1859, 12 Stat. 971.

Lummi Tribe of Indians ("Lummi Tribe")

Treaty of Point Elliott, January 22, 1855, ratified March 8, 1859, and proclaimed April 11, 1859, 12 Stat. 927.

Makah Indian Tribe

Treaty with the Makah (Treaty of Neah Bay), January 31, 1855, ratified March 8, 1859, and proclaimed April 18, 1859, 12 Stat. 939.

Muckleshoot Indian Tribe ("Muckleshoot Tribe")

Treaty of Point Elliott, *supra,* and also Treaty of Medicine Creek, December 26, 1854, ratified March 3, 1855, and proclaimed April 10, 1855, 10 Stat. 1132.

Nisqually Indian Community of the Nisqually Reservation ("Nisqually Tribe")

Treaty of Medicine Creek, *supra.*

Puyallup Tribe of the Puyallup Reservation ("Puyallup Tribe")

Treaty of Medicine Creek, *supra.*

Quileute Tribe of the Quileute Reservation ("Quileute Tribe")

Treaty with the Quinaeilt, et al., *supra.*

Quinault Tribe of Indians ("Quinault Tribe")

Treaty with the Quinaeilt, et al., *supra.*

Sauk-Suiattle Indian Tribe ("Sauk-Suiattle Tribe")

Treaty of Point Elliott, *supra.*

Skokomish Indian Tribe ("Skokomish Tribe")

Treaty of Point No Point, January 26, 1855, ratified March 8, 1859, and proclaimed April 29, 1859, 12 Stat. 933.

Squaxin Island Tribe of Indians ("Squaxin Island Tribe")

Treaty of Medicine Creek, *supra.*

Stillaguamish Indian Tribe ("Stillaguamish Tribe")

Treaty of Point Elliott, *supra.*

Upper Skagit River Tribe ("Upper Skagit Tribe")

Treaty of Point Elliott, *supra.*

Confederated Tribes and Bands of the Yakima Indian Nation ("Yakima Nation")

Treaty with the Yakimas, June 9, 1855, ratified March 8, 1859, and proclaimed April 18, 1859, 12 Stat. 951.

Each of said treaties contains a provision securing to the Indians certain off-reservation fishing rights. The following provision from the Treaty of Medicine Creek is typical of these treaty provisions:

"The right of taking fish, at all usual and accustomed grounds and stations, is further secured to said Indians, in common with all citizens of the Territory, and of erecting temporary houses for the purpose of curing, * * *."

[FPTO §§ 1, 3-1; see also references as to each Plaintiff tribe under paragraphs as to such tribes, *infra*.]

PRETREATY ROLE OF FISHING AMONG NORTHWEST INDIANS

2. The anthropological reports and testimony of both Dr. Barbara Lane and Dr. Carroll Riley have been thoroughly studied and considered by the court. In so doing, the court has noted the nature, extent and duration of field work in the case area and academic research. During trial constant observation was made of the attitude and demeanor of both experts while on the stand as witnesses, and the substance of their testimony has been carefully evaluated. Allowance for the criticism by defendants that some of Dr. Lane's conclusions are "over formulated" has been made in evaluating her testimony in every instance where the criticism might be applicable. Based upon these and other factors, the court finds that in specific facts, the reports of Dr. Barbara Lane, Exhibits USA-20 to 30 and USA-53, have been exceptionally well researched and reported and are established by a preponderance of the evidence. They are found to be authoritative and reliable summaries of relevant aspects of Indian life in the case area at and prior to the time of the treaties, including the treaty councils, Indian groups covered by the treaties, the purposes of the treaties and the Indians' understanding of treaty provisions. In these particulars, nothing in Dr. Lane's report and testimony was controverted by any credible evidence in the case. Dr. Lane's opinions, infer-

ences and conclusions based upon the information stated in detail and well documented in her reports, appeared to the court to be well taken, sound and reasonable. In summary, the court finds that where their testimony differs in any significant particular, the testimony of Dr. Lane is more credible and satisfactory than that of Dr. Riley and is accepted as such except as otherwise specified.

3. In pretreaty times Indian settlements were widely dispersed throughout Western Washington. There was considerable local diversity in the availability and importance of specific animal, plant and mineral resources used for food and artifacts. [FPTO § 3-32] But one common cultural characteristic among all of these Indians was the almost universal and generally paramount dependence upon the products of an aquatic economy, especially anadromous fish, to sustain the Indian way of life. [Ex. G-17o, pp. 286-287; Exs. USA-20 to 30 and 53; Exs. G-21 to 26] These fish were vital to the Indian diet, played an important role in their religious life, and constituted a major element of their trade and economy. Throughout most of the area salmon was a staple food and steelhead were also taken, both providing essential proteins, fats, vitamins, and minerals in the native diet. [FPTO §§ 3-32, 3-33; Ex. USA-20; Ex. PL-40, p. 577; Ex. G-4, pp. 193-197] There was considerable fluctuation in abundance and availability of fish from year to year. Some causes of fluctuation were regular and predictable, as in the case of runs of certain species and races of salmon. Other causes were erratic, such as flooding and alteration in watercourses. [FPTO § 3-32]

4. The major food sources of the Northwest Indians were the wild fish, animal and vegetative resources of the area. It was, therefore, necessary for the people to be on hand when the resources were ready for harvest. These seasonal movements were reflected in native social organization. In the winter, when weather conditions generally made travel and fishing difficult, people

remained in their winter villages and lived more or less on stored food. Fresh fish and other foods were harvested during the winter but that season was devoted primarily to ceremonies and manufacturing tasks. During this time people congregated into the largest assemblages and occupied long, multifamily houses. Throughout the rest of the year individual families dispersed in various directions to join families from other winter villages in fishing, clam digging, hunting, gathering roots and berries, and agricultural pursuits. People moved about to resource areas where they had use patterns based on kinship or marriage. Families did not necessarily follow the same particular pattern of seasonal movements every year. [FPTO § 3–32; Ex. USA–20; see also Exs. USA–21 to 30 and 53; Exs. G–17a–o; Exs. G–21 to 26; Exs. PL–23 and PL–24; Ex. G–4, pp. 193–197]

5. At the time of the treaties and prior thereto, utilization of the rich fishery resource required an intimate knowledge of local environments and the locally available species as well as the development of a variety of specialized techniques for taking fish. [FPTO § 3–32; Ex. USA–20; Ex. JX–2a, § 3.1, pp. 108–114, Figs. 44–47, 280–283; Ex. USA–31e, pp. 17–26; Ex. PL–88a–d; Ex. L–7] The latter involved both group and individual activity and equipment. [FPTO § 3–76] Adequate Indian food preservation techniques had been developed by the time of the treaties and fish were able to be stored for use throughout the year and transported over great distances. [FPTO § 3–32; Ex. USA–20, p. 1; Ex. MLQ–1, p. 1] However, the Indians' harvest of fish was subject to the vagaries of nature which occasionally imperiled their food supply and caused near starvation. The amounts of fish that could be harvested were particularly affected by run-size fluctuations caused by natural conditions and water conditions occurring at the time the fish were running, e. g., flooding, which limited the effectiveness of the Indian fishing gear. [Tr. 2006, l. 17

to 2012, l. 24; Ex. PL–40, p. 577; Ex. F–39; FPTO § 3–32; Ex. USA–20, p. 5]

6. The first-salmon ceremony, which with local differences in detail was general through most of the area, was essentially a religious rite to ensure the continued return of salmon. The symbolic acts, attitudes of respect and reverence, and concern for the salmon reflected a ritualistic conception of the interdependence and relatedness of all living things which was a dominant feature of native Indian world view. Religious attitudes and rites insured that salmon were never wantonly wasted and that water pollution was not permitted during the salmon season. [FPTO § 3–33; Ex. USA–20, p. 9]

7. At the time of the treaties, trade was carried on among the Indian groups throughout a wide geographic area. Fish was a basic element of the trade. There is some evidence that the volume of this intra-tribal trade was substantial, but it is not possible to compare it with the volume of present day commercial trading in salmon. Such trading was, however, important to the Indians at the time of the treaties. [Ex. USA–20, pp. 2–10; Tr. 1778, l. 6 to 1784, l. 13] In addition to potlatching, which is a system of exchange between communities in a social context often typified by competitive gifting, there was a considerable amount of outright sale and trade beyond the local community and sometimes over great distances. [Ex. USA–20, pp. 2–10] In the decade immediately preceding the treaties, Indian fishing increased in order to accommodate increased demand for local non-Indian consumption and for export, as well as to provide money for purchase of introduced commodities and to obtain substitute non-Indian goods for native products which were no longer available because of the non-Indian movement into the area. [Ex. USA–20, p. 13] Those involved in negotiating the treaties recognized the contribution that Indian fishermen made to the territorial economy because Indians caught most of the

non-Indians' fish for them, plus clams and oysters. [Ex. PL–11; Ex. USA–20, p. 15]

8. At the time of the treaties, non-Indian commercial fishing enterprises were rudimentary and largely unsuccessful. In the 1840's and 50's, salmon was packed and shipped from the Columbia River and the case area to such distant places as New York, San Francisco, the Hawaiian Islands, South America and China, but inadequate preservation techniques and slow transportation facilities caused the salmon to reach the markets in unsatisfactory condition, and it obtained a bad reputation among dealers. [Ex. PL–50, p. 310; Ex. MLQ–1, p. 1] There was no statistically measurable commercial fishery at the time the treaties were negotiated. [Ex. MLQ–1, p. 15] At the time of the treaties the commercial fisheries in the case area posed no threat to the abundance of the fish resources. [Tr. 2006, l. 12–16; Tr. 2382, l. 10–18; Exs. PL–7 and PL–8] The non-Indian commercial fishing industry did not fully develop in the case area until after the invention and perfection of the canning process. The first salmon cannery in Puget Sound began in 1877 with a small operation at Mukilteo. Large-scale development of the commercial fisheries did not commence in Puget Sound until the mid-1890's. [Ex. MLQ–1, pp. 1–3] The large-scale development of the commercial fishing industry in the last decades of the Nineteenth Century brought about the need for regulation of fish harvests. [Ex. JX–2a, § 2.3.1, pp. 60–62]

9. There was a sharp decline in Indian population in the case area in the period after extensive contact with Europeans and Americans which occurred around 1780. It has been estimated that Indian populations in the Puget Sound region declined by approximately 50% between 1780 and 1840, but pre-treaty censuses were often incomplete and inaccurate. The Gibbs-Stevens census of 1854 shows a total of 7,559 Indians for all of Western Washington. A decline in population continued during the decades following the signing of the treaties, due in large part to diseases introduced by non-Indians. [Ex. D–1, pp. 9–12; Ex. G–4, pp. 181–184; Ex. MLQ–1, pp. 14, 16] The non-Indian population at treaty times has been estimated at approximately 2,000 people in Western Washington. [Tr. 2475, l. 7 to 2476, l. 8] Because of the great abundance of fish resources and these limited populations, there was no need to regulate the taking of fish by either Indians or non-Indians at treaty times. [Tr. 1849, l. 18–22; Tr. 2381, l. 25 to 2382, l. 18]

10. The Northwest Indians developed and utilized a wide variety of fishing methods which enabled them to take fish from nearly every type of location at which fish were present. They harvested fish from the high seas, inland salt waters, rivers and lakes. They took fish at river mouths as well as at accessible points or stretches along the rivers all the way to the headwaters. Some locations were more heavily utilized than others. Like all fishermen, they shifted to those locales which seemed most productive at any given time. [Exs. USA–20 to 30 and 53] Fishing methods varied according to the locale but generally included trapping, dip netting, gill netting, reef netting, trolling, long-lining, jigging, set-lining, impounding, gaffing, spearing, harpooning and raking. [FPTO § 3–33] Control and use patterns of fishing gear varied according to the nature of the gear. Certain types required cooperative effort in their construction and/or handling. Weirs were classed as cooperative property but the component fishing stations on the weir were individually controlled. [FPTO § 3–76; Ex. USA–26, pp. 13–14]

11. Aboriginal Indian fishing was not limited to any species. They took whatever species were available at the particular season and location. Many varieties, including salmon and steelhead, halibut, cod, flounder, ling cod, rockfish, herring, smelt, eulachon, dogfish and trout, were taken and were important to varying degrees as food and

as items of trade. [FPTO § 3–33; Ex. G–4, pp. 194–195]

12. Indian fishing practices at treaty times were largely unrestricted in geographic scope. Generally, individual Indians had primary use rights in the territory where they resided and permissive use rights in the natal territory (if this was different) or in territories where they had consanguineal kin. Subject to such individual claims, most groups claimed autumn fishing use rights in the waters near to their winter villages. Spring and summer fishing areas were often more distantly located and often were shared with other groups from other villages. [FPTO § 3–34]

13. Each of the Plaintiff tribes had usual and accustomed fishing places within the case area. Although there are extensive records and oral history from which many specific fishing locations can be pinpointed, it would be impossible to compile a complete inventory of any tribe's usual and accustomed grounds and stations. [FPTO § 3–34; Ex. USA–20, p. 21; Ex USA–52, p. 4, l. 7 to p. 5, l. 29] Among the reasons for this are the following: 1) Indian fisheries existed at all feasible places along a given drainage system. Fishing stations which were the site of weirs or permanent villages are more easily documented than riffles where fish were speared; 2) Indian fishermen shifted to those locales which seemed most productive at any given time depending upon such factors as changes in river flow, turbidity or water course; 3) some important recorded fishing sites are no longer extant because of subsequent man-made alterations in watersheds and water systems; and, 4) use of some sites has been discontinued because appropriate Indian gear for those sites has been outlawed or because competing uses and users have made utilization of the sites by Indian fishermen unfeasible. [Ex. USA–20, pp. 21–23; Ex. USA–27b, pp. 1–3] Documentation as to which Indians used specific fishing sites is incomplete. George Gibbs noted that:

"As regards the fisheries, they are held in common, and no tribe pretends to claim from another, or from individuals, seignorage for the right of taking. In fact, such a claim would be inconvenient to all parties, as the Indians move about, on the sound particularly, from one to another locality, according to the season." [Ex. USA–20, p. 18; Ex. USA–27b, p. 3; Ex. G–4, p. 186]

14. Although not all tribes fished to a considerable extent in marine areas, the Lummi reef net sites in Northern Puget Sound, the Makah halibut banks, Hood Canal and Commencement Bay and other bays and estuaries are examples of some Indian usual and accustomed fishing grounds and stations in marine waters. Marine waters were also used as thoroughfares for travel by Indians who trolled en route. [Ex. PL–75; Tr. 2847, l. 13 to 2850, l. 23] Such occasional and incidental trolling was not considered to make the marine waters traveled thereon the usual and accustomed fishing grounds of the transiting Indians. [Tr. 2177, l. 24 to 2180, l. 4]

## TREATY BACKGROUND

15. The United States claimed the area now embraced within the State of Washington by discovery and settlement and by the treaty extinguishment of conflicting claims of Spain (Treaty of February 22, 1819, 8 Stat. 252), Russia (Convention of April 17, 1824, 8 Stat. 302), and Great Britain (Treaty of June 15, 1846, 9 Stat. 869). By the Act of August 14, 1848, 9 Stat. 323, the United States established the Oregon Territory and provided that nothing contained in said act "shall be construed to impair the rights of person or property now pertaining to the Indians in said Territory, so long as such rights shall remain unextinguished by treaty between the United States and such Indians * * *." Section 14 of that act extended to the Oregon Territory the Northwest Ordinance of 1787, 1 Stat. 51, Note a, which provides that "good faith shall

always be observed toward the Indians; their lands and property shall never be taken from them without their consent." By an Act of June 5, 1850, 9 Stat. 437, Congress authorized the negotiation of treaties with the Indian tribes in the Oregon Territory (which then included the area which now comprises the State of Washington) for extinguishing their claims to land lying west of the Cascade Mountains. By the Act of March 2, 1853, 10 Stat. 172, Congress organized the Washington Territory out of part of the Oregon Territory (including all of the present State of Washington) and provided that nothing in said act shall affect the authority of the United States to "make any regulations respecting the Indians of said Territory, their lands, property, or other rights, by treaty, law, or otherwise," which the Government could make if that act had never been passed. All federal laws relating to the Oregon Territory not inconsistent with the 1853 Act were expressly continued in force in Washington Territory. Section 2 of the Act provided for appointment of a governor who was also to perform the duties of Superintendent of Indian Affairs in the Territory. The Appropriation Act of March 3, 1853, 10 Stat. 226, 238, authorized the President to negotiate with Indian tribes west of Missouri and Iowa "for the purpose of securing the assent of said tribes to the settlement of the citizens of the United States upon the lands claimed by said Indians, and for the purpose of extinguishing the title of said Indian tribes in whole or in part to said lands; * * *." The Appropriation Act of July 31, 1854, 10 Stat. 315, 330, authorized the use of appropriations for making treaties in several territories, including Washington, prior to July 1, 1855. [FPTO § 3–28]

16. The Act of February 22, 1889, 25 Stat. 676, admitting Washington to statehood, provided as a precondition to such statehood, that the people of the state forever disclaim all right and title to all lands owned or held by any Indian or Indian tribes and until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States and shall remain under the absolute jurisdiction and control of Congress. Washington accepted this requirement and incorporated it into Article XXVI of the State Constitution. Washington was admitted into the Union as a state on November 11, 1889. 26 Stat. Proclamations no. 8. [FPTO § 3–29]

17. On December 26, 1853, Isaac Stevens, the first Governor and Superintendent of Indian Affairs of the Washington Territory, wrote to the Commissioner of Indian Affairs suggesting the necessity of making treaties with the Indians west of the Cascade Mountains. He pointed out that these tribes lived on different watercourses, bays and inlets of Puget Sound, and lands should be set aside for their use. On August 30, 1854, the Acting Commissioner of Indian Affairs notified Governor Stevens of his appointment to negotiate treaties with all tribes in the Washington Territory. Governor Stevens was directed that in making the treaties he should endeavor to unite the "numerous bands and fragments of tribes into tribes, * * *" and to furnish the Commissioner of Indian Affairs a skeleton map of Washington Territory, showing the location of the different tribes and bands, and the boundaries of the regions claimed by each. In carrying out his duties as Superintendent of Indian Affairs, Governor Stevens had previously, on March 22, 1854, appointed Colonel Michael T. Simmons as Indian Agent for the Puget Sound District and had directed him to visit the various tribes in his district, to make a census of the tribes and bands, ascertaining as nearly as possible the boundaries of the territory claimed by each, and at the same time to organize the small bands into tribes and appoint chiefs for each. Governor Stevens was assisted in arranging for the treaties also by George Gibbs, a lawyer, surveyor and ethnologist, who was one of the sources of information rela-

tive to the identity and location of Western Washington tribes and who wrote an extensive ethnological report in 1854–55, and by Colonel B. F. Shaw, an interpreter. [FPTO § 3–30]

18. No formal political structure had been created by the Indians living in the Puget Sound area at the time of initial contact with the United States Government. Governor Stevens, acting upon instructions from his superiors and recommendations of his subordinates, deliberately created political entities for purposes of delegating responsibilities and negotiating treaties. In creating these entities Governor Stevens named many chiefs and sub-chiefs. [Ex. USA–27a, pp. 14–29; Ex. USA–20, p. 28]

## NEGOTIATION AND EXECUTION OF THE TREATIES

19. The principal purposes of the treaties were to extinguish Indian claims to the land in Washington Territory and provide for peaceful and compatible coexistence of Indians and non-Indians in the area. The United States was concerned with forestalling friction between Indians and settlers and between settlers and the government. The Indians had received constant assurances from settlers and government representatives that they would be compensated for lands which were being settled by United States' citizens. Settlers had taken up land claims under the Donation Act even though the Indian rights had not yet been extinguished by treaties as required by the act creating the Oregon Territory. [FPTO § 3–35; Ex. USA–20, p. 24] Governor Stevens and the treaty commissioners were not authorized to grant to the Indians or treat away on behalf of the United States any governmental authority of the United States. [Ex. D–1, p. 29, l. 11–18; Tr. 1862, l. 6–13; Tr. 1864, l. 20 to 1865, l. 24]

20. At the treaty negotiations, a primary concern of the Indians whose way of life was so heavily dependent upon harvesting anadromous fish, was that they have freedom to move about to gather food, particularly salmon, (which both Indians and non-Indians meant to include steelhead), at their usual and accustomed fishing places. [Exs. PL–15, PL–16b, PL–17c; Ex. USA–20, pp. 25–26; Ex. MLQ–1, p. 14; Tr. 2172, l. 3–12; Tr. 2352, l. 14 to 2365, l. 2; Ex. PL–9, pp. 28–29] The Indians were assured by Governor Stevens and the treaty commissioners that they would be allowed to fish, but that the white man also would be allowed to fish. [Ex. PL–17c, p. 1e] In 1856, it was felt that the development of the non-Indian fisheries in the case area would not interfere with the subsistence of the Indians. [Exs. PL–7, PL–8]

21. It was the intention of the United States Government, in negotiating treaties with the Indians, to make at least non-coastal tribes agriculturists, although not to restrict them to that, to diversify Indian economy, to teach western skills and trades to the Indians and to accomplish a transition of the Indians into western culture. There was no intent, however, to prevent the Indians from using the fisheries for economic gain. [Ex. D–1, p. 23, l. 9–25, p. 23, l. 33 to p. 24, l. 25; Ex. USA–20, p. 26; Tr. 1916, l. 25 to 1917, l. 9; Treaty of Medicine Creek, art. 10, 10 Stat. 1132; Treaty of Point Elliott, art. 14, 12 Stat. 927; Treaty of Point No Point, art. 11, 12 Stat. 933; Treaty with the Makahs (Treaty of Neah Bay), art. 11, 12 Stat. 939; Treaty of the Yakimas, art. 2, art. 5, 12 Stat. 951; Exs. PL–32 and PL–47, pp. 455–456; Tr. 1827, l. 25 to 1828, l. 24; Tr. 2418, l. 4 to 2421, l. 9; Tr. 2453, l. 22 to 2454, l. 13] Upon their removal to reservations, the Indians began farming, with greater success being experienced by the Puget Sound tribes than by the tribes on the ocean coast. [Ex. PL–42]

22. There is no record of English having been spoken at the treaty councils, but it is probable that there were Indians at each council who would have spoken or understood some English. [Ex. D–1, p. 24, l. 31 to p. 25, l. 6; Tr. 2161, l. 2 to 2163, l. 4; Tr. 2392, l. 2 to

2394, l. 3] One Snohomish Indian who understood English helped translate the Point Elliott treaty. [Ex. PL–12; Tr. 2390, l. 24 to 2391, l. 18] Since, however, the vast majority of Indians at the treaty councils did not speak or understand English, the treaty provisions and the remarks of the treaty commissioners were interpreted by Colonel Shaw to the Indians in the Chinook jargon and then translated into native languages by Indian interpreters. Chinook jargon, a trade medium of limited vocabulary and simple grammar, was inadequate to express precisely the legal effects of the treaties, although the general meaning of treaty language could be explained. Many of those present, however, did not understand Chinook jargon. [FPTO § 3–37; Ex. USA–20, pp. 28–29; Ex. G–29a; Ex. Y–21; Tr. 1886, l. 11 to 1887, l. 11; Tr. 2403, l. 24 to 2404, l. 6] There is no record of the Chinook jargon phrase that was actually used in the treaty negotiations to interpret the provision "The right of taking fish, at all usual and accustomed grounds and stations, is further secured to said Indians, in common with all citizens of the Territory." [Ex. USA–20, p. 26; Tr. 2372, l. 15 to 2374, l. 7] A dictionary of the Chinook jargon, prepared by George Gibbs, indicates that the jargon contains no words or expressions that would describe any limiting interpretation on the right of taking fish. [Ex. G–29a; Ex. Y–21; Tr. 2460, l. 10 to 2461, l. 1]

23. The treaty language "in common with all citizens of the Territory" was probably introduced by George Gibbs, who was a lawyer and advisor to Governor Stevens. [Ex. USA–20, p. 26; Tr. 1943, l. 24 to 1944, l. 12] There is no discussion of the phrase in the minutes of the treaty councils, [Exs. PL–10a, PL–10b, PL–12, PL–14, PL–15, PL–16b, PL–17a, PL–17b, PL–17c] in the instructions to Stevens [Exs. PL–1, PL–34] or to the treaty negotiators, or in Stevens' letters of transmittal of the treaties. [Exs. PL–11, PL–14] There appears to be no phrase in he Chinook jargon that would interpret the term in any exact legal sense. [Ex. G–29a; Ex. Y–21]

24. Although there is no evidence of the precise understanding the Indians had of the treaty language, the treaty commissioners probably used the terms "usual and accustomed" and "in common with" in their common parlance, and the meaning of them as found in a contemporaneous dictionary most likely would be what was intended by the government representatives. [Tr. 1946, l. 12–21] The 1828 and 1862 editions of Webster's American Dictionary of the English Language define the terms as follows:

> *accustomed:* Being familiar by use; habituated; inured . . . usual; often practiced.

> *common:* Belonging equally to more than one, or to many indefinitely . . . belonging to the public; having no separate owner . . . general; serving for the use of all.

> *usual:* Customary; common; frequent; such as occurs in ordinary practice or in the ordinary course of events. [Ex. PL–86]

The Indians who negotiated the treaties probably understood the concept of common ownership interest which could have been conveyed in Chinook jargon. [Tr. 2024, l. 2 to 2028, l. 3; Tr. 2048, l. 14 to 2049, l. 3] The clause "usual and accustomed [fishing] grounds and stations" was all-inclusive and intended by all parties to the treaty to include reservation and off-reservation areas. [Tr. 2851, l. 5–19] The words "usual and accustomed" were probably used in their restrictive sense, not intending to include areas where use was occasional or incidental. [Tr. 2176, l. 1–22; Tr. 2177, l. 24 to 2178, l. 5] The restrictive sense of the term "usual and accustomed" could have been conveyed in Chinook jargon. [Tr. 1951, l. 7 to 1952, l. 10]

25. In an extensive report on the Indian Tribes of the Territory of Washington, dated March 4, 1854, George Gibbs had noted that the right of fishery was a subject "concerning which difficulties

may arise" and that the Indians would require liberty of motion for the purpose of seeking fish in their proper season. [Ex. PL–9, p. 29] Elsewhere he observed that the fisheries "are held in common, and no tribe pretends to claim from another, or from individuals, seignorage for the right of taking." [Ex. G–4, p. 186] This was a generalization, probably subject to certain exceptions. [Ex. USA–20, pp. 18–19]

26. There is nothing in the written records of the treaty councils or other accounts of discussions with the Indians to indicate that the Indians were told that their existing fishing activities or tribal control over them would in any way be restricted or impaired by the treaty. The most that could be implied from the treaty context is that the Indians may have been told or understood that non-Indians would be allowed to take fish at the Indian fishing locations along with the Indians. [Ex. PL–10a, 8th page.]

27. Prior to the convening of the treaty councils Governor Stevens sent B. F. Shaw, who was later the official interpreter of the councils, to the Indian villages to explain the purposes of the councils and urge their attendance. Shaw told the Indians that the government wanted them to sell their land for a moderate sum of money and to accept such reservations and other privileges as could be agreed upon at the council. [Ex. USA–45, p. 28] While there is no record of any specific privileges discussed during these contacts, the treaty commission's prior awareness of the importance the Indians attached to fishing makes it probable that the continuance of the right to take fish was one that Shaw had in mind or discussed. [Ex. PL–9, p. 29; Ex. PL–10a, 1st and 3rd pages]

28. At the time of the treaties Indian control over fishing practices was by customary modes of conduct rather than by formal regulations. Controls were necessary in cooperative fishing efforts which required coordination by someone who organized and directed the group effort. The construction of a weir was usually a cooperative effort, a number of men working under the direction of a leader. The entire community usually had access to the weir, the leader regulating the order of use and the times at which the weir was opened to allow upstream escapement for spawning and/or supply for upriver fishermen. Techniques such as spearing or trolling in salt water which involved individual effort were not regulated or controlled by anyone else. [Ex. USA–20, pp. 19, 20] Apart from one instance when the Makahs prohibited a non-Indian from fishing on their reservation, there is no evidence at the time of the treaties that either party intended to restrict the other party's fishing because it was not contemplated that they would interfere with each other. [Tr. 2032, *l.* 14 to 2033, *l.* 6; Ex. PL–8; Ex. USA–20, pp. 20–21]

POST–TREATY INDIAN FISHING

29. Fish continue to provide a vital component of many Indians' diet. For others it may remain an important food in a symbolic sense—analogous to Thanksgiving turkey. Few habits are stronger than dietary habits and their persistence is usually a matter of emotional preference rather than a nutritional need. For some Indians, fishing is also economically important. Fishing is also important for some non-Indians. [FPTO § 3–38]

30. Since treaty times, Indians and non-Indians have adopted new fishing techniques and gear. Indians no longer fish from dugouts, just as non-Indians no longer fish from wooden sailboats. Indians no longer use bark nets and non-Indians no longer use cotton or linen nets. [FPTO § 3–38]

31. Subsequent to the execution of the treaties and in reliance thereon, the members of the Plaintiff tribes have continued to fish for subsistence, sport and commercial purposes at their usual and accustomed places. Such fishing provided and still provides an important part of their livelihood, subsistence and cultural identity. [Exs. PL–44, p. 466;

PL–45, p. 467; PL–46, p. 39; Exs. QN–2 and QN–3; Exs. H–1 and H–2; Ex. L–5; Exs. MS–2, MS–3, MS–6, MS–7, MS–8, MS–9 and MS–10; Exs. Y–13 and Y–26; USA–68, USA–69 and USA–70] The Indian cultural identification with fishing is primarily dietary, related to the subsistence fishery, and secondarily associated with religious ceremonies and commercial fishing. Indian commercial fishermen share the same economic motivation as non-Indian commercial fishermen to maximize their harvest and fishing opportunities. [Ex. F–35, p. 24, *l.* 12–23; Ex. F–40, p. 8, *l.* 2–6, p. 118, *l.* 17 to p. 19, *l.* 12; Ex. F–45, p. 17, *l.* 3 to p. 18, *l.* 2; Tr. 740, *l.* 16 to 742, *l.* 14; Tr. 2566, *l.* 24 to 2567, *l.* 4; Tr. 2896, *l.* 22 to 2897, *l.* 7; Tr. 3031, *l.* 24 to 3232, *l.* 3] Indians allow non-Indians to fish on their reservation in sport fisheries for which Indians serve as guides and charge a license fee. [Tr. 2601, *l.* 10–22; Tr. 3475, *l.* 5–13; Tr. 3511, *l.* 23 to 3512, *l.* 15]

32. Some members of the Plaintiff tribes presently fish in the regular commercial fisheries of this State and the Pacific Coast. These Indians fish with the same gear as other fishermen. When fishing in the State commercial seasons, treaty Indians are not required to purchase a license or pay a landing tax. [Tr. 721, *l.* 5–9; Tr. 2489, *l.* 17–19; Tr. 2498, *l.* 12–15; Tr. 3865, *l.* 16–21; Ex. F–45, p. 14, *l.* 23 to p. 15, *l.* 4] With the exception of the full-time Indian commercial fishermen who fish in the all-citizen commercial fisheries of the State, Indian fishermen frequently have other occupations, but fish for food and to supplement their incomes. [Tr. 2600, *l.* 2–7; Tr. 2602, *l.* 5–22; Tr. 2886, *l.* 3–16; Ex. F–45, p. 15, *l.* 5–12]

33. Acculturation of Western Washington Indians into western culture began prior to treaty times and has continued to the present day. Today most Indians wear traditional western clothing, speak English, utilize the western economic system and western technology, share western religious traditions and participate in the western socio-political organization. Traditional religious rites and ceremonies are no longer widely observed by most tribes. Modern Indians share similar goals with modern non-Indians to acquire most items of American material culture. [Tr. 1991, *l.* 13 to 1992, *l.* 25; Tr. 2431, *l.* 9–16; Tr. 2439, *l.* 9 to 2444, *l.* 8; Tr. 2448, *l.* 8 to 2450, *l.* 4; Tr. 2508, *l.* 19 to 2509, *l.* 4; Tr. 2893, *l.* 7 to 2894, *l.* 15; Ex. F–35, p. 24, *l.* 12–23; Ex. D–1, p. 22, *l.* 9–25; Tr. 2507, *l.* 17 to 2508, *l.* 10; Tr. 2608, *l.* 17 to 2609, *l.* 4; Ex. F–30, Answer to Question 40 in each set of Interrogatories to Plaintiff tribes; Ex. F–40, p. 11, *l.* 22 to p. 12, *l.* 13; Ex. F–42, p. 10, *l.* 18–22; Ex. F–45, p. 15, *l.* 13 to p. 16, *l.* 7] Employment acculturation of Indians has been a major cause of the drastic decline from treaty times of the number of Indians engaged in fishing. [Tr. 1992, *l.* 5–10; Tr. 2599, *l.* 2–13; Tr. 3468, *l.* 16 to 3469, *l.* 8; Ex. F–40, p. 12, *l.* 14 to p. 13, *l.* 3] Additionally, many years of state enforcement actions against Indians exercising their claimed treaty right to fish have caused many members of Plaintiff tribes to discontinue such fishing activities at several of their usual and accustomed fishing places. [Exs. USA–20, p. 23; H–1; H–2; L–5; MS–2; MS–3; MS–7; MS–8; MS–9; MS–10]

34. Some of the Plaintiff tribes presently regulate their tribal members' fishing. [Ex. JX–2b] In general, the pattern of the Indian tribal fishing regulations is designed to achieve a certain percentage spawning escapement from their fisheries. [Tr. 1413, *l.* 12 to 1414, *l.* 9; Tr. 1415, *l.* 5 to 1416, *l.* 1; Tr. 1418, *l.* 16–19] Tribal regulations generally restrict the harvest of fish in one or more of the following ways: 1) limitation on the number of fishermen; 2) separation between net sites; 3) restriction on the length of drift nets; 4) restriction on net length to certain channel widths; 5) restriction of mesh sizes; 6) weekly closed periods; 7) season dates which reflect when fish are available. [Tr. 1411, *l.* 8 to 1413, *l.* 11]

SPECIFIC TRIBES

*Hoh Tribe*

35. The Hoh Tribe is the present-day tribal entity which, with respect to the matters that are the subject of this litigation, is a political successor in interest to some of the Indian tribes or bands which were parties to the Treaty of Olympia. It is recognized by the United States as a currently functioning Indian tribe maintaining a tribal government on the Hoh Reservation. This tribe is organized pursuant to section 16 of the Indian Reorganization Act of June 18, 1934, 48 Stat. 987, 25 U.S.C. § 476. Its membership is determined in accordance with its Constitution and Bylaws approved by the Assistant Secretary of the Interior on February 28, 1969. Its present membership roll was approved by a representative of the Secretary of the Interior on December 15, 1972. The tribe presently has approximately 62 members. [FPTO § 3–11; Ex. PL–55]

36. One of the earliest documentations of Hoh Indian fisheries is an 1853 account by a Russian survivor of an 1808 shipwreck. He wrote of his party's travels up the Hoh River during which they obtained salmon and fish roe from the Indians at various points along the river. At one location about 13 miles upstream the Indians refused to sell them any fish, explaining that high water had covered their fish traps. At the upper part of the river the Russians lived well on stored winter salmon which they found in the houses of Indians who withdrew from their settlements when the Russians arrived. [Ex. USA–22, pp. 5, 9–11]

37. Prior to the treaties the Hoh Indians had devised fish taking techniques adaptable for a variety of water and weather conditions. They constructed artificial falls by placing hemlock logs across the smaller streams. During periods of high water they would catch salmon below the falls with special falls nets. They observed certain rituals to assure continued fish runs. [FPTO § 3–82; Ex. USA–22, pp. 15–16]

38. Linguistically, culturally and historically the Quileute and Hoh Indians were one people who in 1855 lived along the Quillayute and Hoh river systems. Their identification as two separate tribes is a relatively recent artifact of government administration. [Ex. USA–22, p. 1]

39. In treaty times the usual and accustomed fishing places of the Quileute and Hoh Indians included the entire Hoh river system and the Quillayute, Dickey, Bogachiel, Calawah, Soleduck, Queets and Quinault river systems. [FPTO §§ 3–83, 3–84; Exs. USA–20, p. 32; USA–22, p. 17; Exs. H–1, p. 1, *l.* 17–22; H–2, p. 1, *l.* 24 to p. 2, *l.* 5; Ex. USA–31e, pp. 185–188]

40. There are presently fifteen Hoh fishermen, five of whom fish full time and earn on an average $7,000 a year from fishing and ten part-time fishermen who are otherwise employed as loggers and who earn approximately $5,000 a year from fishing. [Tr. 3124, *l.* 23 to 3125, *l.* 19] With the exception of two fishermen, all Hoh fishermen fish on the reservation at permanent set net sites. Two fishermen fish off the reservation because they do not have permanent set net sites on the reservation. [Tr. 3121, *l.* 24 to 3122, *l.* 14; Tr. 3123, *l.* 20 to 3124, *l.* 9]

41. The only portion of the Hoh River that is within the Hoh Reservation is the south half of the river extending one mile upstream from the mouth. [Tr. 3121, *l.* 21–23] The Department of Fisheries has promulgated off-reservation Indian-only fishing regulations for the Hoh River. With the exception of weekly closed periods, the regulations allow fishing down stream of the upper mouth of Nolan Creek to the Hoh Indian Reservation boundary from July 1 to November 30 annually. [Exs. JX–2a, Table 16, p. 158, App. II, p. 309; JX–2b, pp. 2–3]

42. The Hoh tribal council has adopted a fishing ordinance designating set net sites, limiting the number and length of nets, requiring daily removal of fish, regulating sales, and providing

penalties for violations. [Ex. JX–2b, pp. 2–3; Tr. 3129, *l.* 7–12] Annual regulations are not adopted and estimates of predicted run size are not utilized in regulating the fishery. [Tr. 3136, *l.* 13–20; Ex. F–30, Hoh Tribe's Answer to Interrogatory No. 15] The Hoh ordinance does not make provision for emergency regulations. [Ex. F–30, Hoh Tribe's Answer to Interrogatory No. 11]

## Lummi Tribe

43. The Lummi Tribe is the present day tribal entity which, with respect to the matters that are the subject of this litigation, is a political successor in interest to some of the Indian tribes or bands which were parties to the Point Elliott Treaty. This tribe is recognized by the United States as a currently functioning Indian tribe maintaining a tribal government on the Lummi Indian Reservation. Its membership is determined in accordance with its Constitution and Bylaws approved by the Assistant Commissioner of Indian Affairs on April 2, 1948, as amended April 10, 1970. It does not have a current federally approved membership roll but it presently has approximately 1,500 members. [FPTO § 3–12; Ex. PL–56]

44. The Lummi Tribe is composed primarily of descendants of Indians who in 1855 were known as Lummi or Nook-Lummi and who lived in the area of Bellingham Bay and near the mouth of the river emptying into it. The present Lummi Tribe also includes descendants of the Semiahmoo and Samish Indians of 1855. The Lummi Indians, and the Semiahmoo and Samish Indians who were subsumed under the Lummi designation, were party to the Treaty of Point Elliott. Fourteen of the signatories to that treaty were identified as Lummi Indians. [FPTO § 3–39; Ex. USA–30, pp. 1–5]

45. Prior to the Treaty of Point Elliott, the Lummi, Semiahmoo and Samish Indians had been engaged in trade in salmon, halibut and shellfish both with other Indians and with non-Indians.

[FPTO § 3–42] This trade continued after the treaty. [Ex. USA–30, p. 6] At the time of the treaty they maintained prosperous communities by virtue of their ownership of lucrative saltwater fisheries. The single most valuable fish resource was undoubtedly the sockeye, which the Lummis were able to intercept in the Straits on the annual migration of the sockeye from the ocean to the Fraser River. [Ex. USA–30, p. 11] Lummi Indians developed a highly efficient technique, known as reef netting, for taking large quantities of salmon in salt water. [Ex. USA–30, p. 11] Aboriginal Indian "reef netting" differs from present methods and techniques described by the same term. [FPTO § 3–40] The Lummis had reef net sites on Orcas Island, San Juan Island, Lummi Island and Fidalgo Island, and near Point Roberts and Sandy Point. [Ex. USA–30, p. 23; Exs. USA–62, USA–63; Tr. 1699, *l.* 2 to 1701, *l.* 21] When nature did not provide optimum reef conditions the Indians artificially created them. [Ex. USA–30, p. 17] Reef netting was one of the two most important economic activities engaged in by these Indians, the other being the sale of dog fish oil. These Indians also took spring, silver and humpback salmon and steelhead by gill nets and harpoons near the mouth of the Nooksack River, and steelhead by harpoons and basketry traps on Whatcom Creek. They trolled the waters of the San Juan Islands for various species of salmon. [FPTO § 3–42; Ex. USA–30, pp. 6–25; Ex. G–21, pp. I–19–I–21]

46. In addition to the reef net locations listed above, the usual and accustomed fishing places of the Lummi Indians at treaty times included the marine areas of Northern Puget Sound from the Fraser River south to the present environs of Seattle, and particularly Bellingham Bay. Freshwater fisheries included the river drainage systems, especially the Nooksack, emptying into the bays from Boundary Bay south to Fidalgo Bay. [Exs. USA–20, p. 39; USA–30, pp. 23–26; Exs. PL–94a, b, c, d, e, t, u, v,

w, x; Ex. G–26, pp. II–9 to II–13; Exs. USA–60, USA–61, USA–62, USA–63, USA–64; Tr. 1665, *l.* 4–11, *l.* 23–24]

47. Reef net locations were owned by individuals who claimed proprietary rights by virtue of inheritance in the male line. These locations constituted very valuable properties to their native owners. [Ex. USA–30, pp. 6, 20, 21; Tr. 2036, *l.* 10–16; Tr. 2039, *l.* 19 to 2041, *l.* 20] Some of the Lummi signers of the treaty were owners of reef net locations. Lummi Indians who were present at the Point Elliott Treaty Council later asserted that the Lummi signers had received assurances there that they would continue to hold the rights to their fishing grounds and stations, including their reef net locations. [Ex. USA–30, pp. 6–10; Tr. 2054, *l.* 2 to 2055, *l.* 1]

48. After the treaty the Lummi Indians continued to use their reef net locations until about 1894, when fish traps owned by non-Indians were located so as to render valueless many of the Lummi reef net locations. Some Lummis continued to use locations in the San Juan Islands from the turn of the century to the early 1920's. In approximately 1924 Lummi Indians stopped reef netting at their sites off the west coast of Lummi Island when the cannery to which they had been selling their fish closed. In 1934, when fish traps were prohibited in Puget Sound waters, Indian fishermen again had access to former locations. When a new cannery opened in 1939 Lummi Indians and non-Indians began reef netting again on the west coast of Lummi Island. However, non-Indian fishermen using the reef net technique rapidly occupied the more profitable reef net locations. [Ex. USA–30, pp. 26–27; Tr. 2097, *l.* 21 to 2102, *l.* 3; Tr. 2812, *l.* 22 to 2814, *l.* 10; Ex.PL–2, pp. 169–171, 175; Exs. L–5, p. 4, *l.* 4–7, *l.* 26 to p. 5, *l.* 9; L–6, p. 1, *l.* 29 to p. 2, *l.* 24]

49. The Department of Fisheries issues a reef net license to any non-Indian who applies and pays the fee and to any Indian who applies without a fee. The Department does not determine the site where the license is used nor does the license entitle the licensee to any site. The Department does, however, regulate reef net fishermen by time, area and distance between rows of gears. It does not regulate the number of reef nets or the separation between reef nets and reef net boats within a row. [FPTO § 3–608]

50. There are presently 43 reef nets being operated in Legoe Bay off Lummi Island, arranged in rows arbitrarily numbered from 0 to 9 running north to south. None of these is owned by Lummis. Within each row there are varying numbers of reef net gear at specific positions which are numbered from the shore outward. A number of these rows and some of the positions are vacant and have remained so for many years because the sites are not productive. [Tr. 3674, *l.* 9 to 3677, *l.* 6; Tr. 3714, *l.* 17–19; Tr. 3764, *l.* 5–20; Exs. RN–7 and RN–8] Many of the reef net operators have been fishing in the same locations for thirty to thirty-five years. Only seven or eight positions of those occupied in 1973 were profitable over a four-year period. [Tr. 3703, *l.* 2 to 3704, *l.* 3; Tr. 3714, *l.* 10–14; Tr. 3744, *l.* 20 to 3745, *l.* 5]

51. Present day non-Indian reef net gear at Legoe Bay is located in part directly on the sites traditionally occupied by the Lummis at treaty times and thereafter. [Ex. L–7; Tr. 3743, *l.* 3–19; Tr. 2928, *l.* 3 to 2929, *l.* 11; Tr. 3756, *l.* 13 to 3757, *l.* 19; Ex. L–1; Ex. L–3; Tr. 3099, *l.* 20 to 3108, *l.* 23; Ex. L–4; Tr. 3113, *l.* 3 to 3117, *l.* 1]

52. The location of the reef net is one of the most critical factors in the success of a reef net operation. [Tr. 3710, *l.* 15–18; Tr. 3748, *l.* 22 to 3749, *l.* 5] Profitable positions are occupied permanently, unprofitable ones abandoned or operated intermittently or experimentally. [Tr. 3702, *l.* 25 to 3710, *l.* 14]

53. Since the turn of the century, the heavier volume of fish in the vicinity of Legoe Bay traveled close to shore. This has changed so that now fish must be

taken in deeper water. This has been caused by the installation of traps and the present abundance of other fishing gear in the reef net area. [Tr. 3746, l. 20 to 3748, l. 20] In aboriginal times, Indian fishermen, like all fishermen, shifted to those locales that seemed most productive at any given time, including operation of the reef nets. [Exs. USA–20, p. 22; USA–52, p. 4, l. 25 to p. 5, l. 1]

54. All the reef net boats employ the same basic principal developed and used by the aboriginal Lummis, namely creation of an artificial reef to lead the migrating salmon into a net slung between two boats which is lifted when the fish enter the net. [Ex. USA–30, pp. 13–19] Modern gear incorporates numerous refinements and improvements including the addition of electric power to pull the nets. [Ex. RN–1, p. 55, l. 6 to p. 67, l. 14; Ex. RN–5, p. 15, l. 21 to p. 17, l. 9]

55. The present reef net operators occupy fixed positions at the reef net grounds in Legoe Bay and maintain a "gentlemen's agreement" among themselves. The agreement is to the effect that an occupant of a location is entitled to maintain that location to the exclusion of all others. It further provides that no location will be yielded unless to one who agrees to purchase the equipment from the occupant. If the occupant does not desire to sell his equipment no change in occupancy of the location can occur. [Tr. 3681, l. 1 to 3682, l. 4; Tr. 3704, l. 4 to 3705, l. 10; Tr. 3717, l. 13–22] Reef netters do not voluntarily give up their locations or rotate to any other location. [Tr. 3771, l. 19–22] Members of the Reefnetters' Association do not recognize Lummi Indians as having any treaty right to occupy a position on the reef net grounds, and these Indians are, as far as these reefnetters are concerned, in no different position than a non-Indian who would seek to acquire a location. [Tr. 3717, l. 23 to 3719, l. 20]

56. In years past, the few Lummi Indians who operated reef net boats were gradually squeezed out of the reef net fishery by non-Indian pressure and by physical crowding of boats on Indian locations. [Tr. 2936, l. 20 to 2938, l. 17; Tr. 2962, l. 6–21; Tr. 2963, l. 18 to 2964, l. 1; Tr. 2966, l. 7 to 2967, l. 2] No present day Lummis are willing to contest any of the present occupants for possession of a reef net site. [Tr. 3008, l. 13–21] The Lummis are not willing to invest money and gear to occupy locations which are not economically productive. [Tr. 3007, l. 24 to 3008, l. 12] There are Lummi Indians who would be interested in participating in the reef net fishery at Legoe Bay if they could gain access to economically productive locations. [Tr. 2941, l. 13 to 2943, l. 1; Tr. 3009, l. 16 to 3010, l. 2] However, they object to having to purchase a non-Indian's fishing gear in order to occupy a good location. [Tr. 3029, l. 15–24]

57. Over the years the Lummi Tribe and the Department of Fisheries have often worked together to resolve differences, although never reaching total agreement. [Tr. 3014, l. 4–13] In spite of Lummi objections, the Department of Fisheries has opened Bellingham Bay to a heavy gill net commercial fishery which severely depletes the number of fish reaching the Nooksack River, which is depended upon by the Lummi fishermen for a drift net fishery. [Tr. 2978, l. 25 to 2979, l. 18; Tr. 3019, l. 16–22]

58. At the present time, members of the Lummi Tribe engage in all types of fisheries, including gill netting, purse seining and trolling for salmon on Puget Sound, crab fishing, beach seining for all species, including herring, and drift and set gill netting in the Nooksack River. [Tr. 2974, l. 17 to 2975, l. 13] Eight Lummi fishermen own and operate commercial-size fishing boats and approximately 150 members of the tribe take part in the fishery on the Nooksack River. Fishing is vitally important to the people of the tribe, both for subsistence and a livelihood. [Tr. 2976, l. 7 to 2977, l. 6]

59. The Lummi Tribe regulates both its river fishery and offshore fishery and requires its members to carry a tribal identification card and abide by tribal regulations. These fishing regulations are enforceable in tribal court and the tribe utilizes its police for enforcement. [Tr. 2977, *l.* 9 to 2978, *l.* 18] The tribe also imposes and collects a tax on its tribal fishermen. [Tr. 2981, *l.* 17 to 2982, *l.* 2] The tribe also operates a hatchery located at Skookum Creek some 15 or 20 miles from the reservation which has planted fish in the Nooksack River which will migrate to the ocean and Puget Sound. [Tr. 3016, *l.* 5–22]

## Makah Tribe

60. The Makah Tribe is a party to the Treaty with the Makah. It is recognized by the United States as a currently functioning Indian tribe maintaining a tribal government on the Makah Reservation. This tribe is organized pursuant to section 16 of the said Indian Reorganization Act of June 18, 1934, and is incorporated under section 17 of that Act. 25 U.S.C. § 477. Its membership is determined in accordance with its Constitution and Bylaws approved by the Secretary of the Interior on May 16, 1936. It does not have a current federally approved membership roll but it presently has approximately 900 members all residing at Neah Bay, Washington. [FPTO §§ 3–1, 3–13; Tr. 2519, *l.* 15–16; Ex. PL–57]

61. Makah wealth, power and maintenance of Northwest Coast culture patterns were achieved by and dependent upon a thriving commercial maritime economy which was well established prior to 1855. [Ex. USA–21, p. 30] The Makah Indians, prior to treaty times, were primarily a seafaring people who spent their lives either on the water or close to the shore. Most of their subsistence came from the sea where they fished for salmon, halibut and other fish, and hunted for whale and seal. The excess of what they needed for their own consumption was traded to other tribes for many of the raw materials and some of the finished articles used in the daily and ceremonial life of the village. A special feature of the Makah environment was a rich supply of halibut to which the Makah had access by virtue of ownership of lucrative fishing banks respected by competing tribes, a highly developed technology capable of efficiently harvesting the resource, and intensive processing and marketing of the finished product. [Ex. USA–21, pp. 11–13] At the time of the treaties, the Makahs relied more heavily on halibut than on salmon or steelhead for their diet and trade. [Tr. 1879, *l.* 3–7; Tr. 1907, *l.* 2–6] The Makah imported their basic needs such as housing materials and ocean-going canoes used for sea mammal hunting and ocean fishing because of the peculiarly rich resources available to them in their ocean territories, primarily halibut and whale. In addition to the marine products which the Makahs consumed themselves and sold to other Indians in order to buy native goods, they produced a considerable surplus for sale to whites. [Ex. USA– 21, pp. 15, 18; FPTO § 3–47; Ex. PL– 9, p. 35]

62. The treaty commissioners were aware of the commercial nature and value of the Makah maritime economy and promised the Makah that the government would assist them in developing their maritime industry. Governor Stevens found the Makah not much concerned about their land, apart from village sites, burial sites, and certain other locations, but greatly concerned about their marine hunting and fishing rights. Much of the official record of the treaty negotiations deal with this. Stevens found it necessary to reassure the Makah that the government did not intend to stop them from marine hunting and fishing but in fact would help them to develop these pursuits. [Ex. USA–21, pp. 36–37] Article 13 of the Treaty with the Makah, however, did prohibit the tribe from trading at Vancouver Island. [Ex. PL–41, p. 419] By his promises of kettles and fishing apparatus to the

Makah, Governor Stevens clearly indicated that the treaty commissioners had no intention to restrict the Indians to aboriginal equipment or techniques. The Government's intent to aid the Makah in their whaling, sealing and other fisheries continued after the treaty. [FPTO § 3-44; Ex. PL-41, p. 419; Ex. PL-43, p. 417; Ex. USA-21, pp. 33-39]

63. At the time of the treaty, the Makah Indians maintained separate winter and summer villages, such that residents of one winter village (e.g. Baadah) summered at a specific summer village (e.g. Kiddecubbut). The treaty commissioners did not fully understand this network of summer and winter villages. Prior to, during and after the treaty some of the Makah Indians traveled from their summer villages and in the fall moved to camps which provided access to places for taking fish from the salmon runs in the streams and rivers draining into the Strait of Juan de Fuca. [FPTO § 3-46]

64. The Makah could neither read, write nor speak English. Governor Stevens and his party had the assistance of a Clallam Indian who spoke the Makah language, though Makah is totally different and unrelated to Clallam. The treaty appears to have been translated into Chinook jargon, which has a limited vocabulary and was used primarily for trade purposes, but is inadequate to convey concepts of tenure and tenancy in a legal document. Governor Stevens spoke to the Makah in English which was translated into Chinook by B. F. Shaw, the official interpreter. [Ex. USA-21, pp. 24-25]

65. The Makah's usual and accustomed fishing places prior to treaty time included the waters of the Strait of Juan de Fuca to Port Crescent (near Port Angeles) extending out into the ocean to an area known as Swiftsure and then south along the Pacific Coast to an area intermediate to Ozette Village and the Quileute Reservation, as well as the rivers along the Strait of Juan de Fuca and down the Pacific shore starting at the Elwah River and including the Lyre River, Twin River, Pysht River, Hoko River, Sekiu River, Sooes River, Waatch River, Big River, and Ozette River and Lake Ozette. [Exs. USA-20, p. 30; USA-21, pp. 19-22; Ex. USA-31e, pp. 191-197; Tr. 2521, l. 16 to 2522, l. 3, l. 21 to 2523, l. 2] In addition to their plentiful catches of halibut, at treaty times the Makah took chinook, sockeye, chum and coho salmon at their usual and accustomed fishing places using fishing techniques which included beach seining, spearing and trolling. [FPTO § 3-48] The Makah Indians have continued to assert their use rights to areas of saltwater and freshwater after the execution and ratification of the treaty. [FPTO § 3-45]

66. In aboriginal times the Makah enjoyed a high standard of living as a result of their marine resources and extensive marine trade. With the advent of non-Indians to the area, new markets developed, Makah marine pursuits were intensified and Makah wealth increased. [Ex. USA-21, p. 29] The Makah not only sustained a Northwest Coast culture, but also were wealthy and powerful as contrasted with most of their neighbors. They maintained from time immemorial a thriving economy based on commerce. [Ex. USA-21, pp. 32-33]

67. At the present time out of a tribal membership of approximately 900, there are approximately 150 persons engaged in fishing either part time or full time. There are approximately 60 Makah who are steady fishermen. [Tr. 2519, l. 15-16; Tr. 2520, l. 10-21] There are presently eight boats of commercial size fishing on the high seas. Three of these boats are gill netting in the Strait of Juan de Fuca, four are trolling, and one is tuna fishing. The commercial boats are thirty-six feet in length except that the tuna boat is fifty-four feet in length. [Tr. 2523, l. 15 to 2524, l. 13] These boats were obtained by the tribe using its resources to acquire the boats and are managed through a tribal corporation. [Tr. 2524, l. 14-24] These commercial boats go as far as fifty miles out to sea, east to

Puget Sound and south to Westport and the Columbia River. [Tr. 2524, l. 25 to 2525, l. 21] In addition to these larger boats, the remaining Makah fishermen operate small boats ranging in size down to sixteen feet. [Tr. 2524, l. 1–4] The Department of Fisheries, after consultation with the Makah Tribe, has adopted fishing regulations for Washington territorial waters north of Cape Alava and west of the Hoko River for an Indian-only fishery. [Tr. 2554, l. 17 to 2555, l. 8; Ex. JX–2a, App. II, Table 3, pp. 311–312]

68. Salmon is a staple food of the Makah Tribe today and is used for all ceremonies and potlatches. In addition to personal use, the Makah depend upon their commercial take of salmon, and logging activities, for economic survival. [Tr. 2528, l. 8–19]

69. The Makah Tribe has regulated its fishermen since 1937, and has promulgated written regulations for its reservation and off-reservation fisheries since 1952. [Ex. JX–2b, pp. 10–20; Tr. 2530, l. 24 to 2531, l. 5] These regulations were drafted by a fisheries committee composed of seven fishermen elected by the fishermen of the tribe and enacted by the Tribal Council. [Tr. 2519, l. 25 to 2520, l. 7; Tr. 2554, l. 1–8] These regulations have not been revised on an annual basis. [Tr. 2554, l. 9–16] In setting fishing seasons estimates of predicted run size are not utilized by the fisheries committee.. [Tr. 2579, l. 10–14] The regulations are enforced by a tribal patrolman who warns offenders, and if the offender does not cease violation, he will be taken to tribal court and his nets confiscated. The Makah fishermen carry tribal identification cards. [Tr. 2530, l. 24 to 2535, l. 25] In addition, the Makah Tribe has established a formal proceduce by which it seeks advice relating to conservation from state and federal agencies as guidance in drawing up its marine fishery regulations. [Tr. 2537, l. 9 to 2538, l. 7]

70. The Fisheries and Game Departments have from time to time prevented the Makah from exercising their treaty fishing rights at usual and accustomed grounds and stations on rivers along the Strait of Juan de Fuca, [Tr. 2522, l. 4 to 2523, l. 14] and from purse seining off the mouths of the Hoko and Pysht Rivers. [Tr. 2539, l. 25 to 2540, l. 8] In addition, the state allows sport fishermen to fish at the mouth of rivers fished by the Makah. Sport fishermen fishing in Makah usual and accustomed areas are allowed by state law to fish every day of the week and take up to three fish per day per fisherman. The number of sport fishermen is increasing to the point that they seriously impede the efforts of Makah commercial fishermen in marine waters. These fishermen crowd in on Makah fishing boats when they see them taking fish. This seriously hampers the Makah boats' ability to maneuver and to continue their fishing activity. [Tr. 2543, l. 19 to 2546, l. 5] In addition, the Makah have had their nets cut, have had holes chopped in their boats and have been shot at by non-Indians. [Tr. 2540, l. 19 to 2541, l. 7]

*Muckleshoot Tribe*

71. The Muckleshoot Tribe is the present day tribal entity which, with respect to the matters that are the subject of this litigation, is the successor to, and is made up principally of descendants of, tribes or bands which were parties to the Treaty of Point Elliott and the Treaty of Medicine Creek. [Ex. USA–27a, pp. i–vi; Exs. PL–23; PL–66; PL–3; PL–4; PL–41, pp. 417–418; PL–42, pp. 387–388, 392; PL–46, p. 39; Exs. USA–41a, pp. 3–672 to 3–679; USA–41b] It is recognized by the United States as a currently functioning Indian tribe maintaining a tribal government on the Muckleshoot Indian Reservation. This tribe is organized pursuant to section 16 of said Indian Reorganization Act of June 18, 1934, and is incorporated under section 17 of that Act. Its membership is determined in accordance with its Constitution and By-laws approved by the Secretary of the Interior on May 13, 1936, as amended on

June 14, 1961, and March 26, 1969. [Ex. PL–58] Its present membership roll was approved by a representative of the Secretary of the Interior on December 15, 1969, and a supplemental roll was so approved on November 27, 1970. The tribe presently has approximately 386 members. [FPTO § 3–14; Exs. PL–48; PL–5; Exs. USA–54, p. 10, *l.* 24 to p. 12, *l.* 23; USA–46c; USA–46g; USA–47; USA–48; USA–56; USA–57; USA–43, pp. 13, 31; USA–44, pp. 1–2, 36; Tr. 1626, *l.* 1–16]

72. The Muckleshoot Indian Reservation was established on land ceded under the Treaty of Point Elliott, by Executive Order of the President on January 20, 1857, pursuant to authority under Article 6 of the Treaty of Medicine Creek, which was the only pertinent treaty then in effect. [Ex. USA–27a, p. vi; Ex. PL–21] The reservation drew its name from its location on Muckleshoot Prairie and not from the name of any Indian group that was placed thereon. Pursuant to authority of the Treaty of Medicine Creek and the Treaty of Point Elliott, Indians from the Green and White River areas who constituted bands which were parties to the Treaty of Point Elliott, [see Ex. PL–9, p. 42] and some Indians from the upriver portions of the Puyallup River who were party to the Treaty of Medicine Creek, were removed to and consolidated on the Muckleshoot Reservation. No aboriginal band or tribe known collectively by the name "Muckleshoot" (however spelled) existed at treaty time. Those Indians who were removed to and consolidated on the Muckleshoot Reservation thereafter became known as the "Muckleshoot Indians" or "Muckleshoot Tribe." On March 30, 1935, the Indians of the Muckleshoot Indian Reservation voted, pursuant to the provisions of the Indian Reorganization Act, 48 Stat. 988, 25 U.S.C. §§ 476 and 479, not to exclude themselves from application from that Act. That Act authorizes "the Indians residing on the same reservation" to organize as a tribal entity under the Act. The Act of June 15, 1935, 49 Stat. 378, 25

U.S.C. § 478b, provides that nothing in the Indian Reorganization Act "shall be construed to abrogate or impair any rights guaranteed under any existing treaty with any Indian tribe, where such tribe voted not to exclude itself from the application of said Act." [FPTO § 3–14]

73. Acting pursuant to instructions from his superiors in the Indian Service to unite small bands of Indians in Washington Territory under a single head, Governor Stevens designated Seattle as head chief of the Dwamish Indians under which he included the Skopamish, Stkamish, and Smulkamish bands of Indians of the White River and Green River areas. These bands are named in the preamble of the Treaty of Point Elliott. Although none of the Indian signatories to the treaty is identified with any of those three bands, Chief Seattle's signature on the treaty was treated by Stevens and the United States as being on behalf of all of the bands which Stevens had grouped as Dwamish, including the Skopamish, Stkamish, and Smulkamish. [Exs. USA–27a, pp. i–vi; PL–32; PL–66; G–4, p. 179]

74. The United States, acting by and through the Secretary of the Interior and his duly authorized delegatees, has consistently recognized the Muckleshoot Tribe as the political successor in interest to certain of the Indian tribes, bands or villages which were parties to the Treaty of Point Elliott or the Treaty of Medicine Creek. [Exs. PL–48; PL–5; Exs. USA–54, p. 10, *l.* 24 to p. 12, *l.* 23; USA–46c; USA–46g; USA–47; USA–48; Tr. 1624, *l.* 21 to 1625, *l.* 17]

75. Prior to, during and after treaty times the Indian ancestors of the present day Muckleshoot Indians caught chinook, coho, kokanee, sockeye, chum and pink salmon and steelhead which they ate fresh and cured for winter consumption and for exchange and trade. They used weirs, funnel snares, grills, set nets and spears for this purpose. They operated their weir sites so as to periodically remove lattice sections of

the weir thus permitting the salmon to escape upstream to spawn. [FPTO § 3–51; Ex. USA–27b, p. 7]

76. Prior to and during treaty times, the Indian ancestors of the present day Muckleshoot Indians had usual and accustomed fishing places primarily at locations on the upper Puyallup, the Carbon, Stuck, White, Green, Cedar and Black Rivers, the tributaries to these rivers (including Soos Creek, Burns Creek and Newaukum Creek) and Lake Washington, and secondarily in the saltwater of Puget Sound. Villages and weir sites were often located together. [FPTO § 3–53; Ex. USA–20, p. 38; Ex. USA–27b, pp. 7–16; Ex. PL–23, pp. 11–12]

77. The State's failure to recognize the Muckleshoot Tribe as a treaty tribe has limited the share of the catch which the Department of Fisheries has tried to make available to that tribe. [Tr. 3629, l. 8–12; Tr. 3794, l. 12 to 3795, l. 18] If it were determined that the Muckleshoot Tribe has off-reservation treaty fishing rights it would be possible to provide that tribe with a greater share of chinook and coho salmon ‘in Lake Washington than is now allowed. [Tr. 3625, l. 22 to 3626, l. 3]

78. Before the Lake Washington ship canal was constructed in 1916 Lake Washington extended farther south and had its outlet through the Black-Duwamish Rivers. The Cedar River did not empty into the lake, but rather into Black River which no longer exists. At the junction of Cedar and Black Rivers were several winter villages and an important Indian fishery. Black River joined White River to form the Duwamish River and there was another important Indian settlement and fishery at this junction. Farther upstream White River and Green River met and on the land between the forks was the most important and largest upriver settlement and fishery. [Ex. JX–2a, p. 298; Ex. USA–27b, pp. 9–12] The Indians had at least three groups of important weir sites to intercept returning salmon on those rivers. These were destroyed by the changes wrought by the elimination of the Black River and the new flow patterns of the Cedar and White Rivers. The Black River silver salmon run was destroyed, as were some of the other spawning areas around Lake Washington. [Ex. USA–27b, pp. 10–12]

79. The Muckleshoot Tribe has promulgated regulations for its reservation and off-reservation fisheries. [Ex. JX–2b, pp. 21–23] Although the tribe has received assistance from federal biologists in developing its regulations, the federal biologists have discussed with the tribe, but not provided it, estimates of predicted run size and recommendations of seasons or areas for fishing. [Tr. 1285, l. 12–17, l. 22–25; Tr. 1348, l. 5–11; Tr. 1349, l. 18 to 1350, l. 1] There are presently between thirty-five and fifty Muckleshoot fishermen. [Ex. MS–8, p. 4, l. 5–6]

80. There has been cooperation between the Muckleshoot Tribe and the Department of Fisheries, particularly on water problems in the White River, which is one of the major factors affecting the availability of fish in the Indian fishery. [Tr. 3162, l. 10 to 3163, l. 7; Ex. F–25] Although the Department of Fisheries, pursuant to state court decisions, has not recognized the Muckleshoot Tribe as a treaty tribe, it has provided for a permit fishery for Muckleshoot Indians on Lake Washington and test fishing on the Green and Carbon Rivers. [Tr. 1093, l. 16 to 1094, l. 6; Tr. 3570, l. 14 to 3571, l. 15; Tr. 3575, l. 23 to 3577, l. 4]

*Nisqually Tribe*

81. The Nisqually Tribe is the present day tribal entity which, with respect to the matters that are the subject of this litigation, is a political successor in interest to some of the Indian tribes or bands which were parties to the Medicine Creek Treaty. It is recognized by the United States as a currently functioning Indian tribe maintaining a tribal government on the Nisqually Indian Reservation. This tribe is organized pursuant to section 16 of the Indian

Reorganization Act of June 18, 1934. Its membership is presently determined in accordance with its Constitution and Bylaws approved by the Assistant Secretary of the Interior on September 9, 1946. It has a membership roll approved by a representative of the Secretary of the Interior on November 3, 1965. The tribe presently has approximately 48 members. A new constitution was adopted by the tribe on June 9, 1973, to become effective upon approval by the Secretary of the Interior. The matter is currently pending before the Secretary. [FPTO § 3–15; Tr. 2635, *l.* 8–14; Ex. PL–59] The Indians who were assigned to the Nisqually Reservation, including those identified in the treaty preamble as Nisqually and Steilacoom, were thereafter known as Nisqually Indians and were dealt with by the United States as a separate and collective entity. [Ex. USA–25, p. 25]

82. During treaty times the Nisqually Indians recognized separately and harvested the following species or races of anadromous fish: a) Tl'hwai (chum or dog salmon); b) Skowitz (coho salmon); c) Huddo (humpback salmon); d) Satsup (chinook salmon), To-walt (king or tyee salmon) were recognized as Satsup, the basis of distinction being size; e) Skwowl (steelhead). Their fishing techniques included trolling in saltwater, and nets, traps, weirs, gaffs, spears and hook and line in freshwater. Such fish were the Nisqually Indians' most important item of food. They were eaten fresh, were smoked and preserved, and were used for nonfood purposes such as glue base by the Nisqually Indians. The Nisqually Indians also identified several constellations of stars by reference to fish and fisheries. [FPTO § 3–58; Ex. USA–25, pp. 10–21a] The unpublished works of George Gibbs contain at least three notations of a fish trap or fish dam on the Nisqually River involving at least two separate locations. [FPTO § 3–61; Ex. USA–25, p. 22]

83. Dr. George Suckley, who reported information respecting salmon which he recorded from the Indians while he resided at Puget Sound between 1853 and 1856, reported that:

" * * * the salmon known to the Nisquallies as the *skwowl,* which I consider identical with the *Klutchin* of the Clallums, * * * arrives in the bays and estuaries of Puget Sound about the middle of autumn, and towards the first of December commences to run up the larger rivers emptying into the sound. Their ascent of these · streams continue through December and January. This arrival of the species in fresh water is not as simultaneous, neither do they arrive in such great numbers at any one time or in 'schools,' as is the case with the *skourtz* and several other species, but the 'run' being somewhat more 'drawn out' affords a steady moderate supply to the Indians during its continuance."

He further recorded that, after the skwowl entered the rivers, they were taken by the Indians in nets, traps, baskets, and also by spearing. [FPTO §§ 3–55; 3–56; Ex. PL–50, p. 329; Ex. USA–25, pp. 15–16]

84. Dr. George Suckley reported on some of the uses which the Indians made of different species of salmon in 1853 and 1854. Quoting George Gibbs, Suckley reported that the dog salmon is preferred by the Indians for drying because there is but little fat upon it. [FPTO § 3–57; Ex. PL–50; Ex. USA–25, pp. 17–18]

85. At the time of the Medicine Creek Treaty upriver fisheries in the Nisqually area were normally used by the locally resident group. Saltwater fisheries and fisheries at the mouth of the Nisqually River traditionally were used by visitors as well as the local residents. Visitors might use them because they held claims to them by virtue of kin ties with the local people or they might be accorded guest privileges by virtue of friendship. [FPTO § 3–60; Ex. USA–25, p. 26] Use of the lower Nisqually fisheries by non-Nisqually was with the permission of the local people

and would have been accorded automatically to people claiming descent from someone who had come from the local village or who had married into it. People with more distant kin ties to the local village or with none would be accorded fishing privileges on request if amicable relations obtained. [Ex. USA–25, p. 26]

86. The usual and accustomed fishing places of the Nisqually Indians included at least the saltwater areas at the ·mouth of the Nisqually River and the surrounding bay, and the freshwater courses of the Nisqually River and its tributaries, McAllister (Medicine or Shenahnam) Creek, Sequalitcu Creek, Chambers Creek and the lakes between Steilacoom and McAllister Creeks. The saltwater fisheries were shared with other Indians. [FPTO § 3–63; Exs. USA–25, p. 25; USA–31e, pp. 200–202; Exs. G–23, pp. II–18–19; G–25, p. II–4]

87. Salmon and steelhead continue to be important to the Nisqually Indians as evidenced by continued fishing activity. [Exs. USA–25, p. 26; USA–69; USA–70] The greatest catch by species from the Nisqually River by Indians is on the chum salmon run. This run is largely unharvested by non-Indian fisheries in Washington waters because it comes through Puget Sound after the commercial fishing has been closed for the season and because chum salmon do not take the sportsmen's lures or bait to any significant degree. The chum run is in the Nisqually River at the same time that steelhead are running in the river. Because of this the state has allowed no off-reservation Indian net fishery on this run. [Tr. 3633, l. 7 to 3634, l. 18; Tr. 882, l. 16 to 883, l. 25; ·Exs. F–58; F–59; Ex. JX–2a, App. II, p. 315] The Department of Fisheries' agreement to the prohibition is not based on any concern for preservation of the Nisqually River chum run but upon a request from the Game Department that the prohibition was necessary to preserve the winter steelhead run. [FPTO § 3–607]

88. Pursuant to an understanding between the Department of Fisheries and the Department of Game, the latter Department assumes the lead jurisdictional role over the adoption and enforcement of regulations governing fishing on rivers during the time that steelhead are primarily the anadromous fish in the river. [Tr. 221, l. 21 to 223, l. 12; Tr. 226, l. 11–15] On the Nisqually River the Game Department assumes lead jurisdiction under this understanding on December 1st of each year. The peak of the chum run in the Nisqually River occurs after December 1st and the predominant species in the river during December is chum salmon. [FPTO § 3–607; Tr. 2686, l. 5 to 2687, l. 11; Ex. JX–2a, Table 49, p. 215 and Table 62, p. 232; Ex. F–6, Table 20, p. 25]

89. The Game Director has testified that his Department would have no objection to the Department of Fisheries allowing the Nisqually Indians an off-reservation gill net season on the Nisqually River for chum salmon during the first weeks of December if the net mesh size is large enough to allow escapement of steelhead through it, and the run size is sufficient. [Tr. 227, l. 2 to 229, l. 115] Subject to those conditions being satisfied, the Game Director testified that it may be possible and feasible to regulate an off-reservation Indian net fishery on the Nisqually River to take chum and at the same time conserve the steelhead run. [Tr. 232, l. 5 to 233, l. 23]

90. The Nisqually Tribe has promulgated fishing regulations for its on and off-reservation fishing areas. [Ex. JX–2b, pp. 24–26; Ex. USA–70, p. 4, l. 10–14] These regulations were drawn up by a fish committee composed of, tribal fishermen without assistance from federal biologists. [Tr. 2644, l. 13 to 2646, l. 5; Ex. F–72] The original fishing ordinance was adopted in 1968 and annual regulations have been adopted only since 1972. [Ex. F–33, p. 3, l. 17–22] In setting seasons the tribe does not use estimates of predicted run size. [Tr. 2646, l. 6–14] There is no formal

enforcement procedure and the regulations are presently not being enforced. Violations are presently handled by the fishermen themselves. [Ex. F–33, p. 17, *l.* 8–22]

91. Nisqually Indians today fish with drift and set nets. [Tr. 2646, *l.* 15–20] There are not enough fishing sites on the Nisqually Reservation to accommodate all Nisqually Indian fishermen. [Ex. F–33, p. 8, *l.* 7–18; Tr. 2689, *l.* 21 to 2690, *l.* 14] Most members of the Nisqually Tribe live off the reservation in the near vicinity to the Nisqually valley. [Ex. F–33, p. 7, *l.* 19 to p. 8, *l.* 6] A number of set net sites are located throughout the stretch of river downstream from the reservation. [Ex. PL– 53; Ex. USA–70, p. 6, *l.* 11–16] The locations for these cites change because the river course changes. [Tr. 2652, *l.* 17 to 2653, *l.* 1]

92. The Department of Fisheries has promulgated off-reservation fishing regulations for Indians on the Nisqually River. [Ex. JX–2a, App. II, Table 6, p. 315] The Department and the tribe have discussed issues concerning development of off-reservation regulations, but have not reached agreement on fishing seasons, areas, or times. [Ex. F–33, p. 12, *l.* 23 to p. 13, *l.* 5]

93. There are presently approximately fifty fishermen fishing in the Nisqually Indian fisheries, about twenty of whom fish year-round. [Ex. USA–70, p. 3, *l.* 11–14] Included are approximately twenty members of the Nisqually Tribe, seven to ten of whom fish full time. [Ex. F–33, p. 6, *l.* 14 to p. 7, *l.* 8] The Nisqually Tribe allows non-enrolled members to fish in its treaty fisheries. [Ex. F–33, p. 15, *l.* 3–13]

### Puyallup Tribe

94. The Puyallup Tribe is the present day tribal entity which, with respect to the matters that are the subject of this litigation, is a political successor in interest to some of the Indian tribes or bands which were parties to the Medicine Creek Treaty. It is recognized by the United States as a currently functioning Indian tribe maintaining a tribal government. This tribe is organized pursuant to section 16 of said Indian Reorganization Act of June 18, 1934. Its membership is determined in accordance with its Constitution and Bylaws approved by the Secretary of the Interior March 11, 1936, as amended June 1, 1970. It does not have a current federally approved membership roll but it presently has approximately 600 members. [FPTO § 3–16; Ex. PL–60]

95. The reference in the Preamble to the Treaty of Medicine Creek to the Puyallup and S'Homamish Bands of Indians was intended to encompass all those groups of Indians living on the Puyallup River, its tributary creeks, and neighboring Vashon Island. After the treaty these people, as well as any others who removed to the Puyallup Reservation, were all subsumed under the single name "Puyallup". [FPTO § 3–67]

96. At the time of the Medicine Creek Treaty communication among upriver Puyallups, people of the Green River-White River-Stuck River area and the upriver Nisquallies was relatively easy. In addition, there was considerable intermarriage and trade contact with Sahaptin-speaking peoples from east of the Cascades. [FPTO § 3–65]

97. Accounts by settlers and others prior to and contemporaneous with the treaties attest to the abundance of fish in the waters utilized by the Puyallup Indians and to the variety of techniques employed by them in taking fish. In the rivers the bulk of the salmon and steelhead was taken in nets associated with weirs, but other important taking techniques included gaffing, falls traps, river seines, and spearing. In the marine areas salmon were taken by beach seining and trolling. These fish were important to the Indians as an item of diet and subsistence, an item of trade, a medium of exchange and a base for such manufactured commodities as glue. [FPTO § 3–68; Ex. USA–26, pp. 8–16]

98. The principal fishing places of the Puyallup Indians were located in the area ceded by these Indians under the Medicine Creek Treaty as well as the area subsequently set aside pursuant to the treaty for their exclusive use as the Puyallup Indian Reservation. [FPTO § 3–73] The land set apart as the Puyallup Reservation as a result of Governor Stevens' 1856 recommendation for relocation of the reservation also was intended to encompass usual and accustomed freshwater fishing sites, and to provide access to traditional fisheries in Commencement Bay for those Indians who were brought to the reservation. [FPTO § 3–69; Ex. PL–75; Ex. USA–26, p. 21; Ex. PL–42, p. 385]

99. The usual and accustomed fishing places of the Puyallup Indians included the marine areas around Vashon Island and adjacent portions of Puget Sound, Commencement Bay, the Puyallup River and the tributary rivers and creeks. In addition, smaller creeks adjacent to but not tributaries of the Puyallup River were used. [Exs. USA–20, p. 37; USA–26, p. 21; Ex. G–24, p. II–13] The Puyallup Tribe has enacted regulations applicable to the exercise of its tribal fishing rights. [Ex. JX–2b, pp. 27–34; Tr. 2872, l. 25 to 2873, l. 3] The regulations provide for a year-round four day per week fishery without annual seasons. There are limitations on open areas and amount and size of gear. Presently there are no emergency regulations, but the tribal council is authorized to change fishing times, require catch reports and establish registration fees. Predictions of estimated run size are not used in setting the regulations. [Tr. 2879, l. 4 to 2880, l. 3; Ex. JX–2b, pp. 29–33] Penalties are provided for but there is no formal enforcement procedure. Regulations are enforced by a group of twenty-five to thirty fishermen confronting the wrongdoer and pulling his net out of the water if it is in violation of the regulations. [Ex. JX–2b, p. 33; Tr. 2874, l. 9–15; Tr. 2883, l. 15–24]

100. Fishing for salmon and steelhead continues to be important to the Puyallup Tribe. [FPTO § 3–74; Tr. 2874, l. 16–23] There are between thirty and forty Puyallup fishermen. [Ex. F–34, p. 35, l. 1–3; Tr. 2885, l. 13–16] These fishermen fish seasonally, mainly between August and January, and earn approximately $5,000 apiece. During the remainder of the year many are otherwise employed. [Tr. 2885, l. 17 to 2886, l. 16; Tr. 2888, l. 17 to 2889, l. 7]

101. An Assistant Director of Fisheries testified that Puyallup Indians fishing on the fall chinook run in the Puyallup River have overfished causing a reduction in run size. [Ex. F–28, p. 58, l. 29 to p. 59, l. 30; Ex. F–4] In 1973 federal biologists concurred with the Department of Fisheries' prediction that the fall chinook run to the Puyallup River would be a low run. The Department of Fisheries closed all commercial fishing under its control on that run including the Puyallup Indian net fishery. The reason for the closure was explained to a federal biologist who agreed that the Department's restriction of fishing on the Puyallup River fall chinook run was necessary for conservation. [Tr. 1394, l. 20–24; Tr. 3578, l. 18 to 3580, l. 20] Although a member of the Puyallup Tribe's fishery committee discussed the low fall chinook run with the federal biologist, the committee did not close the river to its fishermen. Its fishermen continued to fish in the river contrary to state regulation. [Tr. 2881, l. 1 to 2883, l. 5; Tr. 3580, l. 21 to 3581, l. 2]

102. At least prior to November, 1973, when considering whether to authorize any net fishery for Puyallup Indians the Game Department operated on the premise that, as a result of applicable court decisions, Indian fishing anywhere on the Puyallup River was subject to the regulatory jurisdiction of the State. [Tr. 250, l. 10 to 252, l. 20]

### Quileute Tribe

103. The Quileute Tribe is the present day tribal entity which, with re-

spect to the matters that are the subject of this litigation, is a political successor in interest to some of the Indian tribes or bands which were parties to the Treaty of Olympia. It is recognized by the United States as a currently functioning Indian tribe maintaining a tribal government on the Quileute Reservation. This tribe is organized pursuant to section 16 of the said Indian Reorganization Act of June 18, 1934. Its membership is determined in accordance with its Constitution and Bylaws approved by the Secretary of the Interior on November 11, 1936, as amended March 11, 1949. Its present membership roll was approved by a representative of the Secretary of the Interior on December 26, 1972. The tribe presently has about 450 members. [FPTO § 3–17; Ex. PL–61; Tr. 3192, *l.* 22–24]

104. At the time of the treaty the Quileute (including the Hoh) relied primarily on salmon and steelhead taken in their long and extensive river systems. These Indians were able to take canoes far up into the foothills country by following the river system, not only to take salmon and steelhead, but also to hunt land game in the foothills. [FPTO § 3–77; Ex. USA–22, pp. 9–16]

105. The Quileute reliance on fish as a food staple is reflected in their calendar. Quileute Indian names for some months are related to fish or fishing activities. Translated into English these names and their approximate period of our calendar include the following: "Beginning of the spawning of the steelhead salmon", approximately January (32 days); "regular or strong spawning time of salmon", about February (32 days); "time for black (chinook) salmon", September; "time for silver salmon", October. [FPTO § 3–79; Ex. USA–22, pp. 13–14]

106. An account of Quileute fishing given September 1, 1916, by Arthur Howeattle, a Quileute Indian, stated that the Quileutes used to fish in rivers, lakes and the ocean and that the fishing grounds in the river were used by individual families and those in the lakes and ocean were used in common. He stated further that fish were caught with drag nets, scoop nets and fish-traps, fish baskets, dip nets, spears, hooks and lines. [FPTO § 3–80; Ex. USA–22, p. 14]

107. Quileute aboriginal fishing gear included a stake trap stretching across a stream with open spaces at intervals in which dip nets were suspended; triangular fish traps which often could catch a canoe-load of fish at a time; and sloping dams across a river along which dip or bag nets were suspended from the downstream side into which the fish would jump in their attempts to get over the dam. [FPTO § 3–81]

108. Before, during and after treaty times, the usual and accustomed fishing places of the Quileute and Hoh Indians included the Hoh River from the mouth to its uppermost reaches, its tributary creeks, the Quileute River and its tributary creeks, Dickey River, Soleduck River, Bogachiel River, Calawah River, Lake Dickey, Pleasant Lake, Lake Ozette, and the adjacent tidewater and saltwater areas. In aboriginal times the Quileute Indians utilized fishing weirs where salmon were caught along the Quillayute River. In 1861 James G. Swan encountered fish weirs about a mile up from the bend of the Quillayute River near its mouth and about a mile further upstream. Along the adjacent Pacific Coast Quileutes caught smelt, bass, puggy, codfish, halibut, flatfish, bullheads, devilfish shark, herring, sardines, sturgeons, seal, sea lion, porpoise and whale. [FPTO §§ 3–78, 3–83, 3–84; Exs. USA–20, pp. 31–32; USA–22, pp. 11–21, 25–29; USA–31e, pp. 218–232; USA–53, App. I]

109. Pretreaty Quileute villages were located where the conditions of the river were best for catching fish and, consequently, each village obtained its principal supply from a trap located nearby. The traps were built in shallow water although not necessarily at the mouths of small streams. [Exs. USA–22, p. 18;

USA–31e, pp. 224–225] The fish traps or weirs used by the Quileutes were made of fine maple bows laced by spruce limbs. They entirely closed the streams in which they were built. When the Indians had enough fish for their own immediate needs and to dry for their year's supply, they would remove the weir from the river so that the fish could go up the stream to spawn. [Exs. USA–22, pp. 25–26; USA–31e, p. 222]

110. Fishing is basic to the economic survival of the Quileute people. It is the only resource which the Tribe's members have for making money on the reservation. Fish are distributed freely as gifts and are used in all kinds of ceremonies and celebrations. [Tr. 3193, l. 8 to 3194, l. 16] Because there are limited locations on their reservation and specifically only one or two places suitable for drift netting, it is necessary that the Quileutes go upstream beyond the reservation boundaries to accommodate all the fishermen. [Tr. 3192, l. 10–21]

111. The lowermost 2½ to 3 miles of the Quillayute River are within the Quileute Indian Reservation and the Olympic National Park. The State has no jurisdiction over fishing by Indians in these areas and has not asserted any such jurisdiction. There is, however, a sizeable state-authorized sports fishery for salmon just outside the mouth of the Quillayute River. Historically, members of the Quileute Tribe have fished with gill nets for salmon and steelhead in the Quillayute River both within and upstream from the above-described area and in the lower portions of the Soleduck and Bogachiel Rivers. There is currently an Indian net fishery for both salmon and steelhead within the reservation and national park area. Several of the locations desirable to Quileute Indians for effective set net fishing on the Quillayute River are located upstream from the Olympic National Park in waters under state jurisdiction. Since the creation of the Game Department the Indians have been permitted to fish in these waters for steelhead only in accordance with state law which totally prohibits fishing for steelhead by means other than angling. [FPTO §§ 3–462, 3–463; Tr. 3199, l. 8 to 3200, l. 16] The Department of Fisheries has opened the upstream area of the Quillayute River, upstream to about the mouth of the Soleduck River, to net fishing by Indians for salmon from September 1 to November 30. [Ex. JX–2a, Table 17, p. 159; App. II, p. 310; Tr. 3214, l. 21 to 3215, l. 10]

112. The winter steelhead run in the Quillayute River system commences in strength about December 1 and extends in major strength in the lower portion of the system through March. The Quillayute, Soleduck, Calawah and Bogachiel Rivers are open to steelhead angling under the Washington game laws and regulations generally from about the first of December to the end of February. The portions of those rivers west of U.S. Highway 101 are generally open for an additional period until about April 30, and for an additional period during the summer season. The State licenses guides to take parties of sport fishermen (usually consisting of two fishermen per boat) along the Quillayute River system. Operators of these boats generally charge parties $60 per trip. The operators advertise to attract sport fishermen to fish that river system. [FPTO § 3–462]

113. During the period December through February the Indian catch from the Quillayute River system is predominantly, if not entirely, steelhead. During the 1971–72 run approximately twenty or thirty Indian gill net fishermen fished the Quillayute River but not the entire system. During this time of Indian net fishing, sportsmen have fished the river system both as bank fishermen and as boat fishermen. This sport fishing is mostly upstream from the majority of Indian nets, but at times Indians and sportsmen fish the same stretches of water. Agents of the Game Department have arrested Indians who

have fished for steelhead outside of the reservation and national park area in any time, place, and manner other than that permitted by state law. [FPTO § 3–462]

114. Notwithstanding the Indian commercial net fishing on the Lower Quillayute River, catch statistics from punch card data of the upriver sports fishery show an increase in the sport steelhead catch in recent years. This increase could not have occurred unless increased numbers of steelhead had passed through the lower river Indian net fishery. [FPTO § 3–463]

115. At the present time there are 34 full-time fishermen among members of the Quileute Tribe. [Tr. 3192, *l.* 25 to 3193, *l.* 4] These include fishermen who gill net in the rivers and the owners of six boats which engage in off-shore fishing. [Tr. 3191, *l.* 22 to 3192, *l.* 2]

116. The Quileute Tribe has adopted fishing regulations for both on and off-reservation fisheries. [Ex. JX–2b, pp. 42–44; Tr. 3210, *l.* 11–22] The regulations adopted originally in 1941 and revised in 1973 do not provide for annual seasons and do not take run size into account. Estimates of predicted run size are not utilized in establishing fishing regulations. [Tr. 3210, *l.* 11–22; Tr. 3212, *l.* 20 to 3213, *l.* 7] The tribe does impose a tax on its commercial fishermen, the proceeds of which are for the benefit of the general tribal treasury. [Tr. 3200, *l.* 17–24]

117. The Game Department has interfered with Quileute fisheries by seizing nets and threatening arrests for any Indian net fishing for steelhead on the Quillayute River system outside of reservation or national park boundaries from December 1st through June. [Tr. 3195, *l.* 17 to 3197, *l.* 18] The Game Department has held those nets and retains them indefinitely. The Department makes no effort to bring the matter before a court for declaration of a forfeiture. [Tr. 604, *l.* 14–22] State authorities have persistently tried to stop Quileutes from shipping their steel-head to market. The result is that the Quileutes have to ship them by air. [Tr. 3194, *l.* 17 to 3195, *l.* 5]

118. Prior to October, 1973, the Game Department had never considered a regulation to authorize Quileute Indians to maintain an off-reservation net fishery for steelhead, nor had the Game Department staff advised the Game Commission of the data or supporting facts regarding the Quileute Indian fishery. [Tr. 303, *l.* 14 to 304, *l.* 12; Ex. PL–37]

*Quinault Tribe*

119. The Quinault Tribe is the present day tribal entity which, with respect to the matters that are the subject of this litigation, is a political successor in interest of some of the Indian tribes or bands which were parties to the Treaty of Olympia. This tribe is recognized by the United States as a currently functioning Indian tribe maintaining a tribal government on the Quinault Reservation and is composed of the Quinault and Queets Band of Indians, and other fish-eating Indians of the Olympic Peninsula who were allotted on the Quinault Reservation. Its membership is determined in accordance with its Bylaws adopted by its tribal council on May 22, 1965, and recognized by the Bureau of Indian Affairs. It has a membership roll of 986 approved by a representative of the Secretary of the Interior on March 31, 1973. Additional applications for membership are pending. [FPTO § 3–18]

120. The usual and accustomed fishing places of the Quinault people within the case area at treaty time included the following rivers and streams: Clearwater, Queets, Salmon, Quinault (including Lake Quinault and the Upper Quinault tributaries), Raft, Moclips, Copalis, and Joe Creek. Ocean fisheries were utilized in the waters adjacent to their territory. [Ex. USA–53, p. 24 and App. 1; USA–31e, pp. 205–214, 233–235A]

121. The Quinault also have important fisheries which were shared with other tribes to the south and east of the

boundaries of the case area, especially Grays Harbor and those streams which empty into Grays Harbor. [Ex. USA–53, p. 24 and App. 1 and 2; Tr. 2817, *l.* 3 to 2818, *l.* 19]

122. At treaty time fishing constituted the principal economic activity of the Quinault. Salmon and steelhead served as the principal food and as an important item of trade. [Ex. USA–53, p. 24] In the immediate post-treaty period (1860) the government Indian agent recommended that the Quinault Indians be encouraged to open a trade in their salmon as they could be more profitably employed in that way than in agricultural pursuits. [Ex. PL–41, p. 420; Ex. PL–42, p. 391]

123. The lower portions of the Quinault and Queets Rivers run through the Quinault Reservation. There are tribally managed commercial and sports steelhead fisheries within the reservation and a non-Indian-managed recreational fishery for steelhead outside and above the reservation on these rivers. The steelhead resource on these rivers has been maintained without Game Department stocking. The Game Department has not stocked the Quinault and Queets systems because of limitations in their hatchery program and because of opposition by sportsmen's groups, among other reasons. [FPTO § 3–474; Tr. 314, *l.* 20 to 316, *l.* 15; Tr. 3475, *l.* 5–21]

124. The Quinault Tribe has had regulations on its river fisheries since 1916 and tribal fish patrolmen since 1925. [Tr. 3438, *l.* 21 to 3440, *l.* 5] The tribe has on occasion closed its waters to all fishing and prohibited certain types of gear in order to conserve fish runs. [Tr. 3440, *l.* 25 to 3441, *l.* 14; Tr. 3445, *l.* 12 to 3446, *l.* 2] The Quinault Tribe has not had off-reservation fishing regulations because few of its members fish off-reservation in the case area. [Tr. 3475, *l.* 22 to 3476, *l.* 4] Presently only 30 to 40 per cent of the on-reservation fishing sites on the Quinault River are being used. [Tr. 3455, *l.* 22 to 3457, *l.* 17] Any apparent de-

cline in the Quinault sockeye run is probably not due to overfishing by the Quinault Tribe. [Tr. 3530, *l.* 18 to 3532, *l.* 17; Tr. 3551, *l.* 25 to 3552, *l.* 21; Exs. QN–4, QN–5, QN–6 and QN–7]

125. The Quinault Tribe and the tribal technical staff of fisheries scientists and technicians are presently engaged in a comprehensive fisheries management and enhancement program on the reservation. The program includes the production of sockeye, chum, and steelhead from eggs taken by tribal employees, and the cleaning of streams damaged by logging to recover spawning grounds on the reservation. [Ex. QN–2 and Appendices thereto; Ex. QN–3, pp. 1–11]

126. No special off-reservation fishing season for Quinault Indians has ever been or presently is allowed by the State even though such a season was proposed to the State by tribal officials. [Tr. 3476, *l.* 20 to 3477, *l.* 22]

127. The Quinault Tribe successfully manages its river steelhead run such that both a net commercial and a hook and line sport fishery operate side by side and these uses are not incompatible under the tribal management. [Ex. QN–3, p. 8, *l.* 17 to p. 9, *l.* 14; Tr. 315, *l.* 6 to 316, *l.* 15]

128. The Quinault Tribe is, biologically speaking and from an enforcement standpoint, effectively managing its fisheries resources on the reservation, and is capable of doing so outside of the reservation. [Tr. 3488, *l.* 9 to 3490, *l.* 14; Tr. 3553, *l.* 25 to 3555, *l.* 5]

*Sauk-Suiattle Tribe*

129. The Sauk-Suiattle Tribe is composed primarily of the descendants of the Sakhumehu and other Indians who lived on the upper reaches of the Skagit River system in 1855. [FPTO § 3–85; Ex. USA–29, p. 12; Ex. USA–58; Ex. UPS–2] Those Indians were party to the Treaty of Point Elliott. [Ex. USA–29, p. 9; Ex. UPS–2, pp. 19–21] A Sakhumehu village was located at the con-

fluence of the Sauk and Skagit Rivers. [Ex. USA–58] The Sakhumehu Indians are named in the preamble to the Treaty of Point Elliott; and one of the treaty signatories is identified as a Sakhumehu. At treaty time the Sauk River Indians, who were known variously as Sock-a-muke, Sakhumehu or Sock a bute, regarded themselves as a distinct and separate group and were so regarded by other Indians and by non-Indians. Their separate identity was consistently recognized in reports referring to them before, during and after the Treaty. Prior to and during treaty times these Indians intermarried to a considerable extent with the Upper Skagit and Stillaguamish Indians. After treaty times some of the Sauk River Indians continued to live along the Sauk and Suiattle Rivers where their descendants still reside. [FPTO § 3–85; Ex. USA–29]

130. No separate reservation was established for a Sauk-Suiattle Tribe in their area. They were permitted to move to reservations established in the general vicinity; and the majority who moved to a reservation moved to the Swinomish Reservation, but most remained in their aboriginal area. The Sauk-Suiattle Tribe is organized and incorporated under the State of Washington Nonprofit Corporation Act (RCW 24.03) and is not organized pursuant to any federal law. [FPTO § 3–19; Ex. PL–64] The Tribe is recognized by the federal government, but its membership roll has not been approved by the Secretary of the Interior or his representative. [Exs. USA–43, pp. 19, 41; USA–44, pp. 2, 36] The Tribe has approximately 250 members. [Ex. F–30, Sauk-Suiattle Tribe Answer to Interrogatory 44]

131. The usual and accustomed fishing places of the Sauk River Indians at the time of the treaty included Sauk River, Cascade River, Suiattle River and the following creeks which are tributary to the Suiattle River—Big Creek, Tenas Creek, Buck Creek, Lime Creek, Sulphur Creek, Downey Creek, Straight Creek, and Milk Creek. Bedal Creek, tributary to the Sauk River, was also a Sauk fishing ground. [Ex. USA–29, p. 13; Ex. MS–10, p. 3, l. 1–6]

132. During treaty times the Sauk River Indians took fish with spears, dip nets, traps and weirs. They procured salmon and steelhead in their upriver region and also traveled to the saltwater to procure marine life unavailable in their own territory. They ate salmon and steelhead in both fresh and cured forms. [FPTO § 3–88] In modern times the Sauk-Suiattle Indian fishermen, numbering only about thirty, have not fished commercially and are primarily interested in a personal use fishery. [Ex. F–42, p. 5, l. 4–11 and l. 21 to p. 6, l. 4, p. 8, l. 24 to p. 9, l. 2, p. 10, l. 12–17, p. 16, l. 20 to p. 17, l. 2]

### Skokomish Tribe

133. The Skokomish Tribe is, with respect to the matters that are the subject of this litigation, a political successor in interest to some of the Indian tribes or bands which were parties to the Point No Point Treaty. It also includes descendants from some Indians to whom the Medicine Creek Treaty was applicable. It is recognized by the United States as a currently functioning Indian tribe maintaining a tribal government on the Skokomish Indian Reservation. This tribe is organized pursuant to section 16 of the Indian Reorganization Act of June 18, 1934, and is incorporated under section 17 of that Act. Its membership is determined in accordance with its Constitution and Bylaws approved by the Assistant Secretary of the Interior on May 3, 1938, as amended January 12, 1966. Its present membership roll was approved by a representative of the Secretary of the Interior on May 22, 1973. The tribe presently has approximately 416 members. [FPTO § 3–20; Ex. PL–62]

134. The Skokomish Tribe is composed primarily of descendants of the Skokomish and Too-an-ooch who at treaty times lived in the drainage area of Hood Canal. Those two groups were

named in the preamble of the Treaty of Point No Point. At that time the two names were used to describe the communities of the upper and lower portions of Hood Canal respectively. These groups were different segments of the Too-an-ooch or Twana group. [FPTO § 3–89; Ex. USA–23, p. 21] After the treaty all Indians of the Hood Canal drainage system, except the Port Gamble Reservation of Clallam Indians, have been referred to by the United States Government as Skokomish. [Ex. USA–23, p. 21]

135. Fishing was the most important food acquisition technique of the Twana Indians during treaty times, and salmonid fish (king, silver, humpback and chum salmon and steelhead) were one of their important sources of food. These fish were eaten fresh, were dried and were smoked for winter use. [FPTO § 3–90] Prior to and during treaty times the Twana Indians accumulated food surpluses with which they supplied feasts for invited guests from as far away as Carr Inlet and Vashon Island to the east and Satsop country to the southwest. [FPTO § 3–91; Ex. USA–23, p. 20]

136. Prior to and during treaty times the Twana Indians located villages for easy access to fishing stations. They took salmon and steelhead in salt-water areas by trolling, spearing and netting, and in freshwater areas by single dam and double dam weirs and similar types of traps. They maintained at least three important weir sites on the Skokomish River during the 1850's. The principal signatory of the Treaty of Point No Point for the Skokomish was in charge of an important weir on the Skokomish River. During treaty times the Twana Indians periodically removed lattice sections of their weirs, thus permitting fish to escape upstream to spawn. [FPTO § 3–92; Ex. USA–23, p. 4]

137. The usual and accustomed fishing places of the Skokomish Indians before, during and after treaty times included all the waterways draining into Hood Canal and the Canal itself. Salt-water trolling and spearing were less important than river fisheries. [Exs. USA–20, p. 33; USA–23, pp. 18–22; Ex. PL–42, pp. 389–390; Ex. USA–31e, pp. 238–244]

138. The Skokomish Indians, despite the fact that they could increase fishing effort on their reservation by utilization of fishing sites not in use, have not in recent years cropped the entire available harvestable portion of the coho run even when asked by the Department of Fisheries to fish harder. [Tr. 2596, l. 4–19; Ex. F–28, p. 5, l. 8–10; Tr. 3872, l. 13–18; Ex. PL–77; Ex. PL–81] It is possible, and in the interest of full use of the resource consistently with conservation, to allow a greater Skokomish Indian fishery, off-reservation in the salt-water areas, on the Skokomish River coho runs than the State presently allows. [Tr. 3872, l. 13 to 3874, l. 12]

*Squaxin Island Tribe*

139. The Squaxin Island Tribe is the present day tribal entity which, with respect to the matters that are the subject of this litigation, is a political successor in interest to some of the Indian tribes or bands which were parties to the Medicine Creek Treaty. It is recognized by the United States as a currently functioning Indian tribe maintaining a tribal government on the Squaxin Island Reservation. This tribe is organized pursuant to section 16 of the Indian Reorganization Act of June 18, 1934. Its membership is determined in accordance with its Constitution and Bylaws approved by the Secretary of the Interior July 8, 1965. It has a membership roll approved by a representative of the Secretary of the Interior on April 24, 1971. Its current membership is approximately 175. [FPTO § 3–21; Ex. PL–63]

140. The Squaxin Island Tribe is composed primarily of descendants of the original inhabitants of all the inlets of upper Puget Sound from South Bay on Henderson Inlet around the head of the Sound to North Bay on Case Inlet. Included within this area are: Hender-

son, Budd, Eld, Totten (including Big and Little Skookum), Hammersley, and Case Inlets. The Indian inhabitants of these inlets were listed separately by local group name in the preamble to the Treaty of Medicine Creek as follows and were included in that treaty: Squawksin, Steh-chass, T'Peeksin, Squi-aitl, and Sa-heh-wamish. Pursuant to the Treaty these Indians were relocated on the Squaxin Island Reservation and thereafter were dealt with by the United States as a separate and collective entity under the name "Squaxin" (spelled variously). [FPTO § 3–95; Ex. USA–24, pp. 17–18]

141. During treaty times the Squaxin Island Indians fished for coho, chum, chinook, and sockeye salmon at their usual and accustomed fishing places in the shallow bays, estuaries, inlets and open Sound of Southern Puget Sound and in the freshwater streams and creeks draining into those inlets. Customary use patterns varied according to the types of water areas, with freshwater fisheries being controlled by the residents while the deeper saltwater areas were open to anyone who traveled thereon. Their fishing techniques included trolling, stream weirs, spearing and tidal traps. These Indians continued to fish these areas following their relocation on the Squaxin Island Reservation and to rely in part on fishing for subsistence and monetary income. Salmon fishing and the fishing areas used by their predecessor bands continue to be important to members of the Squaxin Tribe. [FPTO § 3–98]

142. Through agreement with the Department of Fisheries, the Squaxin Island Tribe has closed fishing on the small streams outside the Squaxin Island Reservation to protect the salmon spawning areas and the tribal fishermen have shifted their treaty fishing into Puget Sound marine areas under a special Fisheries Department season. [FPTO § 3–603; Ex. JX–2a, App. II, pp. 316–317] The tribe has adopted fishing regulations similar to the off-reservation regulations of the Depart-

ment of Fisheries, and the tribe feels its own regulations are reasonable and necessary for conservation. [Ex. JX–2b, pp. 39–41; Tr. 1048, l. 17 to 1049, l. 7; Tr. 2488, l. 7–15]

143. The Squaxin Island Tribe, with the cooperation of the Department of Fisheries, maintains a rearing program for chinook and coho salmon. It has grown in three years from four floating pens, each twelve feet square, to ten floating pens, each sixty feet square, and from 250,000 to 750,000 fish. The fish, provided in large part by the Department of Fisheries, are raised by the tribe and sold commercially. Some are released into the Sound for the benefit of all fishermen. [Tr. 2485, l. 18 to 2486, l. 12; Tr. 2493, l. 6 to 2496, l. 11]

### Stillaguamish Tribe

144. The Stillaguamish Tribe is composed of descendants of the 1855 Stoluch-wa-mish of the Stoluch-wa-mish River. The population in 1855 resided on the main branch of the river as well as the north and south forks. The Stillaguamish were believed to number about 200 people in 1855, but the actual number may have been over double that figure. The name Stillaguamish, under various spellings, has been used since about 1850 to refer to those Indians who lived along the Stillaguamish River and camped along its tributary creeks. [Ex. USA–28, pp. 1, 23] They were a party to the Treaty of Point Elliott and are referred to in the preamble of that treaty under the spelling "Stoluck-wha-mish". [Ex. USA–28, p. 15; Ex. PL–65; Ex. G–4, p. 179; Tr. 2415, l. 22 to 2416, l. 9] No signatory is identified as belonging to that group, but they were designated as subordinate to Patkanam who signed the treaty as head chief for the Snoqualmoo and associated tribes. [Ex. G–4, p. 179; Ex. USA–28, pp. 15, 23]

145. No separate reservation was established for the Stoluch-wha-mish Indians. They were allowed to move to reservations established in the general area

near them and some moved to the Tulalip Reservation, but the majority remained in the aboriginal area along the Stillaguamish River. The membership of the Stillaguamish Tribe is determined in accordance with the tribal Constitution and Bylaws which have been approved by the tribe but have not been approved by a representative of the Secretary of the Interior. [FPTO § 3–22; Ex. USA–28, p. 23] The Stillaguamish Tribe is not recognized as an Indian governmental entity by the federal government. Its enrollment has not been approved by the Secretary of the Interior or his representative and the tribe does not have a reservation. [Exs. USA–43, pp. 21–2, 31; USA–44, pp. 2, 36] The Stillaguamish Tribe presently has about 94 members. [Ex. MS–7, p. 4, *l.* 1–2]

146. During treaty times and for many years following the Treaty of Point Elliott, fishing constituted a means of subsistence for the Indians inhabiting the area embracing the Stillaguamish River and its north and south forks, which river system constituted the usual and accustomed fishing places of the tribe. Salmon and steelhead were eaten in both fresh and cured form. These Indians had names for four or five species of salmon, steelhead and other indigenous fish. They took salmon and steelhead by spearing, harpooning, traps and weirs (with dip nets) at various places in those watercourses. The Stillaguamish Indians still consider fishing as a source of food today, and are interested primarily in a personal use fishery. [FPTO § 3–100; Exs. USA–20, p. 38; USA–28, p. 23; Ex. F–43, p. 7, *l.* 5–17; Tr. 2714, *l.* 2–17]

### Upper Skagit Tribe

147. The Indian Claims Commission determined, in The Upper Skagit Tribe of Indians v. United States of America, Docket No. 92, 8 Ind. Cls. Comm. 475, 476–77, 491, that the Upper Skagit Tribe is the successor in interest to the rights of an identifiable group of American Indians identified as ten separate villages on the Upper Skagit and Sauk Rivers in treaty times and subsequently known as "the Upper Skagit Tribe". These antecedents of the Upper Skagit Tribe were signatory parties to the Treaty of Point Elliott. [Ex. G–17(*l*), p. 477; Ex. G–4, p. 180] No separate reservation was established for the Upper Skagit Indians in their area. They were permitted to move to reservations established in the general vicinity. Most of those who moved to a reservation moved to the Swinomish Reservation, but the majority remained in their aboriginal area. The membership of the Upper Skagit Tribe is determined in accordance with Articles of Association adopted in 1962. The tribe is not organized pursuant to any federal law. [FPTO § 3–23; Ex. UPS–2] No enrollment has been approved by the Secretary of the Interior or his representative. [FPTO § 3–23; Ex. UPS–2; Exs. USA–43, pp. 24, 31; USA–44, pp. 2, 36] The tribe has approximately 500 members. [Tr. 3254, *l.* 4–7]

148. At treaty time, the usual and accustomed fishing places of the Upper Skagit Tribe included numerous areas along the Skagit River, extending from about Mt. Vernon upstream to Gorge Dam. [Tr. 3272, *l.* 25 to 3276, *l.* 17] Today the tribe has about thirty fishermen, interested primarily in a subsistence fishery. [Tr. 3254, *l.* 8 to 3255, *l.* 1]

### Yakima Nation

149. The historical background information concerning the Yakima Nation, as shown by the written testimony (Exhibits Y–13 and Y–26) and oral testimony of Yakima tribal members educated in Yakima history and customs by tribal elders, was not controverted in the evidence and is found by the court to be reasonable and credible factual data regarding relevant aspects of Yakima Indian life at and prior to treaty time, including the Yakima treaty council and the intentions and understandings of the Indian representatives there present.

150. The Yakima Nation is a party to the Treaty with the Yakimas. [Ex. Y–6] It is recognized by the United States as a currently functioning Indian tribe composed of the tribes and bands consolidated into the Yakima Nation by that treaty and maintaining a tribal government on the Yakima Indian Reservation, located in South Central Washington. Its membership is determined in accordance with the provisions of the Act of August 9, 1946, 60 Stat. 968, 25 U.S.C. §§ 601–607 [Ex. Y–7] and its membership roll is kept current and is approved by a representative of the Secretary of the Interior. It presently has approximately 6,040 enrolled members. [FPTO § 3–24; Ex. Y–13, p. 2, *l.* 30 to p. 3, *l.* 12; Tr. 3292, *l.* 19 to 3294, *l.* 2]

151. In the main, at the time of the treaty, the Indians who were parties to the Yakima Treaty lived in a food gathering culture. They existed on game, fish, roots, berries and some cultivated vegetables. Of these foods fish was a major food and they landed salmon, steelhead, trout, mussels, eel, and other miscellaneous fish. Salmon, however, both fresh and cured, was a staple in the food supply of these Indians. It was annually consumed by these Indians in the neighborhood of 500 pounds per capita. Circumstances necessitated that large quantities of fish, fish oil, roots and berries be cured in adequate quantities to insure a sufficient and balanced diet for those periods of the year when the fresh supply of these commodities was not available. Quantities of fish in considerable numbers were preserved for future use through smoking and drying. The choice of the method depended on the climatic conditions and the availability of firewood. It was customary for these Indians to manufacture pemican. This was accomplished by pounding the dried strips of fish until quite fine and packing the resultant mass in containers lined with fish skin. In this process oil was used where available and the oil from male steelhead was used for this purpose. Because of the monotony of this fish diet, variety in the kind of salmon and other fish caught was a desired goal. [FPTO § 3–102]

152. With the exception of the spear, gaff and like gear which to a great extent depended on the skill and dexterity of the individual operator, methods used by the Yakima Indians to land salmon and steelhead were very efficient. These Indians used traps, weirs, nets, gill nets, baskets, and seines to land salmon and steelhead. They were proficient in the manufacture of strong twine from native materials. [FPTO § 3–103]

153. Indians from the Yakima Nation and particularly those from the Yakima, Klickitat, Wenatchee, Columbia, Chelan, Entiat, and Kittitas aboriginal groups communicated continually with the tribes on Puget Sound by the use of the Snoqualmie, Naches and Stevens Passes as weather permitted. This continual communication created bilingualism, custom interchange, intermarriage, and utilization of the natural resources in the Puget Sound area. In the main this communication and intermarriage was with the tribes now considered Nisqually, Puyallup, Muckleshoot and Snoqualmie. [FPTO § 3–104] The Yakimas in the Puget Sound area were intermarried as far north as the Skokomish and controlled them to a certain extent. Gibbs in his treaty time census placed approximately 400 Yakimas in the case area. [Exs. Y–15a and Y–15b; Tr. 2132, *l.* 10 to 2133, *l.* 10]

154. At the time of the treaties the Indians of the Yakima Nation used fisheries located in the Puget Sound area for the purpose of obtaining salmon and steelhead primarily for their use. [Ex. F–35, p. 9, *l.* 10 to p. 10, *l.* 14; p. 11, *l.* 15–19; p. 13, *l.* 3–7] Some of these fish taken by Yakimas were consumed by them and some were traded to other Indians. [Ex. Y–13, p. 9, *l.* 7–9; Tr. 3299, *l.* 4–7] They took these fish there by the consent of the tribes in that region. Since there was more intermarriage and communication with those Indians now called Nisqually, Puyallup, Muckleshoot, and Snoqualmie,

fisheries in their area of residence were more commonly used by members of the Yakima Indian Nation. These fisheries in the area of this case's inquiry included the waters of the Snoqualmie, Snohomish, Green, Puyallup, Nisqually, Stuck, Duwamish, White, Carbon, and Black Rivers and their tributaries. [FPTO § 3–105]

155. There had been little non-Indian contact with the Yakimas prior to the treaty negotiations. [Ex. Y–26, p. 7, l. 4 to p. 8, l. 24] The Indians who were subsumed into the Yakima Nation spoke three different languages, Sahaptin, Salish and Chinookan and had many dialects within the two principal language groups. [Ex. Y–26, p. 7, l. 9–13] The treaty negotiations were translated from English or one of these three groups or numerous dialects into Chinook jargon [Ex. Y–26, p. 9, l. 9–10; Ex. D–1, p. 24, l. 26–30] which has a limited vocabulary and contained none of the words "citizens", "territory", "state", "regulations", "commercial", and "usual and accustomed". [Ex. Y–21; Ex. G–29(a); Tr. 3393, l. 11 to 3394, l. 1] This jargon was used principally for trade purposes and was inadequate to convey the legal concepts involved. [FPTO § 3–37]

156. At the treaty council the United States negotiators promised, and the Indians understood, that the Yakimas would forever be able to continue the same off-reservation food gathering and fishing practices as to time, place, method, species and extent as they had or were exercising. [Ex. Y–13, p. 8, l. 6–15; Ex. Y–26, p. 8, l. 29 to p. 9, l. 8; Tr. 3295, l. 16 to 3297, l. 8] The Yakimas relied on these promises and they formed a material and basic part of the treaty and of the Indians' understanding of the meaning of the treaty. [Ex. Y–13, p. 8, l. 16–23]

157. After the treaty was concluded, the Yakima Indians continued to fish as they had. During territorial times officials of the United States and Washington Territory took the position that the off-reservation fisheries were those the Yakima Indians had exercised at treaty or pretreaty times. These officials took the position that the words of the treaty reserved to the Yakima Indians "the right to enjoy all of these fisheries as they had heretofore." [Ex. Y–23, p. 10] The Supreme Court of Washington Territory not only sustained this interpretation of the treaty but took notice as a matter of common knowledge that the Yakima Indians were "tenacious" in adhering to these past customs and traditions. [Ex. Y–23, p. 10]

158. The Yakima Indians have continued to assert their off-reservation fishing rights, [Tr. 611, l. 21 to 612, l. 4 and l. 14 to 615, l. 15] including fisheries in the case area. [Tr. 3321, l. 10–18] The salmon and steelhead landed were consumed or sold commercially. [Ex. Y–13, p. 9, l. 13–16] Arrests of Yakima Indians in the case area since 1966 have caused Yakima fishermen to decrease their fishing effort in that area. The Yakima Nation has not encouraged its fishermen to fish in the case area as time and money limitations would not allow the tribe to protect its fishermen from conviction though the tribe's efforts had been successful as regarded other state arrests. [Ex. Y–13, p. 9, l. 15 to p. 10, l. 7]

159. The Yakima Nation has promulgated fishing regulations for its members in areas east of the Cascade Mountains but has no fishing regulations within the case area. [Ex. JX–2b, pp. 54–61; Tr. 3302, l. 22–24] The Yakima off-reservation fisheries in the Columbia River area are regulated. Prior to 1953, and thereafter in areas where the fishing was not intensive, regulation was by Indian leaders at the site. [Ex. Y–13, p. 10, l. 12 to p. 11, l. 1; Tr. 3307, l. 12 to 3308, l. 19] Since 1953 the Yakima Nation has regulated by written regulations. [Ex. Y–13, p. 11, l. 4–12] These regulations provide for annual review, emergency closures, off-reservation enforcement and identification cards. [Tr. 610, l. 6 to 611, l. 18; Tr. 3291, l. 15 to 3292, l. 22] Untended fishing gear is identified by tags issued by the Yakima Nation. [Tr. 3328, l. 25

to 3329, *l.* 6] The Yakima Nation, through its Tribal Council and its Fish, Wildlife, Law and Order Committee, which has an annual budget currently exceeding $400,000.00, gathers biological and other information with assistance from federal biologists, and holds meetings with its fishermen and others interested before setting seasons or passing other conservation regulations. [Ex. Y–13, p. 2, *l.* 5–24, p. 11, *l.* 13–16; Tr. 1618, *l.* 3 to 1619, *l.* 6; Tr. 3300, *l.* 8 to 3301, *l.* 10] The tribal regulations are enforced by a large law and order department. [Ex. Y–26, p. 2, *l.* 10–29]

160. The Yakima Nation expects its fishermen to respect the regulations of the tribes in the case area. [Ex. Y–13, p. 11, *l.* 19–24] Should further regulation be necessary the Yakima Nation has expressed its intent to confer with other tribes in the area for the purpose of joint regulation, but if the latter did not protect the fishery then the Yakima Nation's expressed intention is to enact conservation regulations of its own covering the case area. [Tr. 3303, *l.* 18 to 3305, *l.* 5] It is likewise the expressed policy of the Yakima Nation in its scheme of regulation to provide for commercial, subsistence and ceremonial landings of salmon and steelhead by net where the fishery will sustain the pressure. Where in the tribe's opinion the fishery will not sustain the pressure, it is the announced policy of the tribe to provide for the following priorities: 1) ceremonial landings; 2) subsistence landings; and 3) commercial landings. [Tr. 956, *l.* 1 to 957, *l.* 17] The Yakima Nation has had successful experiences in joint tribal regulation on the Columbia River [Tr. 3329, *l.* 7–23] and joint regulation with the state and federal government on the Klickitat River. [Ex. Y–13, p. 11, *l.* 25 to p. 12, *l.* 4]

161. Yakima landings for at least ceremonial and personal use in the case area can take place without jeopardizing the continued existence of the fish resource. [Tr. 957, *l.* 25 to 958, *l.* 12; Tr. 959, *l.* 13 to 960, *l.* 5] Yakima tribal regulation of Yakima fishermen at usual and accustomed places in the case area is a matter of genuine interest to the tribe. [Tr. 295, *l.* 1–9; Tr. 960, *l.* 6–23]

162. The Yakimas continue as a religious rite not only the first salmon ceremony but the basic, undying salmon culture existing in this northwest area, and this religious concept of the interdependence and relatedness of all living things is a dominant feature of their lifestyle. [Ex. Y–13, p. 7, *l.* 1–23; Tr. 3297, *l.* 9–15; Tr. 3352, *l.* 17 to 3353, *l.* 2; Tr. 3402, *l.* 7–10]

163. The Yakima Indians have been and continue to be very dependent on anadromous fish to sustain their way of life. [Ex. Y–13, p. 13, *l.* 25 to p. 14, *l.* 2; Ex. Y–10, pp. 31–36; Ex. Y–12, pp. 12–16] They live close to the poverty level and have not reached economic or social parity with non-Indian citizens of the State of Washington. [Ex. Y–13, p. 4, *l.* 13 to p. 5, *l.* 20; Ex. Y–10, pp. 16–26; Ex. Y–9, pp. 2–8; Ex. Y–8, pp. 1–4] Anadromous fish are vital to the Indians' diet with approximately 2,000 of the enrolled members fishing for personal consumption. Approximately four hundred tribal members fish commercially for the most part in the Columbia River area, with only about five Yakima commercial fishermen in the case area. [Tr. 3340, *l.* 5–11]

GENERAL FISHERIES CONSERVATION AND MANAGEMENT

164. A great many of the biological, fisheries management, and fisheries harvest facts relevant to the issues in this case are set out in Exhibits JX–2a and JX–2b, which are an extensive Joint Statement Regarding the Biology, Status, Management, and Harvest of the Salmon and Steelhead Resources of the Puget Sound and Olympic Peninsular Drainage Areas of Western Washington dated May 14, 1973, prepared for this case by staff biologists of the Washington Department of Fisheries, the United States Fish and Wildlife Service, and the Washington Department of Game. The contents of said report are hereby

incorporated by reference as Findings of Fact herein. [FPTO § 3–400]

165. On June 16, 1973, the United States exercised its right to terminate the recognition given to Canadian fishermen to fish in the contiguous zone (established by 16 U.S.C. §§ 1091–1094) off the coast of Washington south of Carroll Island located at approximately 48° north latitude. (Cf. Ex. JX–2a, § 2.-12, pp. 100–101) [FPTO § 3–401]

166. The principal river systems, marine waters and Indian reservations in the case area are depicted on the base map (Exhibits JX–1a and 1b and JX–2a, p. ii). There are numerous lesser streams that are important producers of salmon and steelhead. Many of these are depicted on Exhibit F–71. [FPTO § 3–400; Ex. JX–2a, § 1.2, pp. 9–12; Tr. 749, l. 24 to 774, l. 18; Tr. 3592, l. 11 to 3593, l. 8]

167. Under Washington State law the protection and management of those fish which the State has classified as food fish is under the jurisdiction of the Department of Fisheries headed by a director who is appointed by and serves at the pleasure of the Governor. Salmon are classified as food fish under current Washington law. The Defendant Thor C. Tollefson is the Director of the Fisheries Department, and as such is vested with the authority to exercise all of the powers and duties of that department, including the authority to issue regulations pursuant to state laws and to enforce said laws and regulations. [FPTO § 3–25; Ex. JX–2a, § 2.5, p. 67]

168. Under Washington law, the protection and management of those species of fish which the state has classified as game fish is under the jurisdiction of the Department of Game which consists of the State Game Commission and the Director of Game. [FPTO § 3–26; Ex. USA–39, p. 1; RCW 77.04.020] The Game Commission is the entity which has the authority to adopt rules and regulations governing the time, place and manner of taking game fish. [Ex. USA–39, p. 8; RCW 77.12.040] The Game Commission consists of six part-time commissioners having the qualifications prescribed by RCW 77.04.040 appointed for staggered six-year terms by the Governor. Three commissioners must come from west of the Cascade Mountain summit and three from the east of that summit. The director is appointed by and serves at the pleasure of the Commission. Defendant Carl Crouse is the Director of the Department of Game. Steelhead are classified as game fish under current Washington law. [FPTO § 3–26] In 1925 the state legislature declared steelhead a game fish when taken in fresh water. Previously state fisheries legislation had defined "salmon" as including steelhead. After 1925 the State imposed progressively greater restrictions on the commercial dealings in steelhead and in 1933 steelhead came under the full protection of the State Game fish regulations. [Ex. JX–2a §§ 2.3.1 and 2.3.2, pp. 60–63; Ex. PL–2, pp. 164, 168; Ex. G–15, p. 3, l. 25–32]

169. Fisheries management takes into consideration both the resource itself and the objectives and needs of the societies which control and seek to utilize it. The commercial, sport and Indian fisheries are managed for different use objectives and user interests. Accordingly, the objectives of fisheries management vary in accordance with the purposes and constituency for which the particular fishery is being managed. Commercial fisheries are managed to achieve a maximum sustained yield in terms of food and economic profit, whereas sport fisheries are managed to obtain a maximum sustained recreational experience and a high yield of personal use food and "trophy" product. The Indian tribes have as their primary use objectives the fostering of Indian economic well-being, the preservation of Indian cultural heritage and way of life, and the provision of a significant element of Indian diet. [Ex. JX–2a, § 2.1.-0, pp. 47–48]

170. Although the need for management of the fisheries resource, and the

methods used, depend upon biological analyses, the actual techniques, like the ultimate objectives, involve political and economic considerations. [Ex. JX–2a, § 2.2.5.3, p. 58] Similarly, economic and political considerations are also used to determine who will harvest varying portions of the resource. The Department of Fisheries recognizes that Indians are a user group with legitimate interests in the fisheries. [Tr. 799, *l.* 2 to 801, *l.* 6; Ex. PL–89] One method, which is favored by some fisheries biologists, of providing an acceptable measure of balance between resource users is to limit entry into the commercial salmon fisheries. However, the Washington legislature has not authorized this. [Ex. PL–89]

171. The anadromous fishery resource is both perishable and renewable. Thus, while an over-harvest would impair its renewability, an under-harvest during a limited time it is available would result in an irreplaceable waste of the resource. [Ex. JX–2a, § 2.1.0, p. 47] In addition to being wasteful, over-escapement of fish on the spawning ground can impair the renewability of the resource by causing a condition called "superdeposition" where the last fish that comes in and spawns either spawns directly over the first brood of eggs that were in the redds, or digs them up. Superdeposition can destroy eggs outright and also increase the susceptibility to disease of the eggs remaining. [Tr. 859, *l.* 21 to 860, *l.* 15] Salmon and steelhead frequently spawn in the same areas of the various river systems. [FPTO § 3–453]

172. Managing the commercial fishery for maximum sustained profit requires, among other things, that the harvest occurs near the time when the available "crop" has obtained maximum bulk and quality. These do not necessarily coincide in time and place. Thus the proper time for commercial harvest corresponds most nearly to the relatively brief period of time when the fish are full grown and returning to or entering their natal stream to spawn. Net fishery seasons permit the efficient taking of mature or nearly mature fish for commercial purposes during this time period only. [Ex. JX–2a, § 2.1.1, p. 48]

173. Managing sport fisheries for maximum sustained recreation requires providing ample opportunities for fishing. Long seasons, economically and geographically accessible waters, and high catches per individual effort all increase recreational yield. Feeding and growing salmon in the ocean and Puget Sound are of greatest recreational value because they are vulnerable to sport gear over long periods. On the spawning migration route from their saltwater feeding areas, full-grown salmon are available to anglers for only a short period of time. Feeding activity of these latter fish diminishes or ceases as they complete their saltwater migration period. The efficiency of angling gear is then measurably decreased. In some Puget Sound areas where salmon are in or approaching their natal estuary, the catch rate is commonly one-tenth that of the ocean fishery. In contrast to salmon, steelhead actively feed throughout their entire migration route and are readily available to sport gear in freshwater areas. They are not generally taken by sport gear in saltwater. [Ex. JX–2a, § 2.1.2, pp. 48–49]

174. Management for Indian objectives is closer to commercial management than to sport inasmuch as pursuit of an economic livelihood and the efficient procurement of a food supply are major purposes. In addition, salmon and steelhead have special significance in the religious and cultural mores of the Indian people. Because of traditions, treaty provisions, and location of Indian communities, the Indian fisheries are largely place-oriented. Management for Indian fishery objectives must consider this factor. [Ex. JX–2a, § 2.1.3, pp. 49–50]

175. The Department of Fisheries has not regarded the salmon sport fishery in Puget Sound and on the ocean as a major regulatory concern, because, as compared with the commercial net fish-

eries, the sport fisheries do not need to be managed on a day-to-day basis. [FPTO § 3–581]

176. Among the plaintiff Indian tribes only a few today are active in marine fisheries. The Makahs and Quileutes have troll fisheries off the coast. The Makahs also pursue both troll and gill net fishing in the Strait of Juan de Fuca. The Lummi Indians use gill nets in Puget Sound. The Squaxin Island Indians conduct gill net fisheries in the saltwater inlets of the mainland near their reservation. [Ex. JX–2a, § 3.3.6, p. 128] Indian river fisheries are currently exercised at the mouths and varying distances upstream from the mouths of coastal and Puget Sound rivers. Among the rivers so utilized are the following: Nooksack, Skagit, Stillaguamish, Green, Puyallup, White, Nisqually, Skokomish, Sekiu, Hoko, Sooes, Waatch, Ozette, Quillayute, Hoh, Queets and Quinault Rivers. [Ex. JX–2a, § 3.3.7, p. 129] Indian river fisheries take place in confined areas where there are concentrated passages of fish which may require careful regulation to protect the run. [Ex. F–28, p. 8, l. 10–15] Where escapement requirements thought necessary by the Department of Fisheries have been achieved, it has been by stringent control of harvest near or in the parent streams. [Ex. JX–2a, § 2.6.2.0, p. 73]

177. From a broad biological and managerial standpoint, conservation of fish resources means to protect and improve the habitat that produces the resource, to manipulate stocks of fish to achieve necessary spawning escapement so as to maintain, perpetuate and enhance the resource, and to put the harvestable portion of the resource to beneficial use. [Tr. 1049, l. 12–19; Tr. 1472, l. 1–9] This concept of conservation must be considered in the light of the entire regulatory pattern because all harvesting regulations that restrict time, place and manner of taking fish are interrelated in their application to competing user groups. [Tr. 1055, l. 4 to 1056, l. 8; Tr. 1480, l. 6–12; Ex.

F–27, p. 4, l. 30 to p. 5, l. 1; Tr. 1476, l. 9–16]

178. Assuring proper spawning escapement is the basic element of conservation involved in restricting the harvest of salmon and steelhead. Once that has been achieved, the regulations on time and manner of fishing are designed to facilitate the harvest of the excess and distribute it among users in a manner consistent with meeting use objectives of the people who are going to harvest. [Tr. 1160, l. 17 to 1165, l. 3; Ex. F–28, p. 35, l. 30 to p. 36, l. 8]

179. Under the present complex harvest scheme used by the State to manage the fish resource, regulation has three main purposes: 1) to preserve the fish stocks; 2) to attain the maximum sustained yield; and 3) to provide an orderly fishery. To accomplish these purposes, all the runs and races of fish that spawn in the various streams of the Puget Sound and coastal areas should be recognized. In order to regulate effectively, the State finds it desirable to have: 1) accurate catch and escapement statistics on all races; 2) a forecast of run size; 3) estimates of the number of spawners that can be accommodated in the streams used for spawning; and, 4) information on the number of units of gear, their efficiency, and the fishing time needed to make the catch. [Ex. JX–2a, § 2.2.5.0, pp. 54–55]

180. Regulations designed to preserve fish stocks by limiting the harvest to ensure run survival can be grouped into two major categories: 1) those designed to protect selected portions of a stock of fish, and 2) those designed to limit the size of the take. Net restrictions, closed areas, closed seasons and size and weight limits are examples of regulations designed to protect selected portions of a fish stock. Limitation by quota in a very few special situations, limitation of the number of fishing units, and limitation of gear efficiency are examples of regulations designed to limit the size of catch. [Ex. JX–2a, §§ 2.2.5.0, 2.2.5.1, 2.2.5.2, pp. 55–57]

181. It is necessary for the fishing activity of Indians and non-Indians to be regulated in order to assure that conservation of the fishery resource is achieved. [Ex. F–28, p. 4, *l.* 14–23; Ex. F–35, p. 24, *l.* 12–26; Tr. 3465, *l.* 22 to 3466, *l.* 9] Observance of fishery regulations is important to the achievement of conservation of the resource. A regulation is more likely to be observed if it is simple to understand, reduces conflicts between interest groups, appears fair to, and wins the confidence of, the fishermen. For this reason, regulations which have as their purpose the attainment of an orderly fishery can be helpful in achieving conservation. [Tr. 1092, *l.* 17 to 1093, *l.* 15]

182. Salmon run sizes fluctuate from year to year, and it is generally necessary for the conservation of a particular salmon run that the regulation of the harvest on that run take into account the run's size. Catch fluctuations generally correspond with run size fluctuations. [Ex. F–28, p. 17, *l.* 3 to p. 18, *l.* 2; Tr. 1067, *l.* 10–19; Tr. 1373, *l.* 13 to 1374, *l.* 2; Tr. 3583, *l.* 6 to 3585, *l.* 6] In order to take run size into account, regulations will be more effective if they are based on estimates of predicted run size, adopted annually, and provide for emergency clauses so that as the runs return the regulations can be made to reflect their actual condition. [Tr. 1374, *l.* 10–16] Conversely, spawning escapement should be a fixed number of fish and should not fluctuate with varying run sizes. [Tr. 1070, *l.* 5–23; Tr. 1419, *l.* 25 to 1420, *l.* 6; Tr. 1446, *l.* 19–25]

183. The State does not limit the number of sport fishermen, either resident or nonresident, who may fish for either salmon or steelhead or the number of commercial fishermen who may fish for salmon in waters under its jurisdiction. [Ex. JX–2a, § 2.2.5.2, p. 57; Tr. 172, *l.* 14–19] In 1971 nearly four times as many persons obtained Washington punch cards to sport fish for salmon as obtained them to sport fish for steelhead. [Ex. JX–2a, § 3.2.7, p. 125, § 3.5.4, p. 137]

184. The State of Washington, by statute and regulation, has set aside the steelhead for the use and benefit of a special interest category of persons. Its limitations on the means by which, the purpose for which, and the numbers which any person can take of this species are designed to promote the use of this fish solely as a recreational attraction for residents of the state and non-resident tourists. [FPTO §§ 3–428, 3–436, 3–469; Tr. 112, *l.* 11–23; Tr. 1652, *l.* 3–13]

185. At the present time, the Department of Fisheries cannot completely control the ocean harvest of chinook and coho salmon because most of these fish are caught in waters beyond the state's jurisdictional three-mile limit. [Tr. 1144, *l.* 18–25; Tr. 3208, *l.* 11–13; Tr. 3505, *l.* 11 to 3506, *l.* 5; Tr. 3941, *l.* 21 to 3942, *l.* 2; Ex. F–32, p. 20, *l.* 9–13] A restriction on the ocean troll fishery in Washington waters probably would not greatly increase the number of chinook salmon returning to Puget Sound, because Puget Sound chinook salmon migrate north out of the Strait of Juan de Fuca. [Ex. JX–2a, Fig. 7, p. 241] Canadian fishermen, fishing outside Washington territorial waters, are harvesting an estimated 65 per cent of Puget Sound-origin chinook and over 50 per cent of Puget Sound-origin coho salmon. [Ex. F–28, p. 13, *l.* 7–15; Ex. F–32, p. 11, *l.* 4 to p. 12, *l.* 1; Tr. 3603, *l.* 1 to 3604, *l.* 2] Seventy-five per cent of the ocean catch of Olympic Peninsula-origin chinook salmon occurs off the coast of British Columbia and southeastern Alaska. [Ex. JX–2a, § 1.6.2, p. 29] Ninety per cent of the ocean catch of Puget Sound-origin chinook salmon occurs off the coast of British Columbia and southeastern Alaska. [Ex. JX–2a, § 1.6.3, p. 29–30] Fifty per cent of the ocean catch of Olympic Peninsula-origin coho salmon occurs off the coast of British Columbia. [Ex. JX–2a, § 1.6.7, p. 33]

186. Exhibits F–7 through F–17 show the average annual distribution of catch in all waters of salmon from rivers on which there are Indian fisheries in the case area, excepting the Quinault and Queets Rivers, for all species in the period 1965–1970 and for pink salmon in the odd years from 1959 to 1969. [Exs. F–7 through F–17; Ex. F–28, p. 32, *l.* 3 to p. 33, *l.* 9; Tr. 1180, *l.* 20–23] On an average the following percentages of harvest from the respective stocks in these rivers during this period occurred in waters outside the territorial jurisdiction of the State of Washington: chinook, 58.9%; coho, 55.3%; pink, 29.4%; chum, 2.6%. [Ex. F–7] Other than control over fish landings in the State, there are no fish management regulations or practices which the State of Washington can unilaterally employ to effectively control fishing beyond its territorial waters. (Exs. F–32, p. 20, *l.* 9–13; F–28, p. 12, *l.* 19 to p. 13, *l.* 6]

187. Gill net fishing of the type and operation utilized by the Plaintiff tribes is not an inherently destructive means of harvesting salmonids (including steelhead), and it may be regulated and controlled sufficiently to prevent over-harvesting. [FPTO § 3–472; Ex. USA–36, p. 5, *l.* 18 to p. 6, *l.* 13] The amount of fish taken in nets may be regulated by regulation of net length, the type of the net, mesh size, the place of fishing and periods for taking. Net fisheries and hook-and-line fisheries can be regulated, from total prohibition to total permission, with all degrees of restrictions in between. [FPTO § 3–438]

188. From a biological standpoint one of the standards for determining the amount of fishing time to allow an Indian tribe is the anticipated impact of the tribe's fishery on the run. This is influenced by the number of fishermen and amount of gear that will participate. [Tr. 3840, *l.* 15 to 3841, *l.* 10] It is estimated by the Department of Fisheries that the following numbers of fishermen fish in the Indian, sport and commercial fisheries in the case area: Indian 794;

sport 283,650; commercial 6,600. [Tr. 3645, *l.* 2 to 3649, *l.* 17]

189. Because Indian tribes sometimes sell their fish directly to out-of-state buyers, state catch records of Indian catch obtained from fish buyers in the State of Washington will not necessarily show the entire commercial catch taken by Indian fishermen. [Tr. 3478, *l.* 17 to 3479, *l.* 5; Tr. 3502, *l.* 19 to 3504, *l.* 2]

190. Historically, limitations on the Indians' catch were controlled by: 1) the needs of the relatively small human population; 2) the efficiency of the Indians' fishery as affected by natural phenomena; and, 3) tribal custom and religious commandments. More recently, individual Indian tribes have established written regulations controlling the taking of fish by their members. Others have practiced limitations without formal written regulations. [Ex. JX–2a, § 2.10.4, p. 97] From time to time each of the Plaintiff reservation tribes has enacted written fishing regulations. These regulations deal with the times, places and manner of fishing. Examples of current tribal regulations are included in Exhibit JX–2b. [FPTO § 3–651] Other examples are contained in Exhibits L–9 and QN–1. [Ex. JX–2a, § 2.10.4, p. 97; Tr. 2997, *l.* 2–15; Tr. 3487, *l.* 18–22]

191. Since 1967 the United States Bureau of Indian Affairs has issued identification cards, or approved the issuance of tribal identification cards, co-signed by an authorized Bureau official and tribal chairman, to persons who establish to the satisfaction of both the Bureau official and the tribe that they are members of a BIA-recognized Indian tribe which the Bureau recognizes as having off-reservation fishing rights pursuant to any of the treaties listed in Paragraph 1 above. [FPTO § 3–650; Exs. USA–46c, 46d, 46e, 46f, 46g, 47 and 48; Exs. PL–5 and 48; Ex. USA–54, p. 4, *l.* 18 to p. 9, *l.* 23] Regulations issued by the Secretary of the Interior and published in the Code of Federal Regula-

tions (at 25 CFR Part 256) require that such cards be carried, and be shown on demand to state, federal or tribal enforcement officers, by any Indian exercising treaty fishing rights outside of Indian reservations. The regulations provide that such cards will be prima-facie evidence that the authorized holder is entitled to exercise the treaty fishing rights specified thereon. In 1967 the Bureau of Indian Affairs notified state authorities, including the Department of Fisheries and the Department of Game, of the procedures concerning the issuance of such cards and has furnished them facsimiles of the BIA cards. The Bureau of Indian Affairs maintains lists of all persons to whom such BIA cards have been issued. Upon specific request from state authorities concerning the Indian status or tribal membership of specific individuals, the Bureau has advised state authorities of the information it has on such status. [Exs. USA–46c, 47, 48 and 54, p. 4, l. 18 to p. 9, l. 23; Tr. 1585, l. 20 to 1586, l. 15; Tr. 1588, l. 1–14; Tr. 1601, l. 2–9]

192. Tribal fishing regulations are not technically reviewed for their content in terms of conservation goals prior to the time of or as a condition for their approval by the Bureau of Indian Affairs. However, the Bureau has asked the federal Bureau of Sport Fisheries and Wildlife to work with Bureau of Indian Affairs' staff and with the tribes in the review of tribal regulations before they become effective, so that there is some biological input. [Tr. 1607, l. 3 to 1611, l. 2]

193. Enforcement of state fishing laws and regulations against treaty Indians fishing at their usual and accustomed fishing places has been in part responsible for prevention of the full exercise of Indian treaty fishing rights, loss of income to the Indians, inhibition of cultural practices, confiscation and damage to fishing equipment, and arrest and criminal prosecution of Indians. [Tr. 2623, l. 6 to 2633, l. 22; Tr. 2694, l. 12–23; Tr. 2854, l. 24 to 2865, l. 6; Tr. 2876, l. 21 to 2878, l. 4; Tr. 3004, l. 25 to 3012, l. 8; Tr. 3014, l. 4–13; Tr. 3017, l. 9 to 3022, l. 3]

194. In dealing with fishing by members of the Plaintiff tribes in a manner different from that expressly provided in their respective regulations, both the Game Department and Department of Fisheries have seized nets and other property of those members and have released, confiscated and attempted to prevent the sale and transportation of anadromous fish which are under their respective regulatory jurisdictions and which have been caught by those members. [FPTO §§ 3–5, 3–7]

195. Both the Fisheries and Game Departments have, on several occasions, disposed of or retained for unreasonably long periods of time (often extending over longer periods than one year) boats, nets, whether attended or unattended, or other property of members of the Plaintiff tribes and fish taken from the nets of such members. The tribal members have not been notified of the institution of any proceedings for, or acquisition of, judicial confiscations or forfeitures of said items by the State. [Tr. 604, l. 14 to 605, l. 18; Tr. 625, l. 4 to 627, l. 5; Tr. 2623, l. 6 to 2633, l. 22; Tr. 2657, l. 14 to 2659, l. 10; Tr. 2687, l. 12 to 2688, l. 16; Tr. 2876, l. 21 to 2878, l. 4; Tr. 3195, l. 17 to 3198, l. 16; Tr. 3204, l. 9 to 3205, l. 19]

196. (This Finding of Fact also may be, in part, a Conclusion of Law.) As applied to Plaintiff tribes and their members, the restrictions imposed by each of the following state statutes and regulations are broader than are necessary for the preservation of the fishery resource: RCW 75.08.260, RCW 75.12.060, RCW 75.12.070, RCW 75.12.160, RCW 77.08.020, RCW 77.12.100, RCW 77.12.130, RCW 77.16.020, RCW 77.16.030, RCW 77.16.040, RCW 77.16.060, WAC 220–20–010, WAC 220–20–015(2), and WAC 220–47–020.

197. The court has fully considered defendant Department of Fisheries' proposed Findings of Fact 111–115, 118–122, 125, 126, 129, 133 and 137, joined in

by defendant Department of Game. These proposed Findings of Fact, which to some extent connote Conclusions of Law, generally reflect opinions, conclusions and judgments of Fisheries' officials regarding the requirements and procedures of an efficient management program for anadromous fish. While most of these proposals appear to be reasonable, general policies or goals, in many instances their factual or legal validity cannot be determined in vacuo, but must await specific factual situations for application. On the present record, this court is not satisfied that these proposed Findings of Fact either are or are not established. Therefore, subject to the continuing jurisdiction retained in this case, the court reserves ruling on the above-specified proposed Findings of Fact at this time.

## DEPARTMENT OF FISHERIES POLICIES AND PRACTICES

198. The Fisheries Department has broadly summarized its objectives as follows:

"1. To conserve and, where possible, expand the primary fishery resources;

"2. To promote optimum use of the fisheries resource by fishermen (commercial, sport, and Indian), the fishing industry, and general public;

"3. To encourage harvesting of the sustainable yield of fish in a manner that provides the greatest return to the economy;

"4. To develop public understanding of the fishery resource, its environment, and the philosophy governing exploitation of the resource, and to maintain public respect for the law."

The Department manages and regulates the harvest of the salmon resource for each of the three distinctive fisheries which it recognizes, i. e., commercial, sport and Indian. The differences in use objectives of these three fisheries dictate that separate management policies be applied to each. [Ex. JX–2a, § 2.5 pp. 67–68] Typically, the special treaty Indian fisheries are the last of the user groups to take from the run. [FPTO § 3–601]

199. In regulating the various salmon fisheries, the Department of Fisheries compiles and examines daily catch reports, and compares those reports with reports in previous years. If the comparison and other indicia of run size should indicate that the particular run is larger than the Department's predicted run size, the Department generally extends its seasons; if the comparison shows a smaller run, the department takes emergency action to restrict the length of its seasons. [FPTO § 3–580]

200. The Department of Fisheries begins planning its commercial salmon regulations in December preceding the season which opens the following summer. Regulation proposals are prepared in January and it is at that time that it is desirable to have information on the Indian fishery to be undertaken in the forthcoming season. [Tr. 1079, l. 7 to 1082, l. 18; Tr. 1088, l. 19 to 1089, l. 2; Ex. F–5]

201. A principal method of limiting the commercial take from the salmon runs is limitation on the number of days when fishing is permitted. The Department attempts to provide that the number of days permitted is at the same point in a run, relative to its peaks and low points, such that, if the commercial fishermen in the North Sound are given their days during the time when the run is at its peak in those areas, the Indian fishermen in the rivers are being given their days during the run's peak in the rivers. [FPTO § 3–585] The Department of Fisheries feels it can regulate both commercial and sport fisheries to increase returns to Indian river fisheries to some extent. [Tr. 894, l. 24 to 895, l. 25] For example, the Department of Fisheries has closed East Pass at Vashon Island to commercial fishing. The result of this action has been to increase the salmon run available to treaty Indi-

ans in the Puyallup River by further restricting commercial fishing in the Sound. [FPTO §§ 3–583; 3–599]

202. It is the policy of the Department of Fisheries where there are mixed stocks of fish, one stock of which is in abundance, that it is sometimes in the interest of proper utilization of the total fishery resource to allow a harvest on the mixed stocks in order to prevent waste or overescapement of the abundant stock, even though this harvest may take some fish from a stock which has no harvestable surplus. In such case a value judgment must be made as to the proper regulatory balance to be stricken. [Tr. 863, *l.* 16 to 865, *l.* 16] Puget Sound, and the Columbia River to the extent fish are bound for different tributaries, both have fisheries on mixed stocks. [Tr. 846, *l.* 23 to 847, *l.* 7]

203. Wastage of fish and potential harm to other species and to the spawning stock of the same species may occur as a result of overescapement of salmon at spawning grounds. The Department of Fisheries believes that it is not properly managing the salmon resource if fish in excess of the number needed for spawning escape to the spawning grounds. The Department has some capability to utilize the treaty Indian River net fisheries so as to harvest fish which would be surplus to spawning needs. It has utilized this capability in conjunction with the Muckleshoot, Nisqually and Skokomish Tribes. Weather and the physical conditions of the stream limit this capability. [FPTO § 3–605]

204. The Department of Fisheries has authority to impose limitations on the time, place and manner of sport and commercial fishing for salmon in the offshore areas within the three-mile limit, the Strait of Juan de Fuca and Puget Sound which will effectively increase the size of salmon runs through the usual and accustomed fishing places of the Plaintiff tribes. [FPTO § 3–615]

205. The Department of Fisheries recently has been given power to authorize the moving of fishing gear to places where the Department wants to harvest surplus fish in the rivers and to limit the entry into the fishery so authorized. [FPTO § 3–611]

206. Within the last few years the Washington Department of Fisheries has authorized special limited gill net fisheries for chinook salmon and limited entry purse seine fisheries for coho salmon in marine waters of Carr Inlet, including the milling area off the mouth of Minter Creek, to crop surplus chinook and coho salmon returning to the Department's Minter Creek Hatchery. The extent of the surplus is influenced by limitations imposed on prior marine fisheries to assure adequate escapement to other south Sound streams and is evaluated when it appears at the Minter Creek mouth area. The authorized fishery is then monitored daily to determine its proper duration. Participation in the Minter Creek purse seine fishery is determined by a drawing open to any licensed purse seiner who applies. The Department of Fisheries has neither requested any of the Plaintiff tribes to join in that fishery nor considered the question of whether unlicensed treaty Indians should be allowed to participate in the fishery. At least one of the Plaintiff tribes has members who operate in a marine fishery closer to Minter Creek than many of the non-Indian applicants for the drawing. [Tr. 839, *l.* 16 to 840, *l.* 13; Tr. 3780, *l.* 21 to 3787, *l.* 3; Ex. JX–2a, Table 31, pp. 192–193; JX–2a, App. II, Table 7, pp. 316–317; JX–2a, App. III, pp. 323, 328] Treaty Indian commercial net fisheries can be and have been authorized in areas which the State has designated as salmon preserves without jeopardizing conservation needs. [Tr. 837, *l.* 22 to 839, *l.* 15]

207. Although the Department of Fisheries believes that the approximately 239 smaller streams in the case area which collectively provide a significant part of the salmon production could not sustain an Indian commercial gill net fishery, it has not studied or considered whether it is necessary to prohibit an

Indian spear, gaff, dip net, or hook and line subsistence or other fishery in those streams or an Indian net or troll fishery in their estuaries. [Tr. 3828, *l.* 5 to 3832, *l.* 23]

208. A management plan to meet obligations to provide to treaty Indians in the case area the treaty-secured right to take fish must include other treaty Indians who are not Plaintiffs in this case. [Tr. 3624, *l.* 4–15]

209. The Department of Fisheries takes the position that the treaty tribes hold a distinct treaty right to fish at usual and accustomed places outside their reservation, the quantum of which has never been adequately defined. [FPTO § 3–6] After the 1968 decision of the United States Supreme Court in Puyallup Tribe v. Department of Game, 391 U.S. 392, 88 S.Ct. 1725, 20 L.Ed.2d 689, the Department of Fisheries began to set special seasons for various treaty tribes which provide for fishing for salmon by net at some off-reservation usual and accustomed fishing places. Some of the regulations permit Indian set gill nets on rivers, even though State statutes prohibiting use of such gear have not been changed. Fisheries attempts to set these seasons at times when there are significant numbers of fish in the Indian fisheries. [FPTO § 3–613; Ex. F–27, p. 3, *l.* 23–32] These regulations cover only seven of the treaty tribes in seven specific areas within the case area. [Ex. JX–2a, App. II, pp. 306–317] Indian net fishing which is confined geographically (similar to the limits provided by reservation boundaries on current on-reservation net fishing) may be regulated and controlled to prevent over-harvesting, assuming that some power of effective regulation exists to limit fishing as to time and amount of gear and enforce the limitation effectively. [FPTO § 3–472]

210. The Department of Fisheries has undertaken to augment the volume of fish available to treaty Indians fishing at the usual and accustomed places outside reservation boundaries by at least the following actions:

a) The Department considers the interest of the Indian fishery when formulating its regulations;

b) The Department attempts to determine how many Indians will fish, what their effort will be, and what the estimated take of the Indian fishery will be;

c) The Department has adjusted the number of days when the commercial fleet can fish;

d) The Department has closed certain areas to non-Indian fishing in the marine waters, such as in East Pass, and opened certain areas closed to commercial fishing to Indian commercial fishing, such as South Sound Preserve;

e) The Department has increased its planting efforts in those streams where Indian fisheries occur; and,

f) The Department has carried on stream improvement work. [FPTO § 3–599; Ex. JX–2a, § 2.2.5.1, pp. 55–56; Fig. 18, p. 254; App. II, Table 7, Squaxin Regulations, p. 316]

In some areas the Department of Fisheries' hatchery-reared plants of salmon have contributed significantly to Indian catches of salmon. [Ex. JX–2a, Table 29, pp. 181–187; Fig. 43, p. 279; Ex. F–19; Ex. F–28, p. 59, *l.* 31 to p. 60, *l.* 15; FPTO § 3–606]

211. The Department of Fisheries' hatchery system usually receives salmon in excess of its propagation needs. It is the Department's policy to provide numbers of these fish which are fit for human consumption to economically-depressed Indian people. Indian tribal representatives are contacted when these fish are available and it is their responsibility to see that these fish are distributed to the respective tribal members. In 1972, 256,194 pounds of salmon which had returned to the Department's hatcheries were provided to Indian people. [Ex. F–28, p. 39, *l.* 31 to p. 40, *l.* 11, p. 65, *l.* 17–27; Ex. F–20; Tr. 1095, *l.* 1 to 1096, *l.* 2]

212. For about the past decade, although there have been occasional disagreements about enforcement of Department regulations, the Department of Fisheries has in general had a cooperative relationship with several of the Plaintiff tribes. [Tr. 1006, *l.* 7–17; Tr. 2536, *l.* 20–24; Tr. 3014, *l.* 4–13; Tr. 3163, *l.* 3–7; Ex. F–33, p. 12, *l.* 23 to p. 13, *l.* 5; Ex. F–28, p. 60, *l.* 30 to p. 66, *l.* 11; Ex. F–24; Ex. F–25; FPTO §§ 3–603; 3–604] In addition to informal cooperation between the Department of Fisheries and Indian tribes, the Department has taken into account recommendations of Indian tribes through its administrative hearing process. [Tr. 991, *l.* 18 to 992, *l.* 5]

213. The Department of Fisheries' enforcement practices are governed by RCW 75.08. As described by the Chief of the Department's Fisheries Patrol, the enforcement policies and practices are to be applied equally to Indians and non-Indians without discrimination. [Ex. USA–37, p. 3, *l.* 24 to p. 4, *l.* 4] Unattended and unidentified fishing gear found fishing in violation of State law will be confiscated. The officer seizing the gear should make out a fact sheet regarding the incident, a description of the gear, and the disposition of the gear. Then the gear is to be held in a warehouse in Seattle until sufficient quantities are on hand to make auction of it practicable. The gear then will be sold at auction after the required statutory notice has been given. The proceeds from the sale will go to the State general fund. [Ex. USA–37, p. 4, *l.* 5 to p. 5, *l.* 25] In the case of attended gear, a citation or arrest will be issued. The gear will be seized and held as evidence to be disposed of by the court. [Ex. USA–37, p. 6, *l.* 22 to p. 7, *l.* 17] If there are fish in the gear, the fish will be sold to the highest bid of a commercial fish buyer. The fish ticket is then to be held as evidence and if the person is later acquitted, the proceeds of the sale of the confiscated fish are to be turned over to him by court order. [Ex. USA–37, p. 14, *l.* 20 to p. 15, *l.* 14]

214. During certain times of the year the taking of pink and sockeye salmon from certain waters of the State of Washington and of British Columbia, Canada, is regulated in accordance with regulations prescribed by the International Pacific Salmon Fisheries Commission pursuant to treaties between the United States and Canada. The provisions of these regulations are approved by said International Commission and forwarded to the respective governments for adoption as domestic regulations. These regulations as they apply to waters of the State of Washington are usually promulgated and enforced by the Director of the Department of Fisheries as state regulations. However, under the applicable International treaties and statutes of the United States enacted pursuant thereto, the United States has both the authority and the obligation to enact the International Commission's recommendations as domestic federal regulation and directly enforce them if the State of Washington does not do so. The International Commission has no arrest or enforcement jurisdiction. While the Commission's jurisdiction is limited to protection of pink and sockeye salmon, its regulations which limit the types of gear which may be used or the times during which certain types of gear may be used in Convention waters have a coincidental effect on the taking of coho, chum and chinook salmon which are present during the times that such regulations are in force. The waters to which such internationally prescribed regulations apply include some of the usual and accustomed fishing places of some of the treaty Indian tribes. [FPTO § 3–589; Ex. JX–2a, § 2.13, pp. 101–103; Ex. USA–19]

215. In regulating the American and Canadian net fisheries on pink and sockeye salmon bound for the Fraser River system, the International Pacific Salmon Fisheries Commission has attempted, pursuant to provisions of the applicable treaty, to provide an equal take to the Canadian and the American commercial fishermen in the Strait of Juan de Fuca,

Northern Puget Sound and the Strait of Georgia; such that when it appears that, for example, the Canadians have taken significantly more fish than the Americans, the Commission will adjust its regulations to permit Americans to catch up. All harvesting on Fraser River stocks is intended to take only so much as will not damage the run. While some tributaries to the Fraser River have shown an underescapement as a result of the fishing efforts in the Straits and elsewhere, the regulation of Fraser River stocks by the International Commission is generally regarded by fisheries biologists as well managed. [FPTO § 3–590; Ex. JX–2a, § 2.13, p. 102]

216. Under guidelines established by the U. S. State Department at the instance of the Department of the Interior, the U. S. Commissioners on the International Pacific Salmon Fisheries Commission have sought recently in their activities on the Commission to protect the treaty fishing rights of one or more of the Plaintiff tribes. As a U. S. Commissioner on that Commission, the Director of the Fisheries Department has attempted unsuccessfully to obtain Canadian agreement to a greater number of fishing days for the Makah Indians on the Fraser River sockeye and pink salmon runs. The Director has taken unilateral action to provide more fishing days for the Makahs. [FPTO § 3–591]

217. The regulations of the Department of Fisheries, as presently framed and enforced, in many instances allow all or a large portion of the harvestable numbers of fish from given runs to be taken by persons with no treaty rights before such runs reach many of the Plaintiff tribes' usual and accustomed fishing places to which the treaties apply. [See Ex. JX–2a, App. III]

218. The State and the Director of Fisheries have, by statute and regulation, totally closed a substantial number of the usual and accustomed fishing areas of Plaintiff tribes to all forms of net fishing while permitting commercial net fishing for salmon elsewhere on the same runs of fish. [See Ex. JX–2a, App. III]

## DEPARTMENT OF GAME POLICIES AND PRACTICES

219. The stated purpose of the Game Department is: "To preserve, protect, perpetuate, and enhance wildlife through regulations and sound continuing programs to provide the maximum amount of wildlife-oriented recreation for the people of the State." [Ex. JX–2a, § 2.7, p. 89; Tr. 111, l. 12 to 114, l. 1] The Department and the Game Commission consider this their ultimate purpose in formulating policy, establishing regulations and managing the fish resources under their jurisdiction. [FPTO § 3–428] The state's steelhead fishery laws and regulations are designed to preserve the resource, provide orderly sport harvest and prevent commercialization of the steelhead. [FPTO §§ 3–430; 5–456; Ex. JX–2a, § 2.2.5.5, p. 59] The Game Department views its responsibilities as a state agency to be to protect and perpetuate the wildlife resources under its jurisdiction and where the species can be used consistently with such perpetuation, to use them for recreational enjoyment. [Tr. 112, l. 11–23] The Director believes it would be an abdication of his responsibilities to allow any off-reservation net fishing for steelhead by Indians except as may be ordered by a court. [Tr. 264, l. 10–22; Tr. 251, l. 4–10; Tr. 314, l. 5–13]

220. The Game Commission defines "conservation" as "wise or prudent use." In determining what is wise or prudent use of the fish resource, the Game Commission consults experts in the Game Department and the general public. [FPTO § 3–429]

221. The Director of the Game Department believes that an Indian net fishery for steelhead would be detrimental to the recreational fishery but not necessarily detrimental to the resource itself. [Tr. 288, l. 6 to 289, l. 8]

222. Prior to the United States Supreme Court decision in Department of Game v. Puyallup Tribe, (*Puyallup II*), 414 U.S. 44, 94 S.Ct. 330, 38 L.Ed.2d 254 (1973), when dealing with the claimed treaty fishing rights of Indian tribes, including the Plaintiff tribes, the Game Department took the position that, except for exemption from license fees when fishing in their ceded area, [FPTO §§ 3–478, 3–489; Ex. G–16, p. 4, l. 1–3] the Indian treaties do not grant to any Indian citizen or tribe any privileges or immunities greater than those which the Department recognized as being held by non-Indian citizens, [FPTO § 3–2] and that under the Constitutions and laws of the United States and of the State of Washington, the Department was required to regulate Indian fishing activities outside federal and Indian reservations to the same extent and in the same manner as it regulated fishing activity by all other classes of citizens. [FPTO § 3–3; Tr. 577, l. 2 to 588, l. 5] The Department had taken the position that state law prohibits it from considering recommendations in favor of Indian net fishing at off-reservation usual and accustomed places. [FPTO § 3–432] On the basis of that law, its own view of conservation, and its belief that as a matter of policy net fishing for Indian subsistence or economic need is not a wise or prudent use of the steelhead resource, [FPTO §§ 3–431, 3–432 the Department had refused to attempt to regulate fishing in waters subject to its jurisdiction so as to accord members of the Plaintiff tribes any opportunities to take, at their claimed off-reservation usual and accustomed fishing places, by any means other than angling, a fair and equitable portion of the anadromous fish runs that are subject to its regulatory jurisdiction, consistent with adequate escapement for spawning and reproduction. [FPTO § 3–4]

223. The policies and practices of the Game Department with respect to nets, boats and other gear which may be seized by its agents in the course of their law enforcement duties are:

a) When an unattended net is seized and the owner is not immediately identifiable, the net is marked and stored in Game Department facilities, but no specific written record is made of each seized net; the nets themselves and the written summaries constitute records of seized gear;

b) It is within the seizing officer's discretion whether to send the seized gear to Olympia or to keep it in the regional office where it was seized;

c) The only Game Department accounting of seized nets is a periodic check which results in a record of the number of nets which have been seized and the dates of seizure;

d) When there are only two or three fish seized with the gear, no record of the disposition of those fish is kept;

e) The Department has never asked a court to declare forfeiture of seized, unattended nets;

f) When the Department has seized boats or motors, they have been kept as evidence against an identified defendant;

g) Property is seized for the purpose of introduction as evidence in court;

h) If a person is acquitted of a charge, his gear is returned, but no restitution is made for fish which have been seized with the gear because the fish are rendered valueless due to the passage of time and the delay in court actions. They are disposed of to charitable or public institutions;

i) It is contrary to policy to seize a net which has not been seen engaged in illegal use. [FPTO § 3–479; Ex. USA–38, p. 4, l. 17–30]

224. Prior to February, 1972, a wildlife agent of the Game Department, acting in his official capacity and under color of state law, seized several unattended fishing gill nets from the Quillayute River and its tributaries. The State and the Game Department have been on notice since at least February, 1972, that specifically identified members of the Quileute Tribe have asserted

under oath that nets belonging to them, descriptions of some of which nets were given, were taken by unknown persons from specifically described locations on the Quillayute River at approximately the times which the wildlife agent says he seized the aforementioned nets. No judicial proceeding to declare a confiscation or forfeiture of these nets has been instituted nor have the nets been returned to the claimed owners thereof. [Tr. 625, *l.* 4 to 627, *l.* 5]

225. Prior to *Puyallup II*, the Game Department took the position that laws enacted by the state legislature need not be shown reasonable and necessary for conservation of the fishery in order to be binding on treaty Indians fishing at off-reservation usual and accustomed places, beyond the fact that said laws must have the same degree of reasonableness to apply to Indians as is constitutionally required to apply them to other citizens in the exercise of state police power. [FPTO § 3-485]

226. Prior to *Puyallup II*, the Game Department had never given consideration to the claimed treaty fishing rights of any of the Plaintiff tribes as an interest to be promoted in the Department's regulatory, management and propagation programs. [FPTO § 3-486] It had never considered permitting an off-reservation fishery for steelhead by Indians using any method other than angling, whether solely for Indian dietary consumption, for Indian cultural or ceremonial use, for sale or barter by the individual for his economic well-being, or for tribal economic development, processing, or sale of fish as a tribal enterprise. [FPTO § 3-487]

227. The Game Department has no idea where the Indians' usual and accustomed fishing places are and has never attempted to determine where they are. [Tr. 252, *l.* 21 to 254, *l.* 21] The recently retired Chief of Game's Wildlife Management Division testified as to his belief, and Game's policy, that every place in the State was a place where Indians commonly fished. [Tr. 620, *l.* 5-20]

228. At its meeting on October 2, 1972, the Game Commission considered the question of whether to change its regulations so as to permit net fishing by any Indians at off-reservation usual and accustomed places under claim of treaty rights. The Game Department did not notify any of the Plaintiff tribes or the United States in advance that it would consider this question at that meeting. The Department did not file with the Washington Code Reviser, pursuant to RCW 34.04.025 and 34.04.010, a notice that it was going to consider the matters regarding Indian off-reservation net fishing which were listed on the agenda for, and were considered at, that meeting. In addition to legal advice from its attorney, the Commission considered only the facts and data presented by the Chief of its Fisheries Management Division, Mr. Clifford Millenbach. [FPTO §§ 3-440, 3-441]

229. Mr. Millenbach's preparation for the October 2, 1972, meeting was heavily predicated on his belief that the Department's consideration of an Indian net fishery was tied specifically to the Puyallup River rather than all rivers of the State. [Tr. 348, *l.* 5-12; Tr. 354, *l.* 3-8] Prior to his presentation Mr. Millenbach did not discuss the facts and data or recommendations he presented with any of the Plaintiff tribes and had not consulted with any of those tribes concerning their fishing practices or techniques. He had not estimated how many Indians would fish, how many fish would be in the coming run in the Puyallup River, or what specific level of escapement would be best for that run. He believed that the Commission was then considering a change in its regulations which at that time absolutely prohibited such fishing. [FPTO § 3-440]

230. Mr. Millenbach's October 2, 1972, recommendation to the Game Commission that it not allow an off-reservation Indian net fishery for steelhead was influenced heavily by his belief that state law prohibited him from recommending an authorization for such a fishery. [Tr. 349, *l.* 5-10] The Commis-

sion, upon advice from its attorney, considered the facts and data presented by Mr. Millenbach as informative only, since the Commission believed that state law prohibited it from passing a regulation which authorized off-reservation net fishing for steelhead by treaty Indians. [Tr. 1635, *l.* 12 to 1638, *l.* 13] In recommending that the Commission not authorize such net fishing by treaty Indians the Game Department, a) did not consider the ultimate use which such Indians would make of the fish taken; and, b) did not know how many Indians or nets would fish if such fishing were allowed, although its Director expected there would be many Indians fishing on many rivers. [FPTO § 3–440] The result of this consideration was the Commission's determination not to provide a regulation. The Game Commission asserted that this consideration and action by it constituted fulfillment of the following mandate of the Washington State Supreme Court in Department of Game v. Puyallup Tribe, 80 Wash.2d 561, 571, 497 P.2d 171, 178 (1972):

> "We hold that it is incumbent upon the Department of Game to provide, annually, regulations for a Puyallup Indian net fishery of steelhead when it is determined by the department, upon supporting facts and data, that an Indian net fishery would not be inconsistent with the necessary conservation of the steelhead fishery." [FPTO § 3–441]

231. The Game Department asserted that the Game Commission's action on October 2, 1972, concerning off-reservation Indian net fishing, was not an "order", "rule", or "regulation" as those terms are used in the Washington Administrative Procedure Act. RCW 34.-04.025, RCW 34.04.010, RCW 77.12.040, RCW 77.12.050, or RCW 77.12.060. The Department describes the Commission's action as "an order of policy for conservation" and states:

> "What we were considering was whether an Indian net fishery would be inconsistent with the conservation of steelhead. We determined that In-

dian net fisheries, the establishment of Indian net fisheries would be inconsistent with conservation." [FPTO § 3–441]

The Director of the Game Department understands the result of the October 2, 1972, and August 20, 1973, meetings of the Game Commission was a "closure" of Indian net fishing outside reservation boundaries. [Tr. 252, *l.* 7–20]

232. The facts and data submitted to the Game Commission at its meetings on October 2, 1972, and August 20, 1973, by the Game Department staff were inadequate to enable the Commission to determine whether or not an Indian net fishery on the Puyallup River or on any other river in the state would be inconsistent with the necessary conservation of the steelhead resource. [Tr. 349, *l.* 16 to 361, *l.* 3; Ex. PL–37; Ex. G–18]

233. The sportsmen's catch of winter steelhead on the Puyallup River for 1969–1970, the season immediately preceding the remand trial in Department of Game v. Puyallup Tribe, was an abnormally low 5,615 fish. [Ex. JX–2a, Table 62, p. 232; Ex. USA–3, p. 3] Although sportsmen's catches of winter steelhead on the Puyallup River the following year were 10,656, [Ex. JX–2a, Table 62, p. 232; Ex. USA–2, p. 2] the Director of the Game Department believes that the steelhead run has not, in any year since 1970, reached a magnitude that would justify the Commission's allowing any net fishery by treaty Indians on that river, even under his understanding of the Game Department's obligation under the Washington Supreme Court's May 4, 1972, decision in Department of Game v. Puyallup Tribe, 80 Wash.2d 561, 571, 497 P.2d 171 [Tr. 265, *l.* 11–20; Tr. 340, *l.* 8–14]

234. At its August 20, 1973, meeting to consider whether to allow an off-reservation net fishery for treaty Indians the Game Commission was informed by the Chief of the Game Department's Fishery Management Division, Mr. Millenbach, that the Puyallup River steelhead run is normally between 16,000–

18,000 fish annually, that the sport catch is usually around 12,000–14,000 annually and that a spawning escapement of 25% to 50% is needed. The Commission was advised by its staff that because of this data the steelhead fishery "cannot withstand a commercial fishery on the Puyallup River." When one Commissioner asked Mr. Millenbach if he felt the time would ever come when there would be sufficient steelhead for a net fishing season for the Puyallup Indians, the latter replied that it was the staff's view that the recreational fishery was then harvesting the resource and that this generally will hold true. They foresaw a regular yearly increase in sports fishermen. After receiving this data and recommendation the Commission refused to allow any Indian net fishery for steelhead. [Ex. G–18, pp. 4 and 10]

235. The Game Department has very limited data on the total number of fish in steelhead runs. It does not formally estimate or predict the sizes of future steelhead runs, but does make general comments on relative abundance. The large number of factors which influence eventual survival of steelhead currently make the capability of the Game Department to predict the size of steelhead runs extremely difficult. By examining the current water flow and planting records for the steelhead which will be returning in the coming year, and by examining spawning ground counts for the brood year (when available), the Department estimates whether the coming steelhead runs in named rivers will be greater or smaller than in prior years. [FPTO §§ 3–458, 3–459]

236. The Game Department would be able better to manage the steelhead resource if its facts and data were specific as to individual river systems, but budget limitations of the Game Department preclude the acquisition of this data at this time. [FPTO § 3–473] As its catch statistics and escapement data come to cover longer periods and become more accurate, Game will become better able reliably to protect the steelhead runs and to provide for a more efficient harvest of the resource. [FPTO § 3–433]

237. The Game Department has not determined whether steelhead spawners in excess of the amount a river system could sustain would be harmful to the run. [FPTO § 3–468] The Game Department is aware that planting of pre-smolt size steelhead may create an adverse competition with natural stocks which would not otherwise occur with smolt size plants. [FPTO § 3–444]

238. Steelhead punch cards are used by the Game Department to compile catch data on the time and river in which the fish have been caught. The Department estimates annual steelhead catch by multiplying the catch reported on returned punch cards by a factor designed to compensate for unreturned cards. The Department requires treaty Indians to have a free steelhead punch card when angling outside reservation boundaries. [FPTO § 3–439]

239. There are considerable fluctuations in the percentages of steelhead runs taken by fishermen from year to year. The Department considers that a generally beneficial escapement percentage for steelhead is 25 to 50%. [FPTO §§ 3–464, 3–458]

240. The Game Department's steelhead planting program has grown from a relatively insignificant contribution in the 1940's to a significant contribution to steelhead fisheries since 1951. The Game Department in early 1973 was producing three million winter steelhead smolts and 1.5–2 million summer steelhead smolts in its hatchery program. The Department plants steelhead in approximately 60 rivers currently, these generally being the major rivers. Mr. Millenbach estimates generally a "five per cent return" from steelhead plants in Washington State rivers. Not all river systems sustaining natural steelhead runs are planted. Not all planted rivers have been subject to marking experiments. In determining where to plant steelhead and how much to plant, the

Game Department considers the relative size of the river system, the punch card records of sports catch in previous years, the Department's capacity to produce steelhead smolts and the amenability of the river system to sport fishing. The capacity to produce smolts is considered as the most decisive factor. It is a general policy of the Game Department to plant at least 20,000 steelhead smolts in each planted river. This policy is a result of the Department's determination that such a volume of planting is necessary to encourage a sufficient level of sport fishing to utilize the resulting augmented run. [FPTO § 3–445] In the opinion of the Game Department, its steelhead planting program can be used to reestablish decimated runs when other environmental conditions are adequate. [FPTO § 3–470]

241. The Game Department steelhead seasons vary from river system to river system, due to the fact that the spawning period begins earlier in the smaller systems and that steelhead runs in different systems vary in quantity and timing. The Department attempts to protect steelhead spawning areas throughout the river environment, although it does permit fishing in some river areas where steelhead spawn. The Department has set upstream deadlines, above which no one may fish, in order to provide an undisturbed area for spawning. There is no downstream deadline. The Game Department permits fishing for steelhead in all marine areas within its regulatory jurisdiction. Saltwater steelhead fisheries are insignificant. Most are located on Whidbey Island at Bush Point and Lagoon Point. [FPTO § 3–450]

242. The peak months of the winter steelhead run in Washington are December and January; the peak months for summer steelhead are July and August. [FPTO § 3–455]

243. The Game Department has no recorded statistics indicating whether fishing on spawning grounds by means of drift nets, drag nets, dip nets, set nets, gill nets, or purse seines will cause "prespawning mortality" as that term was used in State v. Moses, 79 Wash.2d 104, 117, 483 P.2d 832 (1971); but Game believes, based on observations, that such activities would cause prespawning mortality. [FPTO § 3–452]

244. From a conservation standpoint it makes no difference whether a fish is caught by sportsmen on a hook and line or by an Indian in a net. Assuming a regulated fishery in both instances it is possible to rebalance the numbers caught and maintain conservation. [Tr. 413, l. 1 to 416, l. 6; Tr. 448, l. 11–19]

245. Experience with the Fraser River fisheries demonstrates that with proper regulation of net fisheries salmon and steelhead resources can be preserved despite the existence of a gill net fishery with an asserted capability of 98% efficiency if unregulated. [Tr. 400, l. 18 to 407, l. 8]

246. The steelhead resource has been preserved even with commercial net fisheries for steelhead on Indian reservations which are entirely unregulated by the State. [Tr. 256, l. 19 to 257, l. 8; Tr. 266, l. 15 to 267, l. 19; Tr. 427, l. 24 to 428, l. 10; FPTO § 3–466]

247. The Game Department has not undertaken any studies to determine the effect on steelhead of the Fisheries Department's recent special treaty Indian net fishing seasons for salmon. The Game Department is unaware of any studies which reliably conclude that an on-reservation Indian net fishery for steelhead which is unregulated by the State has caused a decrease in the steelhead run. [FPTO § 3–456]

248. The Game Department, pursuant to state law, has never considered permitting or authorizing any of the Plaintiff tribes to take part in the management or propagation of any anadromous fisheries under its regulatory jurisdiction. [FPTO § 3–437]

249. According to Game Department reports the statewide Indian catch, including the on-reservation catch, from the 1970–1971 winter steelhead run was

less than 20% of the total catch. [Tr. 393, *l.* 13 to 394, *l.* 9]

250. As one basis for its conclusion that a hook and line fishery is the wisest use of the steelhead resource, the Game Department relies on a study which concluded that a steelhead fisherman contributes approximately $60.00 in general benefit to the economy of the State of Washington for each fish caught. [FPTO § 3–469; Ex. G–12]

251. There are presently about 145,000 licensed steelhead fishermen in the State of Washington. The present law and regulations authorize these fishermen to take 30 fish per man per season with sports gear. [Tr. 310, *l.* 3–13] The actual take totals approximately 250,000 steelhead per year. [Tr. 310, *l.* 24 to 311, *l.* 3; Exs. USA–2 through USA–11] Due to the nature of steelhead fishing, one could not maintain a family on a steelhead catch based on a hook and line fishery. [Tr. 4024, *l.* 5–14]

252. At the time of the treaties and for many years thereafter neither the Indians nor the non-Indian citizens treated steelhead any differently from salmon in terms of the purpose and means of their harvest. [Ex. USA–20, p. 6; Ex. USA–26, p. 62; Ex. PL–2, p. 164; Ex. JX–2a, §§ 2.3.1 and 2.3.2, pp. 61, 63]

253. The Game Department has received federal financial assistance in the amount of 50% under the Anadromous Fish Conservation Act, 16 U.S.C. §§ 757a–757f for construction and operation of its steelhead hatcheries. [FPTO § 3–442; Tr. 237, *l.* 8–16]

Based on the foregoing Findings of Fact the Court makes the following:

## CONCLUSIONS OF LAW

1. Jurisdiction is vested in this Court by virtue of:

a. 28 U.S.C. § 1345, in that the United States brings this action on its own behalf and on behalf of certain federally-recognized Indian tribes in connection with its administration of Indian affairs;

b. 28 U.S.C. § 1331, in that the matter in controversy involves the fishing rights of each of the Plaintiff tribes which in each case have a value in excess of $10,000, exclusive of interest and costs, and are claimed to exist and to be secured under the Constitution, laws and treaties of the United States.

c. 28 U.S.C. § 1343(3) and (4), in that the Plaintiff tribes allege that Defendant State of Washington, and its Department of Fisheries and Game have, under color of state law, regulation, custom and usage, deprived them of rights secured to them in the treaties cited in paragraph 1 and under the Constitution of the United States, and those tribes seek equitable relief for that deprivation.

d. 28 U.S.C. § 1362, as to the following Indian tribes each having a governing body duly recognized by the Secretary of the Interior in that this action is brought by each on its own behalf alleging violations of its rights under the Constitution, laws and treaties of the United States: Hoh Tribe, Lummi Tribe, Makah Tribe, Muckleshoot Tribe, Quileute Tribe, Quinault Tribe, Skokomish Tribe, Squaxin Island Tribe, Yakima Nation. [FPTO § 1]

2. Defendant Washington Reef Net Owners Association, an unincorporated association, is a proper party in accordance with Rule 24(b), Federal Rules of Civil Procedure, as the representatives of its members who are individuals engaging in such form of commercial fishing operations at various points in lower Puget Sound and in the San Juan Islands, claimed by the Plaintiff Lummi Tribe as among its usual and accustomed fishing places. [FPTO § 3–27]

3. Each of the Plaintiffs has standing to maintain the claims asserted in this action. [FPTO § 7]

4. An actual controversy exists between each of the Plaintiffs on

the one hand and each of the Defendants on the other, as to the nature and extent of the claimed treaty fishing rights of the Plaintiff tribes and the attempted regulation thereof by the State Defendants, except that the controversy between the Defendant Reef Net Owners Association and the Plaintiffs is limited to the effect of the treaties on the reef net operations of members of the Association. [FPTO § 3]

5. Declaratory judgments are properly sought pursuant to 28 U.S.C. §§ 2201 and 2202 and this Court may grant such relief. [FPTO § 4]

6. Venue is properly laid in this Court under 28 U.S.C. § 1391(b) in that all Defendants reside within the Western District of Washington. [FPTO § 6]

7. This case is limited to the claimed treaty-secured off-reservation fishing rights of the Plaintiff tribes as they apply to areas of the Western District of Washington within the watersheds of Puget Sound and the Olympic Peninsula north of Grays Harbor, and in the adjacent offshore waters which are within the jurisdiction of the State of Washington. The subject matter of this case is limited to the application of those rights to the anadromous fish which are in the waters described, including such fish as are native to other areas. [FPTO § 5]

8. Within the jurisdictional limits of the applicable statutes, and the subject matter described above, this case calls upon the Court to exercise the traditional equity powers entrusted to the Federal District Courts in declaring in clear and certain terms the special reserved nature of the treaty tribes' fishing rights and in fashioning just and appropriate relief which is comprehensive enough to protect the tribes' rights and to permit exercise of such of the State's police power as is necessary.

9. The recognition of a tribe as a treaty party or the political successor in interest to a treaty party is a federal political question on which state authorities and federal courts must follow the determination by the legislative or executive branch of the Federal Government.

10. Absent a contrary congressional determination, the recognition by the executive branch of the Federal Government, acting through the Secretary of the Interior and his delegatees as the official charged by federal statute with the administration of Indian affairs, of the Plaintiff Muckleshoot Tribe as a political successor in interest to tribes or bands which were parties to the Treaty of Point Elliott or the Treaty of Medicine Creek is binding upon the State of Washington and its agencies and officials.

11. By its enactment of legislation (P.L. 90–530, 82 Stat. 882) providing for the disposition of judgment funds awarded to the Muckleshoot Tribe, Plaintiff herein, by the Indian Claims Commission in Indian Claims Commission Docket No. 98, Congress has recognized that tribe as the successor in interest to Indians who were parties to the Treaty of Point Elliott and the Treaty of Medicine Creek.

12. By its enactment of legislation (P.L. 92–30, 85 Stat. 83) providing for the disposition of judgment funds awarded to the Upper Skagit Tribe, including the allied Suiattle-Sauk Band, by the Indian Claims Commission in Indian Claims Commission Docket No. 92, Congress has recognized that that tribe and band were parties to the Treaty of Point Elliott and has directed the Secretary of the Interior to prepare current rolls of the present-day lineal descendants of members of that tribe and band.

13. By its enactment of legislation (P.L. 93–134 approved October 19, 1973) providing for the future disposition of other judgment awards awarded by the Indian Claims Commission, Congress has authorized the Secretary of the Interior to determine the persons and Indian entities who are the present-day successors in interest to tribes

which the Indian Claims Commission has found ceded lands to the United States pursuant to Indian treaties. Under this legislation the Secretary of the Interior has the authority to determine the present-day representative of the Stillaguamish Tribe which was awarded a judgment in Indian Claims Commission Docket No. 207 for lands ceded pursuant to the Treaty of Point Elliott.

14. The Plaintiff Muckleshoot Tribe is one of the holders of the right of taking fish secured to Indians by the Treaty of Point Elliott and the Treaty of Medicine Creek and it may authorize its members to exercise the right within the limits elsewhere prescribed herein with respect to the scope of the right.

15. Upon approval of their respective membership rolls and structures of organization by the Secretary of the Interior, the Plaintiff Upper Skagit Tribe, Plaintiff Sauk-Suiattle Tribe and Plaintiff Stillaguamish Tribe are each a holder of the right of taking fish secured to Indians by the Treaty of Point Elliott and each may authorize its members to exercise the right within the limits elsewhere prescribed herein with respect to the scope of the right.

16. Each of the Plaintiff tribes holds a right under one or more of the treaties cited in paragraph 1 of the Findings of Fact herein to fish at usual and accustomed places outside of reservation boundaries.

17. Admission of the State of Washington into the Union upon an equal footing with the original states had no effect upon the treaty rights of the Plaintiff tribes. Such admission imposed upon the State, equally with other states, the obligation to observe and carry out the provisions of treaties of the United States.

18. Treaties with Indian tribes must be construed liberally in accordance with the meaning they were understood to have by the tribal representatives at the treaty council and in a spirit which generously recognizes the full obligation of this nation to protect the interests of a dependent people.

19. The treaty clauses regarding off-reservation fishing at usual and accustomed grounds and stations in common with other citizens secured to the Indians' rights, privileges and immunities distinct from those of other citizens.

20. The right secured by the treaties to the Plaintiff tribes is a reserved right, which is linked to the marine and freshwater areas where the Indians fished during treaty times, and which exists in part to provide a volume of fish which is sufficient to the fair needs of the tribes. The right is to be exercised in common with non-Indians, who may take a share which is fair by comparison with the share taken by the tribes. Neither the Indians nor the non-Indians may fish in a manner so as to destroy the resource or to preempt it totally.

21. The right secured by the treaties to the Plaintiff tribes is not limited as to species of fish, the origin of fish, the purpose or use, or the time or manner of taking, except to the extent necessary to achieve preservation of the resource and to allow non-Indians an opportunity to fish in common with treaty right fishermen outside reservation boundaries.

22. The passage of time and the changed conditions affecting the water courses and the fishery resources in the case area have not eroded and cannot erode the right secured by the treaties but have merely affected the limits which may be placed upon its exercise in order to preserve the fish resources which are necessary to the continued and future enjoyment of the right.

23. The State's police power to regulate the off-reservation fishing activities of members of the treaty tribes exists only to the extent necessary to protect the fishery resource. This power does not include the authority to impair or qualify the treaty right by limiting its exercise to State-preferred

times, manners or purposes except as such limitation may be necessary for preservation of the resource and protection of the interests of all those entitled to share it. This power does not include the power to determine for the Indian tribes what is the wisest and best use of their share of the common resource.

24. The Stevens treaties do not prohibit or limit any specific manner, method or purpose of taking fish. The treaty tribes may utilize improvements in traditional fishing techniques, methods and gear subject only to restrictions necessary to preserve and maintain the resource.

25. The exercise of a treaty tribe's right to take anadromous fish is limited only by the geographical extent of the usual and accustomed fishing places, the limits of the harvestable stock, the tribe's fair need for fish, and the opportunity for non-Indians to fish in common with Indians outside reservation boundaries.

26. The only method providing a fair and comprehensive account of the usual and accustomed fishing places of the Plaintiff tribes is the designation of the freshwater systems and marine areas within which the treaty Indians fished at varying times, places and seasons, on different runs. Changes in water course do not impair the geographical scope of the usual and accustomed fishing places. Although no complete inventory of all the Plaintiff tribes' usual and accustomed fishing sites can be compiled today, the areas identified in the Findings of Fact herein for each of the Plaintiff tribes in general describe some of the freshwater systems and marine areas within which the respective tribes fished at the time of the treaties and wherein those tribes, as determined above, are entitled to exercise their treaty fishing rights today.

27. Because the right of each treaty tribe to take anadromous fish arises from a treaty with the United States, that right is reserved and protected under the supreme law of the land, does not depend on state law, is distinct from rights or privileges held by others, and may not be qualified by any action of the state.

28. The phrase "in common with" operates only to limit the exercise of the tribes' right to a share of the resource which will be consistent with preservation and maintenance of the resource and with the reasonable harvest by others of such fish as are not reasonably needed by the tribe, as set forth in the *Final Decision* of the court, pages 342–343.

29. Excepting tribes entitled to self-regulate fishing by their members (See *Final Decision*, pages 340–342), the right of a treaty tribe to take anadromous fish may be regulated by an appropriate exercise of state police power. To be appropriate, such regulation must:

a) Not discriminate against the treaty tribe's reserved right to fish.

b) Meet appropriate standards of substantive and procedural due process; and

c) Be shown by the State to be both reasonable and necessary to preserve and maintain the resource. When State laws or regulations affect the volume of anadromous fish available for harvest by a treaty tribe at usual and accustomed places, such regulations must be designed so as to carry out the purposes of the treaty provision securing to the tribe the right to take fish.

30. In order for a regulation to be reasonable and necessary for conservation, it must, when considered in the context of the total regulatory plan, be designed to preserve or maintain the resource.

31. To meet appropriate standards, regulations that affect the harvest by the tribes on future runs must receive a full, fair and public consideration and determination in accordance with the requirements of the Washington Administrative Procedures Act and regulations thereunder.

32. In order for regulations not to discriminate against treaty Indians, the Department of Fisheries' harvesting plan must provide for an opportunity for treaty Indians to take, at their off-reservation usual and accustomed fishing places, a share of the harvestable fish as set forth in the *Final Decision,* pages 342–343.

33. If any person shows identification (as set forth in the *Final Decision,* pages 341–342) to establish that he is exercising the fishing rights of a treaty tribe and if he is fishing in a usual and accustomed place, he is protected under federal law against any state action, unless the state has established that such action is an appropriate exercise of its police power.

34. The protection of the treaty rights of the Plaintiff tribes to take fish at their usual and accustomed places must be an objective of the State's regulatory policy co-equal with the preservation and propagation of fish runs for other users. Before it can restrict the treaty rights of the Plaintiff tribes to take fish at their usual and accustomed places, the State and its regulatory agencies must treat such treaty rights as an obligation and interest to be promoted in the State's regulatory, management and propagation programs.

35. In order to accord the treaty rights of the Plaintiff tribes and their members the appropriate protection required by paragraph 34 herein, the State and its regulatory agencies may not restrain the exercise of said rights by:

a) Use of a state statute or regulation of broad applicability instead of one specific as to time, place, species and gear; and

b) Prohibition of harvest by the tribes on future runs prior to a full, fair and public consideration and determination of specific need conducted in accordance with the requirements of the Washington Administrative Procedure Act and regulations thereunder.

36. The Plaintiff tribes having a federally-recognized tribal government have jurisdiction (in conformity with their tribal constitutions or other applicable tribal rules or federal statutes) to enact and enforce regulations relating to the exercise outside reservation boundaries by their members of fishing rights secured to said tribes by treaty. However, the tribes cannot enlarge the right beyond that secured in the treaty.

37. Regulation of off-reservation Indian treaty fishing by the United States, the State, or the Plaintiff tribes does not preempt the regulation by any of the other two. Jurisdiction of each entity to regulate is unimpaired by the exercise of another entity's regulatory jurisdiction. With respect to matters over which there may be multiple jurisdiction, the extent of exercise or nonexercise of regulatory jurisdiction by the entity having primary interest in the matter may be relevant to the appropriateness of another entity's exercise of its jurisdiction. Also the exercise of federal or tribal regulatory control may affect the finding of "necessity" which is required for the validity of any state exercise of its police power to preserve the resource.

38. The application of current laws and regulations of the State to restrict the time, place, manner and volume of off-reservation harvest of anadromous fish by treaty tribes is unlawful for the reasons that, a) they have not been established to be necessary to preserve and maintain the resource; b) they operate to discriminate against the tribes' treaty right to fish; c) they have been adopted and enforced in violation of appropriate standards; and, d) they have been adopted and enforced in derogation of the meaning and purposes of the treaty provision at issue in this case.

39. The state laws and regulations pertaining to game fish which reserve the entire harvestable portion of a species of fish for a special interest and

purpose discriminate illegally against the treaty Indians.

40. Regulations of the Director of Fisheries providing for special seasons and limitations applicable to the taking of fish by the members of certain treaty tribes do not fully protect the treaty fishing rights of the Plaintiff tribes in that they:

a) Do not apply to all of the usual and accustomed fishing places of said tribes;

b) Do not extend recognition of the treaty rights to all of the Plaintiff tribes;

c) Do not provide adequate opportunity for said tribes to take their proper share of the fish.

41. The following State statutes and regulations are specifically found not to meet the standards governing their applicability to the Indian exercise of treaty fishing rights and therefore may not lawfully be applied to restrict members of tribes having such rights from exercising those rights: RCW 75.08.260, RCW 75.12.060, RCW 75.12.070, RCW 75.12.160, RCW 77.08.-020, RCW 77.12.100, RCW 77.12.130, RCW 77.16.020, RCW 77.16.030, RCW 77.16.040, RCW 77.16.060, WAC 220-20-010, WAC 220-20-015(2) and WAC 220-47-020.

42. In its consideration on October 2, 1972 and August 20, 1973, of whether an Indian net fishery would be inconsistent with the necessary conservation of the steelhead fishery, the Department of Game and the Game Commission did not accord the Puyallup Tribe or other treaty tribes a hearing in conformity with due process of law or the Washington Administrative Procedure Act, RCW Chapter 34.04, and applicable provisions of the Washington Administrative Code.

43. The seizure and damage, destruction, disposition or unreasonably long detention of fishing gear and other property of members of the Plaintiff tribes by the Defendants or their officers, employees, or agents without any judicial determination of confiscation or forfeiture is an unlawful deprivation of the rights of said members under the Fourteenth Amendment of the Constitution of the United States and the treaties listed in paragraph 1 of the Findings of Fact herein.

44. The continued retention of fishing gear and other property belonging to the members of the Plaintiff tribes and seized pursuant to the laws and regulations which are herein declared to be in conflict with the treaty rights of said tribes is unlawful and such property or its value must be returned to its owner, if known; otherwise to the tribe whose reservation is nearest to the place of seizure.

45. The Lummi Tribe continues to hold treaty-secured rights to fish with reef net gear in its usual and accustomed places, including Legoe Bay off Lummi Island, which rights are distinct from, and have priority over, any privilege of use and occupation of such places by members of the Defendant Washington Reef Net Owners Association.

46. The Plaintiffs are unable to be a party to criminal cases brought for the violation of the state statutes and regulations challenged in this action and are without an adequate remedy at law or any remedy at law whatsoever fully to assert and adequately to enforce and protect the fishing rights reserved and secured to the Plaintiff tribes by the treaties involved in this case. The individual members of the Plaintiff tribes are without an adequate remedy at law to redress or prevent unlawful interference with their exercise of fishing rights reserved and secured by said treaties because: a) the treaty rights that are asserted are unique and the damages which have been or will be sustained are not susceptible of definite monetary determination; and, b) in the case of criminal prosecutions said members have no remedy at all except at the risk of suffering arrests, seizure of

property, fines, imprisonment and confiscation of property involving a multiplicity of legal proceedings.

47. The Plaintiffs are entitled to injunctive relief against the continuation and repetition of acts or omissions declared by these Conclusions of Law to be in violation of the treaty-secured rights of the Plaintiff tribes and their members.

48. This Court should retain continuing jurisdiction of this case to grant such further relief as may be found by the court to be appropriate on motion of any party hereto and to assure compliance with the Judgment Decree entered herein.

## DECLARATORY JUDGMENT AND DECREE

This judgment and decree is based upon the Findings of Fact, Agreed Facts, Conclusions of Law and Decision of the Court entered in this case, all of which by this reference are hereby made a part hereof as though set forth in full herein, and close and detailed consideration by the Court. No language herein shall be interpreted as superseding the Decision of the Court, which shall control if in any respect it appears to be in conflict with any Finding herein.

In order clearly to delineate the off-reservation fishing rights held by certain Indian entities in this district under treaties made with the United States, it is hereby

Ordered, adjudged and decreed that the right of each of the plaintiff tribes in this case to harvest anadromous fish in waters within the Western District of Washington, outside the boundaries of Indian reservations and areas of exclusive *federal jurisdiction,* is declared to be as follows:

A. *Definitions*

All definitions contained in the Glossary of Terms of the Joint Biological Statement (Exhibit JX–2a) are hereby incorporated by reference. In addition and specifically for the purposes of interpreting all provisions of this decree, the following definitions shall be controlling:

1. *Anadromous fish*: Any fish which spawns or is artificially produced in freshwater, reaches mature size while rearing in saltwater and returns to freshwater to reproduce, and which spends *any portion of its life cycle in* waters within the Western District of Washington.

2. *Adequate production escapement*: In an approximate number of anadromous fish, that level of escapement from each fishery which will produce viable offspring in numbers to fully utilize all natural spawning grounds and propagation facilities reasonable and necessary for conservation of the resource, as defined in the Decision of the court.

3. *Harvestable stock*: The approximate number of anadromous fish which is surplus beyond adequate production escapement and Indian needs as defined in the Decision; that is, the number remaining when the adequate production escapement and Indian needs are subtracted from the run size.

4. *To preserve and maintain the resource*: Upon a full consideration of (a) the history of State anadromous fish management, (b) the level of catch within the Western District of Washington in recent years, (c) the quality of freshwater and artificial production environments, (d) the most recent facts and data concerning anadromous fish production potential, (e) the potential for interspecific competition, and (f) the prospects for improvement of anadromous fish production, to perpetuate the runs of anadromous fish at least at their current level.

5. *Run*: A group of anadromous fish on its return migration, identified by species, race and water of origin.

6. *State*: The State of Washington, its agents, officers, agencies, assigns and subdivisions.

7. *Stevens' treaties*: Those treaties identified in the Findings of Fact and Conclusions of Law as having been negotiated between Isaac I. Stevens, for the

United States, and certain Indian tribes and bands who lived in Washington Territory during the 1850's.

8. *Treaty Tribe*: One of the Indian entities described in paragraph 10 below, or any other entity entitled to exercise treaty fishing rights under the treaties construed herein within the Western District of Washington.

9. *Usual and accustomed places*: Those areas in, on and around the freshwater and saltwater areas within the Western District of Washington, which were understood by the Indian parties to the Stevens' treaties to be embraced within the treaty terms "usual and accustomed" "grounds," "stations" and "places."

## B. *Treaty Fishing Rights*

10. Each of the plaintiff tribes listed below is a Treaty Tribe. The list given below is a declaration only as to those 14 Indian entities which have been represented on the plaintiff side in this case. A Treaty Tribe occupies the status of a party to one or more of the Stevens' treaties and therefore holds for the benefit of its members a reserved right to harvest anadromous fish at all usual and accustomed places outside reservation boundaries, in common with others:

Hoh Tribe of Indians;

Lummi Indian Tribe;

Makah Indian Tribe;

Muckleshoot Indian Tribe;

Nisqually Indian Community of the Nisqually Reservation;

Puyallup Tribe of the Puyallup Reservation;

Quileute Indian Tribe;

Quinault Tribe of Indians;

Sauk-Suiattle Indian Tribe;

Skokomish Indian Tribe;

Squaxin Island Tribe of Indians;

Stillaguamish Tribe of Indians;

Upper Skagit River Tribe;

Confederated Tribes and Bands of the Yakima Indian Nation

11. The right of a Treaty Tribe to harvest anadromous fish outside reservation boundaries arises from a provision which appears in each of the Stevens' treaties and which, with immaterial variations, states:

The right of taking fish, at all usual and accustomed grounds and stations, is further secured to said Indians, in common with all citizens of the Territory . . . .

12. It is the responsibility of all citizens to see that the terms of the Stevens' treaties are carried out, so far as possible, in accordance with the meaning they were understood to have by the tribal representatives at the councils, and in a spirit which generously recognizes the full obligation of this nation to protect the interests of a dependent people.

13. From the earliest known times, up to and beyond the time of the Stevens' treaties, the Indians comprising each of the treating tribes and bands were primarily a fishing, hunting and gathering people dependent almost entirely upon the natural animal and vegetative resources of the region for their subsistence and culture. They were heavily dependent upon anadromous fish for their subsistence and for trade with other tribes and later with the settlers. Anadromous fish was the great staple of their diet and livelihood. They cured and dried large quantities for year around use, both for themselves and for others through sale, trade, barter and employment. With the advent of canning technology in the latter half of the 19th Century the commercial exploitation of the anadromous fish resources by non-Indians increased tremendously. Indians, fishing under their treaty-secured rights, also participated in this expanded commercial fishery and sold many fish to non-Indian packers and dealers.

14. The taking of anadromous fish from usual and accustomed places, the right to which was secured to the Treaty Tribes in the Stevens' treaties,

constituted both the means of economic livelihood and the foundation of native culture. Reservation of the right to gather food in this fashion protected the Indians' right to maintain essential elements of their way of life, as a complement to the life defined by the permanent homes, allotted farm lands, compulsory education, technical assistance and pecuniary rewards offered in the treaties. Settlement of the West and the rise of industrial America have significantly circumscribed the opportunities of members of the Treaty Tribes to fish for subsistence and commerce and to maintain tribal traditions. But the mere passage of time has not eroded, and cannot erode, the rights guaranteed by solemn treaties that both sides pledged on their honor to uphold.

15. The treaty-secured rights to resort to the usual and accustomed places to fish were a part of larger rights possessed by the treating Indians, upon the exercise of which there was not a shadow of impediment, and which were not much less necessary to their existence than the atmosphere they breathed. The treaty was not a grant of rights to the treating Indians, but a grant of rights from them, and a reservation of those not granted. In the Stevens' treaties, such reservations were not of particular parcels of land, and could not be expressed in deeds, as dealings between private individuals. The reservations were in large areas of territory, and the negotiations were with the tribes. The treaties reserved rights, however, to every individual Indian, as though described therein. There was an exclusive right of fishing reserved within certain boundaries. There was a right outside of those boundaries reserved for exercise "in common with citizens of the Territory."

16. The Stevens' treaties do not reserve to the Treaty Tribes any specific manner, method or purpose of taking fish; nor do the treaties prohibit any specific manner, method or purpose. Just as non-Indians may continue to take advantage of improvements in fishing techniques, the Treaty Tribes may, in exercising their rights to take anadromous fish, utilize improvements in traditional fishing methods, such for example as nylon nets and steel hooks.

17. The exercise of a Treaty Tribe's right to take anadromous fish outside of reservation boundaries is limited only by geographical extent of the usual and accustomed places, the limits of the harvestable stock and the number of fish which non-treaty fishermen shall have an opportunity to catch, as provided in the Decision of the Court.

18. Because the right of each Treaty Tribe to take anadromous fish arises from a treaty with the United States, that right is preserved and protected under the supreme law of the land, does not depend on State law, is distinct from rights or privileges held by others, and may not be qualified by any action of the State.

19. The treaty phrase "in common with" does not secure any treaty right or privilege to anyone other than the Treaty Tribes, nor does that phrase qualify any Indian's treaty right to fish, except as provided in the Decision of the Court.

20. Except for tribes now or hereafter entitled to self-regulation of tribal fishing, as provided in the Decision of the Court, the right of a Treaty Tribe to take anadromous fish may be regulated by an appropriate exercise of State power. To be appropriate, such regulation must:

a. Not discriminate against the Treaty Tribe's reserved right to fish;

b. Meet appropriate standards of substantive and procedural due process; and

c. Be shown by the State to be both reasonable and necessary to preserve and maintain the resource. When State law or regulations affect the volume of anadromous fish available for harvest by a Treaty Tribe at usual and accustomed places, such regulations must be de-

signed so as to carry out the purposes of the treaty provision securing to the Tribe the right to take fish.

■■■■ 21. If any person shows identification, as provided in the Decision of the Court, that he is exercising the fishing rights of a Treaty Tribe and if he is fishing in a usual and accustomed place, he is protected under federal law against any State action which affects the time, place, manner, purpose or volume of his harvest of anadromous fish, unless the State has previously established that such action is an appropriate exercise of its power.

22. The application of currently effective laws and regulations of the State of Washington specified in the Conclusions of Law which affect the time, place, manner and volume of off-reservation harvest of anadromous fish by Treaty Tribes is unlawful for the reasons also stated in the Conclusions of Law.

23. All Findings of Fact and Conclusions of Law pertinent to the nature, scope and effect of the fishing rights of the Treaty Tribes are specifically incorporated by reference herein.

24. The court retains jurisdiction of this case for the life of this decree to take evidence, to make rulings and to issue such orders as may be just and proper upon the facts and law and in implementation of this decree.

25. Appointment of a Master, technical experts and an Advisory Committee on Treaty Right Fishing will be considered and determined as provided in the Decision of the court.

26. Plaintiffs' application for an injunction will be considered and determined upon hearing thereof at the earliest practicable date following entry of this judgment and decree.

## RULINGS ON FISHERIES' QUESTIONS PER RECONSIDERATION MOTION

■■■■ 1. Is the state or its officers authorized to arrest a member of one of plaintiff tribes fishing in contravention of state law outside the area of his tribe's usual and accustomed fishing grounds, enumerated in this Court's Findings of Fact or as determined in a subsequent proceeding in this Court, even though such individual may prove, in his defense in any criminal proceeding resulting from his arrest, that such area in which he was fishing is a usual and accustomed fishing ground of his tribe?

A. Yes. In the hearings of March 5 and 6, 1974, the court directed each plaintiff tribe to determine and report to Fisheries and Game, in advance of a particular run or season, the names of tribal members who expect to fish in the period in question, the amount and type of gear to be used, and the usual and accustomed locations where such fishing will be conducted. After a reasonable time for compliance, any tribal member fishing in a location other than as reported by his tribe, is acting in violation of the orders and decision of this court. If such tribal member is also fishing in violation of state law, he or she is subject to state arrest and criminal prosecution; provided, that if the defendant proves he was fishing at a usual and accustomed ground or station of his tribe, although not previously designated as such, it shall be a defense to any such prosecution.

■■■■ 2. Can the state meet its burden of proving the necessity for a state regulation of an off-reservation Indian treaty fishery by showing that:

(a) The off-reservation catch, other than fish needed for personal food or ceremonies, of the tribe or tribes for which regulation is sought is in excess of 50% of the harvest taking place by all fishermen in the area of the tribe's or tribes' usual and accustomed fishing grounds; and

(b) such regulation is necessary for conservation?

A. No. While the showing specified in the question might be sufficient on a particular run of fish in a particular stream or area, it would be necessary to

further show how the particular take affected the total take of all treaty right fishermen at all usual and accustomed grounds and stations. The State must regulate non-Indian fishing in marine areas to assure, as far as possible, that an adequate number of harvestable fish reach the Indian fisheries.

3. What is the status of a tribe pending its compliance with the Court's requirements to identify and certify its fishermen and to provide the state with fish catch statistics?

A. During the period pending compliance with the identification and certification requirements regarding the fishermen and tribal catch statistics reports, each tribe shall provide its fishermen with such credentials as are reasonably practicable, and a tribe, if otherwise qualified, will be entitled to self-regulation status. `

4. Is the state or its officers authorized to arrest a member of one of plaintiff tribes fishing in contravention of state law without identification as required by the Court's opinion, even though such individual may prove, in his defense in any criminal proceeding resulting from his arrest, that he is a member of one of the plaintiff tribes?

A. The answer to this question is similar to the answer to question No. 1 above. In its Final Decision # I, the court required each tribe to provide its members with proper identification. Failure of an individual tribal fisherman to have such identification on his person when fishing, or when going to or from a fishing site, will cause him to be subject to state authority.

5. In proving regulations to the Court or in establishing findings before a special master:

(a) What specific elements must the state show to satisfy the requirement that the state prove in advance that its regulations are necessary for conservation?

(b) What specific elements must a tribe show to satisfy the qualifica-

tions that its fishing regulations will not adversely affect conservation?

A. (a) Final Decision # I prescribes the applicable standards and elements required for the state to show a specific regulation is necessary for conservation. These include requirements that the state utilize run size predictions, valid escapement goals, the least restrictive regulation of tribal fishermen and that the state view the entire run as a divisible resource. Experience with actual proposed regulations may disclose other specific elements which must be shown in advance of enforcement of state regulations against treaty right fishermen.

(b) Tribes shall promptly prepare regulations and submit them to Fisheries and Game, who will examine the proposed regulations for alleged inadequacies. The parties will confer with a view toward agreement; failing that, proposed regulations will be reviewable by the court on application of either party.

6. If the state can show that it is necessary for conservation to restrict off-reservation treaty fishing on a threatened run of a species destined for one river, but that other runs of the same species destined for other rivers are abundant enough to permit harvesting by treaty and non-treaty fishermen in accordance with the opinion of the court, may the state restrict the treaty off-reservation fishery on the threatened run even though non-treaty fishermen fishing on mixed runs will incidentally impact the threatened run? (See F.F. 202)

A. The state would not necessarily be allowed to operate in the manner set forth in the question. Various other factors may be involved. The state must explore alternatives to fishing on mixed stocks, consistent with the goal of full harvest of the resource.

7. Do fish caught by a member of one of the plaintiff tribes in the all citizen fishery count toward the off-

reservation 50% share of his tribe? (See F.F. 32)

A. Fish caught by a member of one of the treaty tribes while fishing in the all-citizen fishery, at a usual and accustomed fishing place of the tribe, will be included in the tribe's off reservation share of the harvest. If a tribal member fishes in the all-citizen fishery at a location which is not a usual and accustomed ground or station of his tribe, that individual's catch will not count toward the tribal off-reservation share.

■■■ 8. If a plaintiff tribe meets the qualifications and conditions for self regulation, may the state adopt that tribe's off-reservation fishing regulations, or other regulations approved by the Court, and enforce the same, i. e., is there pre-emption or concurrent jurisdiction between the state and the tribe? (See C.L. # 37)

A. As stated in Conclusion of Law No. 37, the state and treaty tribes have concurrent jurisdiction with regard to regulation of the fishery resource. If, however, the treaty tribe is self-regulating, the state has only limited jurisdiction with regard to such tribe. The state can adopt regulations of a self-regulating tribe, but only if state promulgation is consistent with requisite administrative procedures. Furthermore, before any particular state regulations can be enforced against any treaty right fisherman, the state must additionally satisfy the requirement of showing the specific regulation is reasonable and necessary for conservation. Upon satisfaction of these requirements, self-regulating tribes must adopt state regulations found reasonable and necessary for conservation, as directed in Condition (a) at page 32 of FD#I. Also the state has authority to monitor the fishing activities of self-regulated tribes and to report alleged violations of valid state regulations to tribal authorities and, if appropriate action is not taken by the tribe, to the court for determination.

9 and 10—There are no questions so numbered.

■■ 11. May the state adopt and enforce, as its own regulation the regulation of a plaintiff tribe, which has not qualified to be self-regulating, without independently proving to the Court that such regulations are necessary for conservation?

A. The answer to this question is similar to the answer to question 8 above, except that with respect to non self-regulating tribes, the state may enforce properly promulgated regulations which have been established to be reasonable and necessary for conservation.

■■ 12. Where two or more Indian tribes have treaty rights to fish in the same off-reservation area, how is the off-reservation 50% treaty share to be calculated?

A. The division among tribes of the Indian off-reservation share of the harvest shall be determined by the tribes fishing in the same usual and accustomed places. The only concern of the state would be to determine (a) whether the total harvest by all tribes exceeds 50%, and (b) whether any tribe or group of tribes will cut into escapement when fishing as the tribes had planned.

13. Where two or more Indian tribes have treaty rights to fish in the same off-reservation area and the state, being unable to prove in advance the necessity of its regulations for conservation, adopts the regulations of one of the treaty tribes entitled to fish there, may the state enforce its regulation as to all treaty fishermen entitled to fish there?

A. State enforcement of fishing regulations adopted from either self-regulating or non self-regulating tribes is covered by the answers to questions 8 and 11 above.

■■ 14. Does a plaintiff tribe, which qualifies as a self-regulating tribe, have authority to enforce its off-reservation fishing regulations against persons who are not members of such tribe?

A. No. A self-regulating tribe has authority only over its own members.

However, the tribes should report apparent misuse of the fishery to the state if a non-Indian is involved or to the tribe of a treaty right fisherman, and if appropriate action is not taken, such report should be brought to the court for such action as the court finds appropriate.

 15. If a tribe does not qualify as a self-regulating tribe and the state is unable to prove in advance the necessity of its regulations for conservation, does it necessarily follow that treaty fishing in the tribe's off-reservation usual and accustomed fishing area must be unregulated?

A. If a member of a non self-regulating tribe is alleged to be guilty of misuse of the fishery, such incident shall be reported to his tribe for adjudication, and failing prompt and appropriate action there, the matter should be brought to court for such action as the court finds appropriate.

 16. How does the "alternative means" requirement in paragraph number 6 on page 36 of the Court's Opinion relate to the percentage share plan for off-reservation fisheries in paragraph 7 on pages 36–37 of the same?

A. The precise answer to this question is difficult because paragraph 6 on page 36 has been taken out of context and contrasted with the "sharing equally" concept. Taken together, in context, this language means that the state may not allow an overharvest by non-treaty fishermen, and then justify restriction of treaty right fishing by the requirements for spawning escapement necessary for conservation. Because of the locations of their usual and accustomed fishing places, treaty Indians are usually the last user group to harvest the resource. Because also the number of non-treaty right fishermen greatly exceeds the number of treaty right fishermen, the state must generally regulate the harvest by non-treaty right fishermen in order to assure, insofar as possi-

ble, that an adequate number of fish reach usual and accustomed fishing grounds to provide both the Indian tribal share of the harvest and the necessary spawning escapement.

 17. For the purpose of exercising treaty fishing rights, may an Indian only be enrolled in one tribe?

A. Yes. The practicalities of regulatory enforcement require that any treaty right Indian, eligible for enrollment in more than one tribe, may be certified and identified for fishing purposes by only one tribe.

 18. Does the 1937 Convention between the United States and Canada (50 Stat. 1355), which establishes the International Pacific Salmon Fisheries Commission with jurisdiction to regulate the harvest of pink and sockeye salmon in the Strait of Juan de Fuca and northern Puget Sound, modify the Stevens treaties, so that plaintiff tribes which have usual and accustomed fishing grounds within the convention waters must fish in conformity with the regulations promulgated by the Commission and enforced, pursuant to 16 U.S.C. § 766d, by the State of Washington? (See F.F. 214)

A. In the opinion of this court, the 1937 convention does not explicitly or implicitly modify the Stevens' treaties. However, this court believes that treaty right tribes fishing in waters under the jurisdiction of the International Pacific Salmon Fisheries Commission must comply with regulations of the Commission.

 19. Are salmon runs, e. g., Deschutes River and Minter Creek, which are entirely artificially propagated, as distinguished from wild salmon runs which are artificially augmented, excluded from any calculation of the treaty fishermen's off-reservation 50% share as defined in the Court's opinion?

A. No. However, this ruling is subject to further consideration of the artificial propagation issue during pretrial and trial of the environmental issues.

20. Can a person who is not an enrolled member of a particular treaty tribe exercise, or assist in the exercise of, the treaty fishing right of, or on behalf of, a member of such tribe?

A. A treaty right fisherman may secure the assistance of other tribal fishermen with off reservation treaty fishing rights in the same usual and accustomed places, whether or not such fishermen are members of the same tribe or another treaty tribe. A treaty right fisherman may also be assisted by his or her spouse (whether or not possessing individual treaty rights), forebears, children, grandchildren and siblings.

## PROPOSED AMENDMENTS AND RULINGS THEREON

21. The Court's Opinion, Judgment and Decree be amended to require that the identification cards issued by the tribes, as required in the Court's Opinion, contain thereon the holder's tribal enrollment number.

A. There being no objection by plaintiffs, the amendment is adopted.

22. The Court's Opinion, Judgment and Decree be amended to require unattended gear to be marked by an identification tag issued by the tribe, as is required by the Yakima Tribe. (See F.F. 159)

A. The principle that unattended gear be marked by an identification tag is adopted; however, the specific type of tag to be used will be later determined by the court unless the parties can agree thereon.

23. Finding of Fact No. 101 be amended to include: Hatchery returns of fall chinook salmon to the Department of Fisheries Puyallup Hatchery were 22 fish as of the week of September 15, 1973. At a corresponding time in 1972, there was a return of 115 fall chinook salmon. The projected return of Puyallup River fall chinook salmon to the Puyallup Hatchery for the 1973 run was 132 fish, which compares with the previous all time low of 241 fish during a twenty year period commencing in 1953. (Tr. 4213, l. 21 to 4214, l. 23)

A. Denied. The data specified in the first two sentences are correct, but incomplete and out of context and therefore misleading. The first figure in the last sentence is a speculative estimate rather than established fact and therefore contrast to an actual prior year figure is also misleading.

24. Finding of Fact No. 96 and Conclusion of Law No. 41 be amended to delete RCW 75.08.260 from the list of specific statutes and regulations declared to be unlawful [Note: This statute makes violation of fishery statutes and regulations a gross misdemeanor. If it cannot be applied to treaty fishermen in instances where fishery regulations have received prior approval by the Court, Fisheries is without any enforcement of its valid regulations. Fisheries has no authority of its own to make violation of its regulations unlawful. That power rests with the legislature.]

A. Denied, subject to modification as set forth in paragraph 6 of the injunction entered March 22, 1974.

25. Findings of Fact Nos. 153 and 158 be amended to delete references to the fact therein stated that the Yakimas sold commercially fish taken by them in the case area, and to add the following:

At the time of the treaties the Indians of the Yakima Tribe used fisheries located in the Puget Sound area for the purpose of obtaining salmon and steelhead for their subsistence and trade with other Indians. [Tr. 3299, l. 4–7; Ex. F–35, p. 11, l. 15–19, p. 13, l. 3–7; Ex. Y–13, p. 9, l. 8–14].

A. After consideration in context of FD#I and the record, denied.

26. Conclusions of Law be amended to add the following Conclusion:

The Yakima Tribe's treaty right to fish within the case area is subject to the consent of other treaty tribes in whose usual and accustomed fishing places the Yakima Tribe also fished at treaty times. (See F.F. 153)

A. After consideration in context of FD#I and the record, denied.

27. The Court's Opinion, Judgment and Decree be amended to indicate that the Quinault and Yakima Tribes do not meet Condition (a) [tribal off-reservation fishing regulations] of the Qualifications and Conditions established by the Court in its opinion to enable these tribes to be self-regulating, and, therefore, said tribes may not self-regulate their members' off-reservation fishing until such time as all the conditions established by the Court are met. [See F.F. 124 and 159].

A. Denied as to the Quinault Tribe; the required regulation was filed with the Court March 18, 1974. Denied as to the Yakima Nation, effective when that tribe adopts a regulation comparable to that filed by the Quinault Tribe.

28. The Court's Opinion, Judgment and Decree be amended to provide a method for the state to enact emergency regulations necessary for conservation. [See F.F. 199]. Such provision should recognize the provisions of the Washington Administrative Procedures Act for enactment of emergency regulations and provide a prompt method for judicial review, specifying the requisite notice and hearing requirements. Such procedure should enable the state to act within a twenty-four hour period.

A. Denied, except as the subject is now covered by paragraph 19 of the Injunction entered March 22, 1974.

## INJUNCTION

Plaintiffs have moved the court for an injunction against defendants. The court has already determined that plaintiffs are entitled to injunctive relief against the continuation and repetition of acts and omissions which are in violation of the treaty-secured rights of the plaintiff tribes and their members. Defendants and plaintiffs have all submitted motions, memoranda, and have made oral argument to the court concerning general and specific questions and problems which will or may arise as the court's Final Decision # I is implemented. The court is of the firm opinion that the decision must be implemented as rapidly and as orderly as is practicable and consistent with conservation and protection of the anadromous fish resource, the rights of the Indian tribes, and the lawful exercise of state police power. In order to facilitate that implementation, it is necessary and desirable to define with specificity the obligations of the parties under the decision, making allowance for special practical problems and circumstances which a court of equity must heed.

Of utmost and immediate importance for protection of the fishery resource is the fashioning of an interim program for the lawful exercise of state police power over persons within state jurisdiction. The facts before this court indicate no reason for delaying an implementation of the rights of the plaintiff tribes to take fish as guaranteed to them in their treaties with the federal government, and assuring an equitable apportionment of the state's fish harvest between treaty Indian and non-treaty fishermen. By adopting a flexible interim program, these goals all can be met. The court recognizes, of course, that such an incipient program must be flexible enough to accommodate the needs of all parties and the practical realities which exist as a new approach to fisheries management is effectuated.

The parties have raised a number of issues and questions concerning details and timing of the decision's implementation. Many such inquiries can be answered only as situations arise. Others are answered by defining the obligations of the parties in this injunction. The court has already appointed a special master to assist it in resolving future matters which arise under the decision and in implementing it.

Without attempting to anticipate each and every problem or question which may arise, the basic obligations of the parties, together with means for resolving future matters, can be set forth to guide the conduct of all parties, plaintiff

and defendant. Accordingly, the court recognizes that successful performance of many duties imposed upon defendants by this injunction will depend upon plaintiffs' cooperation, good faith efforts, and compliance with requirements set forth in Final Decision # I.

It is not intended that anything in this injunction shall be construed to limit or qualify in any manner Final Decision # I or the right of the parties as set forth in that decision. All terms used in this injunction shall have the meanings set out in Final Decision # I. As used herein, the term "Final Decision # I" means the Final Decision in this cause entered on February 12, 1974, as modified by the Orders entered March 22, 1974, including the Findings of Fact, Conclusions of Law and Decree entered February 12, 1974 which were made a part of said Final Decision # I.

Therefore, it is hereby

Ordered, adjudged and decreed that the State of Washington; Thor C. Tollefson, Director, Washington State Department of Fisheries; Carl Crouse, Director, Washington Department of Game; The Washington State Game Commission; the Washington Reef Net Owners Association, their agents, officers, employees, successors in interest; and all persons acting in concert or participation with any of them ("defendants") are permanently enjoined and restrained to obey, to respect and to comply with all rulings of this court in its Final Decision # I and with each provision of this injunction, subject only to such modifications as may be approved as a part of an interim program.

1. Defendants shall:

 a. fully and fairly recognize each of the plaintiff tribes as a tribe holding all rights described and declared as to it in Final Decision # I and accord to each the tribal rights and powers recognized as to it in that decision;

 b. fully observe and to the best of their ability carry out the provisions and purposes of the treaties cited in paragraph 1 of the Findings of Fact;

 c. conform their regulatory action and enforcement to each and all of the standards set forth in Final Decision # I;

 d. recognize the fishing rights in the case area of any treaty tribe not a party to this case to the full extent declared in Final Decision # I as to the plaintiff tribes and perform all acts and duties set forth in this injunction with respect to such additional treaty tribe upon the agreement of defendants or determination by the court that the tribe is a treaty tribe.

2. Defendants shall not interfere with or regulate or attempt to regulate the treaty right fishing of members of the Yakima Indian Nation or Quinault Tribe or any other treaty tribe during any period for which said tribe has been or is hereafter determined pursuant to Final Decision # I to be entitled to self-regulate such fishing by its members without any state regulation thereof; provided however that monitoring by the state as stated as a condition for self-regulation may be exercised by the state and in case of a threat to the resource, the defendants may apply to the court for the exercise of regulatory authority;

3. Defendants shall not interfere with or regulate or attempt to regulate the treaty right fishing of members of any treaty tribe during any period not covered by paragraph 2 above as to such tribe unless the state first shows to the satisfaction of such tribe or this court that such regulation conforms to the requirements of Final Decision #I and this injunction.

Provided that notwithstanding any other provisions hereof the state may adopt and enforce provisions contained in a duly enacted off-reservation fishing regulation of any tribe when:

 a. the tribe or tribes affected or this court determines that state assist-

ance in the enforcement of such provisions is necessary for conservation; or

b. the tribe has entered into an agreement under which the state may apply the provisions contained in such tribal regulation against the persons exercising the treaty fishing rights of such tribe.

4. Except as otherwise provided in this injunction, defendants shall not enforce any state statute or regulation not conforming to the above against any individual fishing at his tribe's usual and accustomed fishing place who identifies himself by a tribal membership certification carried on his person. Any person exercising a treaty fishing right must have his identification as specified in paragraph 5 of this injunction on his person or risk lawful arrest by defendants, although it may later be determined or asserted as a successful defense in a criminal prosecution that such person was exercising a federally protected Indian treaty right to fish.

5. Identification sufficient to require application of paragraph 4 above shall be:

a. until June 1, 1974, for plaintiff tribes other than the Sauk-Suiattle, Upper Skagit and Stillaguamish Tribes, any identification which has been issued or authorized pursuant to the provisions of 25 C.F.R. § 256.3;

b. for any of the Sauk-Suiattle, Upper Skagit or Stillaguamish Tribes until the membership roll and organizational structure of said tribe is approved by the Secretary of the Interior or his delegate, but not beyond one year from the date of this injunction, any identification card signed by the tribe's tribal chairman certifying the person's membership in the tribe; and

c. in all the cases after the dates specified in a and b above, only identification which includes the name, tribal affiliation, enrollment number (where applicable), and a photograph of the holder and is certified by an authorized representative of the tribe or the Bureau of Indian Affairs.

6. Except as otherwise provided in this injunction, defendants shall not apply or enforce any of the following statutes or regulations to regulate, limit or restrict the exercise of the fishing rights of a treaty tribe as declared in Final Decision # I: RCW 75.08.260, RCW 75.12.060, RCW 75.12.070, RCW 75.12.160, RCW 77.08.020, RCW 77.12.-100, RCW 77.12.130, RCW 77.16.020, RCW 77.16.030, RCW 77.16.040, RCW 77.16.060, WAC 220–20–010, WAC 220–015(2), WAC 220–47–020. Defendants may apply RCW 75.08.260 and RCW 77.-16.240 with respect to those statutes and regulations which meet the requirements of paragraph 3 of this injunction.

7. In order for this court to determine that a state statute or regulation is reasonable and necessary for conservation, defendants must demonstrate that:

a. the specific statute or regulation is required to prevent demonstrable harm to the actual conservation of fish, i. e., it is essential to the perpetuation of a particular run or species of fish;

b. the measure is appropriate to its purpose;

c. existing tribal regulation or enforcement is inadequate to prevent demonstrable harm to the actual conservation of fish;

d. the conservation required cannot be achieved to the full extent necessary, consistent with the principle of equal sharing between treaty and non-treaty fishermen expressed in paragraph 14 of this injunction, by restriction of fishing by non-treaty fishermen or by other less restrictive alternative means or methods.

8. The court finds that the state has the responsibility for conserving the resources and accordingly, the state defendants shall diligently and vigorously,

as far as circumstances permit, enforce their applicable statutes and regulations in order to safeguard the fish resources in the state from depletion or destruction due to unlawful fishing by persons subject to the state's jurisdiction.

9. The state defendants shall begin immediately, and shall continue expeditiously, to revise and to reorganize their regulatory action and enforcement so as to conform the same to all requirements of Final Decision # I and this injunction.

10. The state defendants shall publish any state treaty right fishing regulations which may be adopted after being shown to be in conformity with the requirements of Final Decision # I and this injunction, separate and apart from other state fishing regulations or as a separate and plainly labeled part thereof readily distinguishable from other fishing regulations.

11. The state defendants shall not adopt regulations or enforce any statutes or regulations affecting the volume of anadromous fish available for harvest by a treaty tribe at usual and accustomed places unless such regulations are designed so as to carry out the purposes of the treaty provisions securing to the tribe the right to take fish.

12. Except as otherwise provided by paragraph 19 hereof, the state defendants shall not adopt or enforce any regulations that affect the harvest by the tribe on future runs unless there first has been a full, fair and public consideration and determination in accordance with the requirements of the Washington Administrative Procedures Act and regulations under it.

13. The state defendants shall not regulate or restrain the exercise of treaty fishing rights of plaintiff tribes and their members by use of a state statute or regulation of broad applicability instead of one specific as to time, place, species and gear.

14. The state defendants shall not adopt or enforce any regulation which effectively limits the harvest by treaty tribes on future runs unless the state's regulatory scheme provides an opportunity for treaty tribes and their members to take, at their off-reservation usual and accustomed fishing places, by reasonable means feasible to them, an equal share of the harvestable number of each species of fish that may be taken by all fishermen; *provided* that for the present time defendants shall not be required to achieve mathematical precision in so allocating the fish;

*Provided further* that in order to approach more nearly the principle of equal sharing, the fish which Indian treaty fishermen shall have an opportunity to catch shall include not only an equal share of the total number of fish of any species which are within the regulatory jurisdiction of the State of Washington but shall also include an additional amount or quantity of fish which shall be determined by agreement of the parties or by approval of this court, to reflect the substantially disproportionate numbers of fish, many of which might otherwise be available for harvest by Indian treaty right fishermen, caught by non-treaty fishermen in marine areas closely adjacent to, but beyond the territorial waters of the state, or outside the jurisdiction of the state although within Washington waters;

*And provided further* that additional adjustments to permit the opportunity for treaty or non-treaty fishermen to harvest more or less than an equal share of any species of fish in the same or a subsequent year may be made by agreement of the parties, or by application by any party to the court for its direction or approval to compensate or allow for:

a. unexpected conditions or circumstances;

b. run size predictions, which, in spite of defendants' best efforts to achieve accuracy, were incorrect;

c. emergency regulations adopted in accordance with the provisions of this injunction;

d. historical fisheries of particular importance to Indians;

e. alteration or destruction of usual and accustomed fishing places, or environmental conditions, which limit the present day opportunity of treaty fishermen to take fish at such places;

f. measures shown by the state to be reasonable and necessary to assure as nearly as possible that there is as full a harvest as possible consistent with Final Decision # I.

15. Where the fish allocated to Indian treaty fishermen must be divided among two or more tribes having usual and accustomed fishing places through which the fish will pass, responsibility for such division shall rest with the tribes involved.

16. The state defendants shall immediately and expeditiously, consistent with availability of funds, begin to gather data and otherwise increase their technical capability to make run size predictions, establish escapement goals, and otherwise to increase their ability to manage the fisheries under their jurisdiction and control in a manner fully consistent with Final Decision #I.

17. The state defendants shall, as soon as practicable in advance of every fishing season, determine on the basis of the most current and reliable information available to them from their own technical staffs, other sources such as the treaty tribes and the United States Fish and Wildlife Service, as accurately as possible the number of harvestable fish that may be taken during a particular fishing period which amount or quantity shall exclude such fish as are required for adequate production escapement and the estimated number of fish which will be needed by the tribes for traditional tribal ceremonies and personal subsistence consumption by tribal members and their immediate families. In carrying out this duty defendants may request treaty tribes to submit to the Departments of Fisheries or Game reasonably accurate estimates of (1) the type, location and amount of fishing gear expected to be used and the antici-pated time for its use; (2) the number or quantity of fish they intend and expect to take at their usual and accustomed fishing grounds for traditional ceremonial needs and for consumption by tribal members and their families; (3) the number or quantity of fish they intend and expect to take on their reservations; and (4) reports of catches of fish by tribal members as to both on and off-reservation treaty fishery for the purpose of establishing escapement goals and other purposes which are reasonable and necessary conservation purposes.

18. The state defendants shall make available to a treaty tribe upon its request at the earliest practical time, such raw or processed data as they have available from time to time relative to the expected size, timing and condition of fish runs in the case area and the current level of harvest and escapement.

19. In order to accommodate unforeseen circumstances as readily as possible, consistent with conservation necessity, defendants may utilize procedures for making emergency regulations affecting taking of fish under their jurisdiction and control; *provided* that they shall adhere in every respect to the requirements of the Washington State Administrative Procedures Act and the regulations under it, and that the approval of such emergency regulations by this court where otherwise required by Final Decision #I and this injunction or the consent of all affected tribes has been obtained; *provided,* however, that emergency regulations are enforceable by the state upon filing with the court and service upon the tribes affected (or their counsel of record, if any) a copy of such regulations and a statement of facts and circumstances of the emergency on which the regulation is based. Any such tribe may respond and seek immediate court review. Requests for emergency consideration by this court will be given priority and determined speedily.

20. Plaintiffs and defendants shall submit, either jointly or separately, on or before July 15, 1974, for the court's

approval, a program to implement the interim plan for state regulation to be effective until defendants have an opportunity to implement fully all aspects of Final Decision #I, but no longer than one year from the date of submission or any extensions granted by leave of this court for good cause, and such regulations shall be, to the extent possible and practicable, consistent with the spirit of Final Decision #I, provided that all parties will be expected to adopt a flexible, reasonable approach in recognition of the special problems of defendants in implementing a new regulatory scheme and the fact that many of the tribes are only beginning to develop and exercise their full regulatory capabilities. Accordingly, the court will not expect or insist upon absolute compliance with the letter of Final Decision #I in reviewing and approving the interim plan.

21. Defendants shall in no manner limit, restrict or inhibit the time, place, manner, volume or purpose of the disposition by a member of a plaintiff tribe of fish harvested according to his rights and the rights and powers of his tribe, as declared and adjudged in Final Decision #I, or interfere with any person purchasing, attempting to purchase, transporting, receiving for shipment, processing or reselling, fish taken pursuant to the exercise of such rights.

22. Game defendants may submit to this court a plan for determining the identity and origin of fish classified by state law as game fish which are purchased by fish buyers within the State of Washington and for monitoring and obtaining statistics and records from such fish buyers in order that trafficking in game fish not lawfully taken by treaty Indian fishermen consistent with Final Decision #I in this case, and in violation of state law, can be detected promptly and appropriate action taken.

23. With respect to any item of fishing gear which has been seized or damaged or (as provided below) has been claimed to have been seized or damaged, by any of the defendants pursuant to

statutes, regulations, orders, practices, procedures, or actions declared and adjudged unlawful in Final Decision #I and which had not been judicially ordered forfeited or confiscated prior to February 12, 1974, the defendant having control, or who has been claimed to have control, of such gear shall:

a. provide all plaintiff tribes a complete list of gear so seized;

b. return such gear to the owner or his delegate on or before July 1, 1974; or if the ownership is unknown or in dispute as of July 1, 1974, return such gear to the tribe whose reservation is nearest the place of seizure or as otherwise directed by order of the court; and

c. on or before July 1, 1974, provide this court and all plaintiffs a full accounting as to each such item of gear and the disposition thereof.

24. Any member of any plaintiff tribe shall be entitled to invoke the continuing jurisdiction of this court as provided in paragraph 25 to make a claim to the return of gear allegedly seized or damaged by any one of the defendants, or of its fair market value, or diminution of value of gear returned under paragraph 23 which is not substantially in the same condition as immediately prior to seizure, if:

a. the claim arises from an act of the defendants after September 18, 1967;

b. he notifies the state Attorney General in writing of his claim on or before May 31, 1974 or within 30 days after the return of gear under paragraph 23 for claims for diminution of value; and

c. his notice describes in such detail as is possible under the circumstances, the time, place and manner of seizure or damage, the identity of the offending persons and the size, character and value of the gear.

As to any such notice, the state Attorney General shall provide a response to

the claimant and shall report its contents with his accounting of July 1, 1974. If the response disputes the claim of seizure or damage by the defendants, the state shall accord the member an opportunity to be heard on his claim and to inspect any fishing gear or other property of the type claimed that is in its possession, for purposes of attempting to identify it as claimant's property. Any dispute over the fact of such seizure or damage or over the value of such property which is unresolved sixty days after the notification submitted pursuant to a above, may be referred to either party to the court as provided in paragraph 25.

25. The parties or any of them may invoke the continuing jurisdiction of this court in order to determine:

a. whether or not the actions, intended or effected by any party (including the party seeking a determination) are in conformity with Final Decision #I or this injunction;

b. whether a proposed state regulation is reasonable and necessary for conservation;

c. whether a tribe is entitled to exercise powers of self-regulation;

d. disputes concerning the subject matter of this case which the parties have been unable to resolve among themselves;

e. claims to returns of seized or damaged fishing gear or its value, as provided for in this injunction;

f. the location of any of a tribe's usual and accustomed fishing grounds not specifically determined by Final Decision #I; and

g. such other matters as the court may deem appropriate.

In order to invoke such jurisdiction, the party shall file with the clerk of this court and serve upon all other parties (through their counsel of record, if any) a "Request for Determination" setting forth the factual nature of the request and any legal authorities and argument which may assist the court, along with a statement that unsuccessful efforts have been made by the parties to resolve the matter, whether a hearing is required, and any factors which bear on the urgency of the request. Any party shall have an opportunity to respond to, join in, or supplement the request within seven days of its service or such other time as may be directed by the court. The court may then decide the matter, hold a hearing, or refer the request to the special master to hear evidence and legal argument, as soon as is practicable. If the matter is referred to the special master, he shall have authority to summon witnesses, issue subpoenas, hold hearings, and take such evidence as may be introduced and such as he may deem necessary to call for. The master shall, with all convenient speed, submit to the court, with copies to all parties (through their counsel of record, if any), a report of his factual findings, conclusions of law based upon them where necessary, along with his recommended disposition and reasons in support of it. The parties may submit to the court exceptions to the master's report. The master's report shall be subject in whole or in part to consideration, revision or approval by the court and in every case the court shall make the final determination. This injunction shall not alter or deprive the parties of any right to bring motions and other matters before this court as provided in the Federal Rules of Civil Procedure.

26. Defendants shall submit to the court and all parties on July 1, 1974 and each three months thereafter until further order of this court a progress report concerning those matters which they are ordered to perform by this injunction, stating in reasonable detail the actions taken to carry out the provisions of paragraphs 9 and 16 of this injunction and any other pertinent matters affecting fulfillment of the terms of this injunction and/or Final Decision #I.

## INTERIM PLAN AND STAY ORDER PENDING FINAL DECISION ON APPEAL

The court having considered the need for an interim plan and having considered the interim proposal, now hereby orders that the following interim plan shall be in effect and shall be binding upon all parties to this litigation except as to tribes determined to be self-regulating. In making this order the court does so reserving jurisdiction to make further modifications if the court deems them necessary and further orders a stay of portions of the injunction, final decision No. 1 and the decree of February 12, 1974.

The court now, therefore, orders, adjudges and decrees:

(1) Effective June 1, 1974, all off-reservation fishing areas in the case area are closed to Indian treaty fishing except to the extent that tribes adopt and file with the court and the defendants tribal regulations for the fishing activities of their members and specifying the areas to be opened to fishing by tribal members. Indians who engage in fishing activities not in accordance with those tribal regulations shall be subject to the same provisions of the state law as non-Indians engaging in fishing activities.

(2) The biologists of the defendants and biologists for the tribes shall meet to formulate general principles to be utilized as guidelines to be flexibly applied in the adoption of specific fishing regulations.

(3) The tribes, prior to filing with the court tribal fishing regulations, shall give the defendants an opportunity to meet with and confer with tribal representatives on the subject of such fishing regulations.

(4) The defendants are authorized to adopt and enforce with the tribes' approval tribal regulations as state regulations as to members of the tribe in question without the necessity of proving the need for conservation under the provisions of the decision.

(5) The defendants will make significant reductions in the non-Indian fishery, as are necessary to achieve the ultimate objectives of the Court's decision without requiring mathematical precision, but in making such reductions will do so consistent with the concept of permitting the full harvest of fish.

(6) The defendants will monitor the fish catch and the results and statistics from such monitoring shall be used in considering the regulatory pattern for the following year.

(7) The parties shall exchange all available data concerning size, timing and condition of fish runs in the case area and the current level of harvest and escapement in response to reasonable requests for the same to assist the parties in carrying out their responsibilities.

The court further orders, adjudges and decrees that any portion of Final Decision No. 1, the Decree of February 12, 1974, and the Injunction of March 22, 1974, which is in conflict with the Interim plan is hereby stayed subject to subsequent orders of this court.[1]

1. In the original order, in sixteen paragraphs the court listed specific portions of Final Decision #I, the Decree of February 12, 1974 and the Injunction of March 22, 1974 to be stayed. In summary, these primarily dealt with two major subjects:
(1) requirements that state statute and regulations concerning the exercise of fishing rights must be established to be reasonable and necessary for conservation and must be promulgated consistent with administrative and procedural due process before they may be lawfully applied to treaty right fishermen; and
(2) the obligation of the state and its agencies to develop and enforce statutes and regulations relating to both treaty right and non-treaty right fishermen in a manner that will assure that the opportunity to harvest the anadromous fish resource at tribal off reservation usual and accustomed fishing places is "shared equally," as that concept is defined in Final Decision #I, by the respective user groups.

APPENDIX

TABLE OF CASES

Alaska Pacific Fisheries v. United States, 248 U.S. 78, 39 S.Ct. 40, 63 L.Ed. 138 (1918)

*Arizona* v. California, 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1962)

Carpenter v. Shaw, 280 U.S. 363, 50 S. Ct. 121, 74 L.Ed. 478 (1930)

*Cherokee Nation* v. Georgia, 30 U.S. (5 Pet.) 1, 8 L.Ed. 25 (1831)

Choctaw Nation v. Oklahoma, 397 U.S. 620, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970)

*Choctaw* Nation of Indians v. United States, 318 U.S. 423, 63 S.Ct. 672, 87 L.Ed. 877 (1943)

Confederated Bands of Ute Indians v. United States, 330 U.S. 169, 67 S.Ct. 650, 91 L.Ed. 823 (1947)

Daniel, Attorney General et al. v. Family Security Life Insurance Co., et al, 336 U.S. 220, 69 S.Ct. 550, 93 L.Ed. 632 (1949)

Dept. of Game v. Puyallup Tribe *(Game-I)*, 70 Wash.2d 245, 422 P.2d 754 (1967)

Dept of Game v. Puyallup Tribe (Game-II), 80 Wash.2d 561, 497 P.2d 171 (1972)

Dick v. United States, 208 U.S. 340, 28 S.Ct. 399, 52 L.Ed. 520 (1908)

Duwamish, et al., Indians v. United States, 79 Ct.Cl. 530 (1934) cert. denied, 295 U.S. 755, 55 S.Ct. 913, 79 L.Ed. 1698 (1935)

Ex Parte Crow Dog, 109 U.S. 556, 3 S. Ct. 396, 27 L.Ed. 1030 (1883)

Ferguson, Attorney General of Kansas, et al v. Skrupa d/b/a Credit Advisors, 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed. 2d 93 (1963)

*Geer* v. Connecticut, 161 U.S. 519, 16 S. Ct. 600, 40 L.Ed. 793 (1896)

Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968)

Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)

Holcomb v. Confederated Tribes of Umatilla Reservation, 382 F.2d 1013 (9th Cir. 1967)

Johnson v. Gearlds, 234 U.S. 422, 34 S. Ct. 794, 58 L.Ed. 1383 (1914)

*Jones* v. Meehan, 175 U.S. 1, 20 S.Ct. 1, 44 L.Ed. 49 (1899)

*Kennedy* v. Becker, 241 U.S. 556, 36 S. Ct. 705, 60 L.Ed. 1166 (1916)

Kennerly v. District Court of Montana, 400 U.S. 423, 91 S.Ct. 480, 27 L.Ed.2d 507 (1971)

*Lacoste* v. Dept. of Conservation, 263 U. S. 545, 44 S.Ct. 186, 68 L.Ed. 437 (1924)

*Lone Wolf* v. Hitchcock, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903)

*Maison* v. Confederated Tribes of Umatilla Indian Reservation, 314 F.2d 169 (9th Cir. 1963)

*Makah* v. Schoettler, 192 F.2d 224 (9th Cir. 1951)

Mason v. Sams, 5 F.2d 255 (D.Wash. 1925)

Mattz v. Arnett, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973)

McClanahan v. State Tax Comm'n of Arizona, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973)

*Menominee* Tribe v. United States, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968)

*Mescalero* Apache Tribe v. Jones, 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973)

*Missouri* v. Holland, 252 U.S. 416, 40 S. Ct. 382, 64 L.Ed. 641 (1920)

Muckleshoot Tribe of Indians v. United States, U.S. Ct.Cl. No. App. 3–64 (Feb. 23, 1966)

*Murdock* v. Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943)

Olsen, Secretary of Labor of Nebraska v. Nebraska ex rel., 313 U.S. 236, 61 S.Ct. 862, 85 L.Ed. 1305 (1941)

*Patsone* v. Pennsylvania, 232 U.S. 138, 34 S.Ct. 281, 58 L.Ed. 539 (1914)

People v. Jondreau, 384 Mich. 539, 185 N.W.2d 375 (1971)

Perrin v. United States, 232 U.S. 478, 34 S.Ct. 387, 58 L.Ed. 691 (1914)

*Puyallup-I*—Puyallup Tribe of Indians v. Dept of Game, 391 U.S. 392, 88 S. Ct. 1725, 20 L.Ed.2d 689 (1968)

*Puyallup-II*—Dept. of Game v. Puyallup Tribe, Inc., 414 U.S. 44, 94 S.Ct. 330, 38 L.Ed.2d 254 (1973)

Rice v. Olson, 324 U.S. 786, 65 S.Ct. 989, 89 L.Ed. 1367 (1945)

*Seufert* Bros. Co. v. United States, 249 U.S. 194, 39 S.Ct. 203, 63 L.Ed. 555 (1918)

Seymour v. Superintendent, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962)

Skiriotes v. Florida, 313 U.S. 69, 61 S. Ct. 924, 85 L.Ed. 1193 (1941)

Skokomish Indian Tribe v. France, 320 F.2d. 205 (9th Cir. 1963)

*Sohappy* v. Smith, 302 F.Supp. 899 (D. Or.1969)

Standing Rock Sioux Tribe v. United States, 182 Ct.Cl. 813 (1968)

Starr v. Long Jim, 227 U.S. 613, 33 S. Ct. 358, 57 L.Ed. 670 (1913)

State v. *Arthur*, 74 Idaho 251, 261 P.2d 135 (1953)

State v. Gowdy, 1 Or.App. 424, 462 P.2d 461 (1970)

State v. Gurnoe, 53 Wis.2d 390, 192 N. W.2d 892 (1972)

State of Wash. v. Joe *McCoy*, 63 Wash. 2d 421, 387 P.2d 942 (1963)

State v. Moses (*Moses-I*) 70 Wash.2d 282, 422 P.2d 775 (1967)

State v. Moses (*Moses-II*) 79 Wash.2d 104, 483 P.2d 832 (1971) cert. denied, 406 U.S. 910, 92 S.Ct. 1612, 31 L.Ed. 2d 822 (1972)

State v. Satiacum, 50 Wash.2d 513, 314 P.2d 400 (1957)

State v. Tinno, 94 Idaho 759, 497 P.2d 1386 (1972)

The Kansas Indians, 72 U.S. (5 Wall.) 737, 18 L.Ed. 667 (1867)

The New York Indians, 72 U.S. (5 Wall.) 761, 18 L.Ed. 708 (1867)

*Tulee* v. Washington, 315 U.S. 681, 62 S.Ct. 862, 86 L.Ed. 1115 (1942)

Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616, reh. denied, 380 U.S. 989, 85 S.Ct. 1325, 14 L.Ed.2d 283 (1965)

United States v. Agnew, 423 F.2d 513 (9th Cir. 1970)

United States v. Ahtanum Irrigation District, 236 F.2d 321 (9th Cir. 1956) cert. denied, 352 U.S. 988, 77 S.Ct. 386, 1 L.Ed.2d 367 (1956); 330 F.2d 897 (9th Cir. 1956); 338 F.2d 307 (9th Cir. 1964), cert. denied, 381 U.S. 924, 85 S.Ct. 1558, 14 L.Ed.2d 683 (1964)

United States v. Cutler, 37 F.Supp. 724 (D.Idaho 1941)

United States v. Fidelity & Guaranty Co., 309 U.S. 506, 60 S.Ct. 653, 84 L. Ed. 894 (1940)

United States v. Holliday, 70 U.S. (3 Wall.) 407, 18 L.Ed. 182 (1866)

United States v. Hosteen, 191 F.2d 518 (10th Cir. 1951)

*Ward* v. Race Horse, 163 U.S. 504, 16 S. Ct. 1076, 41 L.Ed. 244, (1895)

United States v. Kagama, 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228 (1886)

United States v. Local 83, et al., U.S.D. C. W.D. Wash. No. 8618 (June, 1970)

United States v. 43 Gallons of Whiskey, 93 U.S. (3 Otto.) 188, 23 L.Ed. 846 (1876)

United States v. Nice, 241 U.S. 591, 36 S.Ct. 696, 60 L.Ed. 1192 (1916)

United States v. Shoshone Tribe, 304 U. S. 111, 58 S.Ct. 794, 82 L.Ed. 1213 (1938)

United States v. Walker River Irr. Dist., 104 F.2d 334 (9th Cir. 1939).

United States v. *Winans*, 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905)

Village of Kake v. Egan, 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962)

Whitefoot v. United States, 293 F.2d 658, 155 Ct.Cl. 127 (Ct.Cl. 1961)

Williams v. Lee, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959)

Williamson, Attorney General of Oklahoma et al. v. Lee Optical of Oklahoma, Inc. et al., 348 U.S. 483, 75 S.Ct 461, 99 L.Ed 563 (1955)

Winters v. United States, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908)

*Worcester* v. Georgia, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832)

Yick Wo v. Hopkins, 118 U.S. 356, 6 S. Ct. 1064, 30 L.Ed. 220 (1886)

## OTHER AUTHORITIES

Comment, "State Power and the Indian Treaty Right to Fish" 59 U. Calif. L. Rev. 485 (1971)

C. Hobbs, "Indian Hunting and Fishing Rights II", 37 Geo. Wash.L.Rev. 1251 (1969)

R. Johnson, "The States Versus Indian Off-Reservation Fishing: A United States Supreme Court Error" 47 U. Wash.L.Rev. 207 (1972)

Webster's Third New International Dictionary of the English Language, 1961 Edition.